UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

———————————————————————————

THOMAS KURTZ,

                                        Plaintiff,


v.                                                              3:25-cv-1174
                                                                (AMN/TWD)


F.O.I.L. OFFICER JOHN DOE, et al.,

                                        Defendants.

———————————————————————————

APPEARANCES:

THOMAS KURTZ
*Plaintiff, pro se*
23-B-2545
Mid-State Correctional Facility
P.O. Box 2500
Marcy, NY 13403

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## REPORT-RECOMMENDATION AND ORDER

### I.     INTRODUCTION

The Clerk has sent to the Court for review a complaint submitted by *pro se* plaintiff

Thomas Kurtz ("Plaintiff") asserting claims pursuant to 42 U.S.C. § 1983.  *See* Dkt. No. 1.

Plaintiff, who is currently confined at Mid-State Correctional Facility, has not paid the filing fee

for this action and seeks leave to proceed *in forma pauperis* ("IFP").  *See* Dkt. Nos. 2, 3, 5, 7, 8.

### II.    IFP APPLICATION

"28 U.S.C. § 1915 permits an indigent litigant to commence an action in a federal court

without prepayment of the filing fee that would ordinarily be charged."  *Cash v. Bernstein*, No.

1:09-CV-1922, 2010 WL 5185047, at *1 (S.D.N.Y. Oct. 26, 2010).  "Although an indigent,

incarcerated individual need not prepay the filing fee at the time of filing, he must subsequently

pay the fee, to the extent he is able to do so, through periodic withdrawals from his inmate

accounts." *Id*. (citing 28 U.S.C. § 1915(b); *Harris v. City of New York*, 607 F.3d 18, 21 (2d Cir.

2010)); *see also* 28 U.S.C. § 1915A(c) ("As used in this section, the term 'prisoner' means any

person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or

adjudicated delinquent for, violations of criminal law or the terms and conditions of parole,

probation, pretrial release, or diversionary program.").

Upon review, Plaintiff's IFP application demonstrates economic need. *See* Dkt. No. 8.

Because Plaintiff has met the statutory requirements of 28 U.S.C. § 1915(a) and has filed the

inmate authorization form required in this District he is granted permission to proceed IFP.[1]

## III.    COMPLAINT

Plaintiff commenced this action utilizing a form civil rights complaint, identifying 42

U.S.C. § 1983 as the basis for his claims. Dkt. No. 1 at 1.[2]   The complaint lists one defendant,

"F.O.I.L. officer - Jon-Doe." *Id*. at 2. His statement of facts reads, in full:

> Not allowing Plaintiff to Freedom of information Act to a sexual
> misconduct police report from Sept 28 of 2008 under Freedom of
> information Act 5 U.S.C. § 552. F.O.I.L. officers state No reports
> exhist in county record. State police say the same that No record
> exhist. This was stated to me on January 22 2025.

*Id*. at 4. Plaintiff identified three claims: (1) "Denial of Freedom of information Act 5 U.S.C. §

552;" (2) "Crule and unusual punishment 9th;" and (3) "Denial to Plaintiff to putition the

---

[1] Although his IFP application has been granted, Plaintiff will still be required to pay fees that he
may incur in this action, including copying and/or witness fees.

[2] Citations to Plaintiff's submissions will refer to the pagination generated by CM/ECF, the
Court's electronic filing system. Unless otherwise indicated, excerpts from the record are
reproduced exactly as they appear in the original and errors in spelling, punctuation, and
grammar have not been corrected.

Government of Greavence." *Id*. at 5.  Concerning relief, Plaintiff requests "Police reports of sexual misconduct on September of 2008" and $20,000.00.  *Id*.

## IV.    LEGAL STANDARD

Section 1915 of Title 28 requires a district court to dismiss an *in forma pauperis* complaint if the action is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief.  *See* 28 U.S.C. § 1915A(b)(1)-(2); § 1915(e)(2)(B)(i)-(iii); *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998).  The Court must also dismiss a complaint, or portion thereof, when the Court lacks subject matter jurisdiction.  *See* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

While the law mandates dismissal on any of these grounds, the Court is obliged to construe *pro se* pleadings liberally, *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), and interpret them to raise the "strongest arguments that they *suggest*."  *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474-75 (2d Cir. 2006) (internal quotation marks and citation omitted, emphasis in original).  A claim is frivolous when it "lacks an arguable basis either in law or in fact."  *Neitzke v. Williams*, 490 U.S. 319, 325 (1989), *abrogated on other grounds Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *see also Denton v. Hernandez*, 504 U.S. 25, 33 (1992) ("[A] finding of factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible"); *Livingston*, 141 F.3d at 437 ("[A]n action is 'frivolous' when either: (1) the factual contentions are clearly baseless . . . or (2) the claim is based on an indisputably meritless legal theory.").

Additionally, when reviewing a complaint, a court may look to the Federal Rules of Civil Procedure.  To survive dismissal for failure to state a claim, a complaint must contain a short and

plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). This short and plain statement of the claim must be "plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citations omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.

Moreover, a court should not dismiss a *pro se* complaint "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999) (citation and internal quotation marks omitted). However, an opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

## V. ANALYSIS

As an initial matter, in addition to Mr. Kurtz, "Hill Top Lake LLC" is listed as a plaintiff in the caption of the complaint and in some of the materials submitted in connection with Plaintiff's application to proceed IFP. *See* Dkt. No. 1 at 1; Dkt. No. 2 at 1; Dkt. No. 8 at 1. However, the statute governing appearances in federal court, 28 U.S.C. § 1654, "allow[s] two

types of representation: 'that by an attorney admitted to the practice of law by a governmental regulatory body, and that by a person representing himself.'" *Lattanzio v. COMTA*, 481 F.3d 137, 139 (2d Cir. 2007) (quoting *Eagle Assocs. v. Bank of Montreal*, 926 F.2d 1305, 1308 (2d Cir. 1991)). A nonlawyer cannot bring suit on behalf of another person and "may not represent a separate legal entity such as a corporation." *Id.*; *see United States ex rel. Mergent Servs. v. Flaherty*, 540 F.3d 89, 92 (2d Cir. 2008); *Iannaccone v. Law*, 142 F.3d 553, 558 (2d Cir. 1998). A "corporation may appear in the federal courts only through licensed counsel." *Amerio v. Gray*, No. 5:15-CV-538, 2020 WL 4192618, at *17 (N.D.N.Y. July 21, 2020) (quoting *Rowland v. Cal. Men's Colony*, 506 U.S. 194, 201-02 (1993)). Therefore, insofar as Plaintiff purports to assert claims on behalf of Hill Top Lake LLC, the undersigned recommends dismissal of any such claims. *See*, *e.g.*, *Milea v. Hoveman*, No. 5:24-CV-0407 (DNH/TWD), 2024 WL 2272879, at *3 (N.D.N.Y. May 20, 2024).

Next, Rule 8 of the Federal Rules of Civil Procedure requires a pleading contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a)(2). "The purpose of [Rule 8] is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." *Flores v. Graphtex*, 189 F.R.D. 54, 55 (N.D.N.Y. 1999) (internal quotations and citations omitted). Allegations "so vague as to fail to give the defendants adequate notice of the claims against them . . ." are subject to dismissal. *Sheehy v. Brown*, 335 F. App'x 102, 104 (2d Cir. 2009) (summary order). Rule 10 of the Federal Rules of Civil Procedure provides "[a] party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances . . . . If doing so would promote clarity, each claim founded on a separate transaction or occurrence--and

each defense other than a denial--must be stated in a separate count or defense." Fed. R. Civ. P.

10. Rule 10 serves "to provide an easy mode of identification for referring to a particular

paragraph in a prior pleading . . . ." *Flores*, 189 F.R.D. at 55 (internal quotations and citation

omitted). A complaint that fails to comply with these pleading requirements "presents far too a

heavy burden in terms of defendants' duty to shape a comprehensive defense and provides no

meaningful basis for the Court to assess the sufficiency of their claims," and may properly be

dismissed by the Court. *Gonzales v. Wing*, 167 F.R.D. 352, 355 (N.D.N.Y. 1996); *see also*, *e.g.*,

*Gosier v. Collins*, No. 6:23-CV-1485 (DNH/TWD), 2024 WL 1016392, at *2 (N.D.N.Y. Mar. 8,

2024), *report and recommendation adopted*, 2024 WL 1307035 (N.D.N.Y. Mar. 27, 2024).

Here, the complaint lacks a short and plain statement showing Plaintiff is entitled to relief

as well as numbered paragraphs, limited as far as practicable to a single set of circumstances.

From what the Court can glean, Plaintiff sought to obtain reports concerning an incident which

occurred in September of 2008 from "F.O.I.L." and "state police" officers. *See* Dkt. No. 1 at 4.

However, Plaintiff's claims he was denied his constitutional rights and subjected to cruel and

unusual punishment are, at best, conclusory, and wholly unsupported by well-pleaded factual

allegations. Therefore, dismissal for failure to state a claim is warranted.

Finally, to the extent Plaintiff seeks to challenge the *denial* of a FOIL request, this Court

lacks subject matter jurisdiction over any such claim. *See*, *e.g.*, *Jackson v. Wilcox*, No. 1:23-CV-

0130 (MAD/CFH), 2023 WL 2756489, at *5 (N.D.N.Y. Apr. 3, 2023) ("As courts have

repeatedly held that federal courts lack jurisdiction to review FOIL claims, this Court lacks

jurisdiction to review [defendant's] alleged denial of plaintiff's FOIL request. Thus, it is

recommended that the complaint be dismissed without prejudice for lack of subject matter

jurisdiction."), *report and recommendation adopted*, 2023 WL 4230351 (N.D.N.Y. June 28,

2023) (explaining, "the Court lacks subject matter jurisdiction over the complaint as federal courts do not have jurisdiction over claims related to FOIL request denials.") (citations omitted); *Syfert v. City of Rome*, No. 6:19-CV-0775 (GTS/ML), 2020 WL 7053542, at *3 n.2 (N.D.N.Y. Dec. 2, 2020) (explaining "New York law provides a remedy for the improper denial of a FOIL request. A person denied access to requested documents may appeal the denial to the head, chief executive or governing body of the entity or agency in possession of the documents . . . . The person must then challenge the denial of the FOIL request on appeal by commencing a proceeding under Article 78 of the New York Civil Practice Law and Rules.") (internal quotations and citations omitted); *Thomas v. Pingotti*, No. 9:17-CV-0300 (GTS/DEP), 2017 WL 3913018, at *11 (N.D.N.Y. Sept. 6, 2017) ("While the exact contours of plaintiff's claim are far from clear, to the extent that he claims that the denial of his FOIL request violated his constitutional rights, that claim is not cognizable in this Section 1983 action.") (citing *Ladeairous v. Attorney Gen. of N.Y.*, 592 F. App'x. 47, 48 (2d Cir.), *cert. denied sub nom.*, *Ladeairous v. Schneiderman*, 136 S. Ct. 220 (2015), *reh'g denied*, 136 S. Ct. 579 (2015)). Accordingly, insofar as Plaintiff seeks relief due to the denial of a FOIL request, the undersigned recommends dismissal of his claims for lack of subject matter jurisdiction.

In sum, the Court recommends dismissal of Plaintiff's complaint in its entirety, without prejudice. The Court advises Plaintiff that should he be permitted to amend his complaint, any amended pleading he submits to this Court must comply with Rules 8 and 10 of the Federal Rules of Civil Procedure. Any such amended complaint should specifically identify the legal theory or theories that form the basis for his claim. Plaintiff must provide a short and plain statement of the relevant facts supporting his claim against any Defendant named in the amended complaint, including the date and time of the alleged occurrence(s), to his best approximation.

Plaintiff is cautioned that no portion of his prior complaint shall be incorporated into his amended complaint by reference.  Any amended complaint submitted by Plaintiff must set forth all of the claims he intends to assert against the Defendant and must demonstrate that a case or controversy exists between the Plaintiff and the Defendant which Plaintiff has a legal right to pursue and over which this Court has jurisdiction.  Of course, Plaintiff may also pursue his claims in state court if appropriate.

VI.    **CONCLUSION**

**WHEREFORE**, it is hereby

**ORDERED** that Plaintiff's motion to proceed *in forma pauperis* (Dkt. No. 8) is **GRANTED**, and it is

**ORDERED** that the Clerk shall provide the Superintendent of the facility, designated by Plaintiff as his current location, with a copy of Plaintiff's inmate authorization (Dkt. No. 3) and notify the official that this action has been filed and that Plaintiff is required to pay the Northern District of New York the statutory filing fee of $350.00 in installments, over time, pursuant to 28 U.S.C. § 1915;[3] and it is further

**ORDERED** that the Clerk shall provide a copy of Plaintiff's inmate authorization (Dkt. No. 3) to the Financial Deputy of the Clerk's Office; and it is further

**RECOMMENDED** that Plaintiff's complaint (Dkt. No. 1) be **DISMISSED**; and it is further

---

[3] Prisoners are not exempt from paying the filing fee, even when they have been granted permission to proceed IFP.  *See* 28 U.S.C. § 1915(b)(1).

**ORDERED** that the Clerk provide to Plaintiff a copy of this Report-Recommendation and Order, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.[4]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

**IT IS SO ORDERED.**

Dated: November 4, 2025
        Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[4] If you are proceeding *pro se* and are served with this Report-Recommendation and Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation and Order was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

2010 WL 5185047
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

David J. CASH, Plaintiff,
v.
BERNSTEIN, MD, Defendant.

No. 09 Civ.1922(BSJ)(HBP).
|
Oct. 26, 2010.

*REPORT AND RECOMMENDATION* [1]

[1]   At the time the action was originally filed, the Honorable Leonard B. Sand, United States District Judge, granted plaintiff's application for *in forma pauperis* status based on plaintiff's *ex parte* submission (Docket Item 1). Although the present application seeking to revoke plaintiff's *in forma pauperis* status is non-dispositive, I address it by way of a report and recommendation to eliminate any appearance of a conflict between the decision of a district judge and that of a magistrate judge.

PITMAN, United States Magistrate Judge.

**\*1**   TO THE HONORABLE BARBARA S. JONES, United States District Judge,

I. *Introduction*

By notice of motion dated March 4, 2010 (Docket Item 11), defendant moves pursuant to 28 U.S.C. § 1915(g) to revoke plaintiff's *in forma pauperis* ("IFP") status on the ground that plaintiff has previously had at least three Section 1983 actions dismissed as frivolous, malicious or failing to state a claim upon which relief could be granted, and has not shown that he is in imminent danger of serious physical injury. Defendant further seeks an order directing that the action be dismissed unless plaintiff pays the full filing fee within thirty (30) days. For the reasons set forth below, I respectfully recommend that defendant's motion be granted.

II. *Facts*

Plaintiff, a sentenced inmate in the custody of the New York State Department of Correctional Services, commenced this action on or about January 12, 2009 by submitting his complaint to the Court's Pro Se office. Plaintiff alleges, in pertinent part, that he has "a non-healing ulcer that is gane green [*sic* ]" and that defendant Bernstein "did not want to treat the ulcer right" (Complaint, dated March 3, 3009 (Docket Item 2) ("Compl."), at 3).

The action was originally commenced against two defendants—Dr. Bernstein and Dr. Finkelstein. The action was dismissed as to Dr. Finkelstein because the complaint contained no allegations whatsoever concerning Dr. Finkelstein (Order dated February 18, 2010 (Docket Item 9)).

On March 4, 2010, the sole remaining defendant—Dr. Bernstein—filed the current motion. Plaintiff failed to submit a response. Accordingly, on August 20, 2010, I issued an Order advising plaintiff that if he wished to oppose the motion, he must submit

his opposition by September 15, 2010 and that after that date I would consider the motion fully submitted and ripe for decision (Order dated August 20, 2010 (Docket Item 15)). The only submission plaintiff has made in response to my Order is a multi-part form issued by the New York State Department of Correctional Services entitled "Disbursement or Refund Request." [2] By this form, plaintiff appears to request that the New York State Department of Correctional Services pay the filing fee for this action. The form is marked "Denied."

[2]    Plaintiff sent this form directly to my chambers, and it has not been docketed by the Clerk of the Court. The form will be docketed at the time this Report and Recommendation is issued.

### III. *Analysis*

28 U.S.C. § 1915 permits an indigent litigant to commence an action in a federal court without prepayment of the filing fee that would ordinarily be charged. Although an indigent, incarcerated individual need not prepay the filing fee at the time at the time of filing, he must subsequently pay the fee, to the extent he is able to do so, through periodic withdrawals from his inmate accounts. 28 U.S.C. § 1915(b); *Harris v. City of New York,* 607 F.3d 18, 21 (2d Cir.2010). To prevent abuse of the judicial system by inmates, paragraph (g) of this provision denies incarcerated individuals the right to proceed without prepayment of the filing fee if they have repeatedly filed meritless actions, unless such an individual shows that he or she is in imminent danger of serious physical injury. *See Ortiz v. McBride,* 380 F.3d 649, 658 (2d Cir.2004) ("[T]he purpose of the PLRA ... was plainly to curtail what Congress perceived to be inmate abuses of the judicial process."); *Nicholas v. Tucker,* 114 F.3d 17, 19 (2d Cir.1997). Specifically, paragraph (g) provides:

> **\*2**  In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g).

If an inmate plaintiff seeks to avoid prepayment of the filing fee by alleging imminent danger of serious physical injury, there must be a nexus between the serious physical injury asserted and the claims alleged. *Pettus v. Morgenthau,* 554 F.3d 293, 298 (2d Cir.2009).

Section 1915(g) clearly prevents plaintiff from proceeding in this action without prepayment of the filing fee. The memorandum submitted by defendant establishes that plaintiff has had his IFP status revoked on at least four prior occasions as a result of his repeatedly filing meritless actions.

• In 2005, plaintiff commenced an action in the United States District Court for the Northern District of New York seeking to have his infected leg amputated. *Nelson[3] v. Lee,* No. 9:05–CV–1096 (NAM)(DEP), 2007 WL 4333776 (N.D.N.Y. Dec. 5, 2007). In that matter, the Honorable Norman A. Mordue, Chief United States District Judge, accepted and adopted the Report and Recommendation of the Honorable David E. Peebles, United States Magistrate Judge, that plaintiff had brought three or more prior actions that had been dismissed for failure to state a claim and that plaintiff's IFP status should, therefore, be revoked. 2007 WL 4333776 at \*1–\*2.

[3]    It appears that plaintiff uses the names David J. Cash and Dennis Nelson interchangeably. In his complaint in this matter, plaintiff states that the Departmental Identification Number, or DIN, assigned to him by the New York State Department of Correctional Services ("DOCS") is 94–B–0694 (Compl. at 7). DOCS inmate account records submitted by plaintiff

in connection with his application for IFP status indicate that DIN 94–B–0694 is assigned to Dennis Nelson. In addition, the DOCS form described in footnote two bears the docket number of this action, but is signed in the name of Dennis Nelson and was sent in an envelope identifying the sender as Dennis Nelson. A subsequent action has been filed in this Court in which the plaintiff identifies himself as Dennis Nelson but lists his DIN as 94–B–0694, the same DIN used by plaintiff here. Finally, plaintiff has submitted nothing to controvert the assertion in defendant's papers that David Cash and Dennis Nelson are the same person. In light of all these facts, I conclude that David Cash and Dennis Nelson are both names used by plaintiff.

• In *Nelson v. Nesmith,* No. 9:06–CV–1177 (TJM)(DEP), 2008 WL 3836387 (N.D.N.Y. Aug. 13, 2008), plaintiff again filed an action concerning the medical care he was receiving for his left leg. The Honorable Thomas J. McAvoy, United States District Judge, accepted the Report and Recommendation of Magistrate Judge Peebles, and revoked plaintiff's IFP status and dismissed the action on the ground that plaintiff had previously commenced at least three actions that had been dismissed on the merits. 2008 WL 3836387 at *1, *7.

• In *Nelson v. Spitzer,* No. 9:07–CV–1241 (TJM)(RFT), 2008 WL 268215 (N.D.N.Y. Jan. 29, 2008), Judge McAvoy again revoked plaintiff's IFP status on the ground that plaintiff had commenced three or more actions that constituted "strikes" under Section 1915(g) and had not shown an imminent threat of serious physical injury. 2008 WL 268215 at *1–*2.

• Finally, in *Nelson v. Chang,* No. 08–CV–1261 (KAM)(LB), 2009 WL 367576 (E.D.N.Y. Feb. 10, 2009), the Honorable Kiyo A. Matsumoto, United States District Judge, also found, based on the cases discussed above, that plaintiff had exhausted the three strikes permitted by Section 1915(g) and could not proceed IFP in the absence of a demonstration of an imminent threat of serious physical injury. 2009 WL 367576 at *2–*3.

**\*3** As defendant candidly admits, there is one case in which plaintiff's leg infection was found to support a finding of an imminent threat of serious physical injury sufficient to come within the exception to Section 1915(g). *Nelson v. Scoggy,* No. 9:06–CV–1146 (NAM)(DRH), 2008 WL 4401874 at *2 (N.D.N.Y. Sept. 24, 2008). Nevertheless, summary judgment was subsequently granted for defendants in that case, and the complaint was dismissed. Judge Mordue concluded that there was no genuine issue of fact that plaintiff had received adequate medical care for his leg wound and that the failure of the leg to heal was the result of plaintiff's own acts of self-mutilation and interference with the treatment provided. *Nelson v. Scoggy,* No. 9:06–CV–1146 (NAM)(DRH), 2009 WL 5216955 at *3–*4 (N.D.N.Y. Dec. 30, 2009). [4]

[4]    Although the form complaint utilized by plaintiff expressly asks about prior actions involving the same facts, plaintiff disclosed only the *Scoggy* action and expressly denied the existence of any other actions relating to his imprisonment (Compl. at 6).

In light of the foregoing, there can be no reasonable dispute that plaintiff has exceeded the three "strikes" allowed by Section 1915(g) and that he cannot, therefore, proceed here without prepaying the filing fee unless he demonstrates an imminent threat of serious physical injury. Plaintiff has declined to attempt to make this showing in response to defendant's motion, and the only suggestion in the record of serious physical injury is the bare statement in the complaint that plaintiff "need[s] to go back to a wound speci [a]list before the gane green [*sic* ] kills [him]" (Compl. at 5). "However, unsupported, vague, self-serving, conclusory speculation is not sufficient to show that Plaintiff is, in fact, in imminent danger of serious physical harm." *Merriweather v. Reynolds,* 586 F.Supp.2d 548, 552 (D.S.C.2008), *citing Ciarpaglini v. Saini,* 352 F.3d 328, 330 (7th Cir.2003) *and White v. Colorado,* 157 F.3d 1226, 1231–32 (10th Cir.1998); *see also Martin v. Shelton,* 319 F.3d 1048, 1050 (8th Cir.2003) (imminent danger exception to Section 1915(g) requires "specific fact allegations of ongoing serious physical injury, or of a pattern of misconduct evidencing the likelihood of imminent serious physical injury"). Given the plaintiff's history, as set forth in the cases described above, I conclude that this vague statement is insufficient to support a finding that plaintiff is in imminent danger of serious physical injury. [5]

5      Plaintiff has sent me several letters describing his wound and its symptoms in detail, and I have no doubt that the wound is serious. However, in granting summary judgment dismissing an action last year based on the same allegations, Judge Mordue of the Northern District found that there was no genuine issue of fact that plaintiff's own conduct was responsible for the ineffectiveness of the treatment he was provided:

> Furthermore, to the extent that Nelson's medical treatment was delayed, much of the delay was due to his own refusal to cooperate with medical staff and his self-mutilations. Nelson's actions to thwart the medical treatment of his wound cannot be construed as interference or indifference by anyone else.... [T]he medical treatment Nelson received complied with constitutional guarantees as it was appropriate, timely, and delayed only by Nelson's own actions.

*Nelson v. Scoggy, supra,* 2009 WL 5216955 at *4.

Given plaintiff's total failure to respond to the pending motion and his failure to even deny that he is actively thwarting treatment of his wound, it would be sheer speculation for me to conclude that he is in imminent danger of a serious injury as a result of defendant's conduct.

## IV. *Conclusion*

Accordingly, for all the foregoing reasons, I find that plaintiff has had three or more prior actions dismissed as being frivolous, malicious or failing to state a claim and that plaintiff's *in forma pauperis* status should, therfore, be revoked. If your Honor accepts this recommendation, I further recommend that the action be dismissed unless plaintiff pays the filing fee in full within thirty (30) days of your Honor's final resolution of this motion.

## V. *OBJECTIONS*

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report to file written objections. *See also* Fed.R.Civ.P. 6(a). Such objections (and responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the Chambers of the Honorable Barbara S. Jones, United States District Judge, 500 Pearl Street, Room 1920, and to the Chambers of the undersigned, 500 Pearl Street, Room 750, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Jones. FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS ***WILL*** RESULT IN A WAIVER OF OBJECTIONS AND ***WILL*** PRECLUDE APPELLATE REVIEW. *Thomas v. Arn,* 474 U.S. 140, 155 (1985); *United States v. Male Juvenile,* 121 F.3d 34, 38 (2d Cir.1997); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.1983).

## All Citations

Not Reported in F.Supp.2d, 2010 WL 5185047

**End of Document**      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Amerio v. Gray, Not Reported in Fed. Supp. (2020)

2020 WL 4192618

  KeyCite Yellow Flag

Distinguished by   EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro S.A.,   D.D.C.,   August 8, 2022

2020 WL 4192618
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Steven AMERIO and Andrew Goldberg, Plaintiffs

v.

Gregory W. GRAY, Jr.; Gregory P. Edwards; Archipel Capital LLC; BIM
Management LP; and Bennington Investment Management, Inc., Defendants.

5:15-CV-538
|
Signed 07/21/2020

**Attorneys and Law Firms**

OF COUNSEL: JOHN C. CHERUNDOLO, ESQ., J. PATRICK LANNON, ESQ., CHERUNDOLO LAW FIRM, PLLC, Attorneys for plaintiffs and intervenors, AXA Tower One 17th Floor, 100 Madison Street, Syracuse, New York 13202.

OF COUNSEL: KEVIN P. RODDY, ESQ., WILENTZ GOLDMAN & SPITZER PA, Attorneys for plaintiffs, 90 Woodbridge Center Drive, Suite 900, Woodbridge, New Jersey 07095.

JAMES TONREY ESQ., OF COUNSEL: JAMES E. TONREY, JR., ESQ., Attorneys for plaintiffs, 144 Pinewood Avenue, Staten Island, New York 10306.

GREGORY W. GRAY, JR., Defendant pro se, 60 School Street #1192, Orchard Park, NY 14127.

OF COUNSEL: MICHAEL J. GRUDBERG, ESQ., TARTER KRINSKY & DROGIN LLP, Attorneys for defendants Edwards, and Bennington Investment, Management, Inc., 1350 Broadway, New York, New York 10018.

## MEMORANDUM–DECISION and ORDER

DAVID N. HURD, United States District Judge

## CONTENTS

 **\*1**  I. INTRODUCTION...——

II. BACKGROUND...——

III. LEGAL STANDARD...——
A. Default Judgment...——

B. Summary Judgment...——

IV. DISCUSSION...——
A. The Motion to Intervene...——

Case 3:25-cv-01174-AMN-TWD    Document 10    Filed 11/04/25    Page 15 of 83

**Amerio v. Gray, Not Reported in Fed. Supp. (2020)**

2020 WL 4192618

B. Edwards' Motion for Summary Judgment...——

   1. Securities Fraud...——

   2. Common Law Fraud...——

   3. Negligent Misrepresentation...——

   4. Breach of Fiduciary Duty...——

C. Plaintiffs' Claims Against Bennington...——

D. Plaintiffs' Motion for Default Judgment...——

   1. Facts Attributable to Each Defendant...——

   2. Securities Fraud...——

   3. Common Law Fraud...——

   4. Negligent Misrepresentation...——

   5. Breach of Fiduciary Duty...——

   6. Plaintiffs' Remaining Claims Against the Archipel Defendants...——

E. Plaintiffs' Claims Against Gray...——


V. CONCLUSION...——

## I. INTRODUCTION

Plaintiffs Andrew Goldberg ("Goldberg") and Steven Amerio ("Amerio", together "plaintiffs") were two of more than one hundred investors who found themselves disappointed—to say the least—with the venture capital opportunities presented by the several defendants assembled in this case. Although the financial loss that they suffered varies, the narrative they present and the culprits they identify are the same.

Among those culprits is Gregory Gray ("Gray"), the founder and architect of a series of investment vehicles under the brand name Archipel ("the Archipel entities"). As a structure to orchestrate the Archipel entities, Gray founded Archipel Capital, LLC ("Archipel"), a New York limited liability company that served as a brand Gray used in advancing investment opportunities to clients. Gray also founded BIM Management LP ("BIM"), a Delaware limited partnership that provided the operational apparatus to manage the Archipel entities.

In addition to Gray, defendant Gregory Edwards ("Edwards") was also a partner of BIM, and plaintiffs allege that Edwards is also culpable for the economic harm they have sustained. Edwards' own company, Bennington Investment Management, Inc. ("Bennington"), a Canadian corporation, also counts among the list of those that plaintiffs would hold accountable.

In brief, plaintiffs allege that defendants swindled, comingled, and generally mismanaged the funds with which they were entrusted. As a result, on April 30, 2015, plaintiffs filed a complaint in this District. The Second Amended Complaint ("the SAC"), the current operative pleading, asserts the following three counts under federal law: (I) securities fraud under § 10(b) of the Securities and Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. § 78j(b) and the corresponding Rule 10b-5 of the Code of Federal Regulations, 17 C.F.R. § 240.10b-5, ("Rule 10b-5"); (II) Control Person Liability under § 20(a) of

Case 3:25-cv-01174-AMN-TWD    Document 10    Filed 11/04/25    Page 16 of 83

Amerio v. Gray, Not Reported in Fed. Supp. (2020)

2020 WL 4192618

the Exchange Act, 15 U.S.C. § 78t; and (III) a violation of the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962. Additionally, plaintiffs assert the following nine state law claims: (IV) common law fraud; (V) common law negligent misrepresentation; (VI) common law breach of fiduciary duty; (VII) common law conversion; (VIII) common law unjust enrichment; and (IX-XII) claims under New York's Debtor and Creditor Law §§ 273-76.

 **\*2** Three motions are presently under consideration. First, five other frustrated investors in the Archipel entities, Andrew C. Russo, Caroline Hardman, Lee Knight, Todd Morakis ("Morakis"), and David Work (together "the intervenors"), have moved to intervene and be joined into this action as plaintiffs. Second, Edwards and Bennington have moved for summary judgment on the four counts of the SAC that remain against them: (I) securities fraud; (IV) fraud; (V) negligent misrepresentation; and (VI) breach of fiduciary duty. Third and finally, plaintiffs have moved for default judgment against Archipel and BIM, neither of whom have appeared or defended this action. Those motions having been fully briefed, they will now be decided based on the parties' submissions without oral argument.

## II. BACKGROUND

From 1996 until the early 2010s, Gray held several jobs at several companies in the securities industry. See Dkt. 279-4 ("Gray Dep."), pp. 4-5. [1] Gray's somewhat nomadic career was forced to take a detour on December 17, 2008, when the New York Stock Exchange (the "NYSE") barred him from "acting in any capacity with a member firm for three years." Dkt. 279-7, p. 10. In sum and substance, Gray was accused of mismanaging and comingling his clients' funds and, upon his errant trades being discovered, harassing his clients to coerce their silence. Id. at 10-17. On July 22, 2009, the Securities Exchange Commission (the "SEC") upheld the NYSE's censure. Id. at 9.

[1]      Pagination corresponds with CM/ECF.

Ostracized from the traditional brokerage industry for at least three years, Gray decided to take a different approach. In 2008 or 2009, he reached out to Edwards, a veteran investment advisor out of Canada who had engaged a group of investors in a few startup opportunities Gray had proposed to him. See Dkt. 279-3 ("Edwards Dep."), pp. 5-6. Gray now had a new enterprise of his own in the works and wanted Edwards to join him. Id.

In March of 2008, [2] Gray's successor at the investment firm through which he had met Edwards "casually mentioned" Gray's discipline to Edwards over the phone. Edwards Dep. 7. On November 5, 2008, Edwards sent Gray an email chastising him for keeping his punishment secret, going so far as to call him "pathetic." Id. at 26-27. According to Edwards, he asked later that same year that Gray explain how the discipline came to pass. Dkt. 273-1 ("Edwards Dec."), ¶ 12. Apparently satisfied with Gray's explanation, Edwards accepted Gray's offer to go into business together and joined Archipel's advisory board. Id. at ¶ 12; Edwards Dep. 7.

[2]      The parties dispute whether Edwards discovered Gray's disciplinary history in March or November of 2008. However, because neither party disputes that Edwards was aware of the discipline by the time he joined Archipel, that dispute is immaterial.

As a member of Archipel's board, Edwards' role was that of a "technical advisor." Edwards Dep. 40. He describes his responsibilities at Archipel as involving valuation, financial analysis, deal terms, and structure. Id. at 23. As to whether a particular investment was suitable, he left that to Gray. Id. In any case, he visited Archipel's offices in Buffalo approximately four times over four years to meet with Gray but did not supervise him or any other Archipel employee. Edwards Dec. ¶ 14.

To that end, some explanation is necessary as to how Archipel and its varied entities worked. First, Archipel would identify a company looking for investors. Dkt. 279-6, p. 20. Often, these companies were either nascent, or otherwise looking to grow and expand without offering public stock. Id. at 17. Archipel would then seek out investors, who would purchase shares not in the company itself, but in an Archipel entity. See Dkt. 279-8, pp. 7-8 (describing the function of one particular Archipel entity that invested in Twitter).

Case 3:25-cv-01174-AMN-TWD    Document 10    Filed 11/04/25    Page 17 of 83

Amerio v. Gray, Not Reported in Fed. Supp. (2020)

2020 WL 4192618

**\*3**  The Archipel entities were each limited partnerships and each investor became a limited partner of the entity by purchasing its shares. *See* Dkt. 279-8, pp. 7-8. Despite being a general partnership itself—with Gray and Edwards as its general partners —BIM was the general partner of each Archipel entity. Dkt. 279-6, p. 18; *see, e.g.*, Dkt. 279-8, p. 7. As such, BIM was tasked with managing the entities, in exchange for taking five percent of the investment pool as a management fee. *See id.* at 8.

Once the entity reached a critical mass of investors, it would invest in the targeted company. *See* Dkt. 279-8, pp. 7-8. If all went well, the target would flourish with the investment, grow in value through the extra funds and the network afforded by Archipel, and then the Archipel entity would cash out and collect a profit. *See id.*; Gray Dep. 5. In any case, when an Archipel entity sold its invested stock, it would first repay the limited partners until they received their investment back, with ten percent of any further profit going to BIM and the remaining ninety percent getting distributed to the limited partners proportionally to their initial investment. Dkt. 279-8, p. 7.

Instrumental in each Archipel entity transaction was each entity's Private Placement Memorandum ("PPM"), a document that detailed how the entity worked. *See generally, e.g.*, Dkt. 279-8. Each PPM explained the structure of its corresponding Archipel entity and the payment structure should an investment pay off. *See id.* The PPMs also provided a brief biography of Edwards, Gray, and Archipel's Managing Director, Devin Stelljes ("Stelljes"), and identified that the three of them would "manage [BIM, as general partner of the Archipel entity,] and oversee its operations[.]" *Id.* at 11. Edwards' biography, listed first, is the most extensive. *See id.* However, that description is silent as to what role he actually occupied at Archipel. *Id.*

As for Gray, most of the PPMs make no mention of his disciplinary history, and in fact list him as a "registered investment advisor" with active licenses. *See* Dkt. 279-8, p. 11. Only the Late Stage Fund LP PPM, created in 2014, notes his prior securities violation as a risk factor and acknowledges only that he passed the requisite tests to receive his licenses. Dkt. 279-12, pp. 10-12. Edwards does not recall whether he suggested to Archipel's counsel that the PPMs should acknowledge Gray's disciplinary history. Edwards Dep. 19. Edwards did, however, discuss with Gray whether his discipline should be included in the PPMs because he believed that an investor should know of a sufficiently serious disciplinary action. *Id.* Outside of his discussion with Gray and providing his biography, Edwards' only interaction with the PPMs was to give cosmetic comments on an early draft. *Id.* at 14.

Having ironed out a fundamental structure, Archipel set to finding companies in which to invest. One Archipel investment opportunity began to come together in December of 2010, when Edwards met Hilary DeCesare ("DeCesare") at a conference. Dkt. 279-5, p. 15. DeCesare was a co-founder and CEO of Everloop, a "security company to keep kids safe online." *Id.* Hoping to secure funding for Everloop, DeCesare gave an investment pitch to an audience of roughly 200 people, among them Edwards. *Id.* Edwards was convinced and wanted to meet with DeCesare to discuss her working with Archipel to raise capital. *Id.*

**\*4**  Early in 2011, DeCesare met with Gray to discuss working together, but found herself put out by his attitude, which she described as "very arrogant." Dkt. 279-5, p. 16. Shortly after that poor first impression, she told Edwards that she did not want to work with Gray. *Id.* DeCesare's opinion of Gray only soured further later that year when she discovered his disciplinary history. *Id.* at 24.

To allay her burgeoning concerns, Gray sent DeCesare an email, which Edwards had reviewed, detailing his narrative of the NYSE disciplinary process. Edwards Dep. 52-53. As a final concession to DeCesare's concerns, Gray and Edwards agreed that the name of the investment vehicle would be Bennington-Everloop LP ("BELP"), instead of the originally proposed Archipel-Everloop LP, so that Edwards' company, and by implication Edwards, would have a stronger association with the investment entity. *Id.* at 52.

Having collected a growing crop of investment opportunities, Archipel began looking for investors. Among those new investors was plaintiff Andrew Goldberg, a retired college graduate. Dkt. 273-3 ("Goldberg Dep."), p. 3. Through pure happenstance, Goldberg was put in contact with Devin Stelljes ("Stelljes"), an Archipel employee. Goldberg Dep. 8. The two eventually met

Amerio v. Gray, Not Reported in Fed. Supp. (2020)

2020 WL 4192618

in person, and Stelljes pitched this plaintiff an opportunity to invest in BELP. Dkt. 279-1, p. 13; Dkt. 279-13, p. 6. During that meeting, Stelljes never mentioned Edwards. Goldberg Dep. 9. Stelljes' silence regarding Edwards perhaps stemmed from his lack of understanding as to what Edwards did at Archipel and the fact that he "didn't meet with [Edwards] much." Dkt. 279-5, p. 6.

Three months later, Goldberg invested $100,000 in Everloop through BELP. Goldberg Dep. 9. Goldberg would ultimately invest an additional $200,000 of his money through Archipel entities, with $50,000 each going to companies called Bloom Energy ("Bloom") and Agrivida, and $100,000 going to the social media company Twitter. *Id.*

Goldberg did not communicate with Edwards prior to any investment in an Archipel entity. Goldberg Dep. 10. Instead, he spoke with Gray and Stelljes before making each investment. *Id.* at 9-10. In fact, Goldberg is unsure when he first heard Edwards' name. *Id.* at 12. However, at some point before 2014, Goldberg learned that Edwards was a Certified Financial Advisor, which impressed him. Dkt. 279-1, pp. 40-41.

Goldberg's counterpart plaintiff, Steven Amerio, is also a college graduate, and has spent his entire career in the investment industry. Dkt. 273-4 ("Amerio Dep."), pp. 3-6. Amerio first heard about Archipel through his friend, proposed intervenor Todd Morakis. *Id.* at 9. Both Amerio and Morakis work in finance, and Morakis mentioned that he had been investing through Archipel and suggested to Amerio that he could also get involved. *Id.* at 3-5, 9. Amerio held Morakis' opinion and intelligence in high regard, and as a result when Morakis described Gray as a "standup individual" and a "good guy," Amerio was intrigued. *Id.* at 10-11. Accordingly, Morakis introduced Amerio to Gray, who persuaded Amerio to invest in Bloom. *Id.* at 9. At the time he invested, Amerio was aware that venture capital investments carry a high degree of risk. *Id.* at 15.

Although Amerio does not recall Edwards being discussed by an Archipel employee prior to his investment in Bloom—and he distinctly recalls that Morakis never mentioned Edwards—he remembers that Gray would often refer to his "partner." Amerio Dep. 10. In fact, Amerio does not recall hearing Edwards' name at all before he invested, but he does believe that he read his name in the Bloom PPM. *Id.* As a result, although Amerio did not communicate with Edwards directly before investing in Bloom, he was nevertheless aware of Edwards' extensive credentials as an investment advisor and assumed that he was Gray's partner. *Id.* at 12. Amerio describes those credentials as a factor in his decision to invest in Bloom. *Id.*

 **\*5** Nevertheless, Amerio had "no idea" whether Edwards would be involved in administering the investments in Bloom. Amerio Dep. 13. Throughout Amerio's time as a Bloom investor, he never spoke to Edwards, not even by email. *See id.* at 27.

At some point, Goldberg's sister also became an investor in Archipel at Goldberg's suggestion. Goldberg Dep. 26. However, as she communicated with Gray, something in his attitude struck a wrong chord with her, and so she searched him on Google. *Id.* at 15. Through that internet search, Goldberg's sister came across Gray's NYSE disciplinary history, which she of course promptly shared with her brother. *Id.*

Goldberg called Gray and Stelljes frequently after the revelation of Gray's past, because his trust in Gray was, perhaps understandably, diminished. Goldberg Dep. 16. After all, he felt that Gray "had essentially lied to [him] by not" disclosing his discipline. *Id.* Although Goldberg expressed a desire to "get past" the issue of Gray's failure to disclose his disciplinary history and did not leave Archipel, he began to closely scrutinize his investments in Everloop and Twitter. *Id.* As a result, Goldberg and Gray had frequent arguments, during some of which Gray "threatened" to sell off Goldberg's Twitter shares. *Id.* at 17. Although Goldberg considered this a threat because he believed that his Twitter investments could become valuable, he nevertheless encouraged Gray to find him a buyer for his shares so that the two of them would no longer work together. *Id.*

On June 10th, 2014, Gray and Goldberg launched into another argument over email as to the amount of Twitter shares to which Goldberg was entitled. *See* Dkt. 279-1, p. 32; 279-22, pp. 7-8. As the argument escalated, Goldberg forwarded the email chain concerning the dispute to Edwards, as well as Archipel's attorney. Dkt. 279-1, p. 32; 279-22, pp. 7-8. Upon being included in the argument, Edwards did not respond, and did not check Gray's math. Edwards Dep. 39. Instead, Edwards urged Gray

Case 3:25-cv-01174-AMN-TWD    Document 10    Filed 11/04/25    Page 19 of 83

Amerio v. Gray, Not Reported in Fed. Supp. (2020)
2020 WL 4192618

not to respond because he did not believe that Goldberg was capable of having a rational conversation on the issue. *Id.* At the same time, Edwards reached out to Archipel's counsel to ask him to reassure Goldberg that "all numbers and documents will be rechecked or something to that effect." *Id.* at 40.

Unfortunately for Goldberg, he would soon be proved right to be concerned about Gray's candor, and unfortunately for Gray he had bigger concerns ahead than Goldberg's ire. The facts surrounding Gray's indictment by the United States Attorney's Office for securities fraud have already been recounted in the twin to this case, *McEssy v. Gray*, 2019 WL 6829053 (N.D.N.Y. Dec. 13, 2019), and need not be recounted at great length.

Suffice it to say, the Archipel entities yielded few returns. *See McEssy*, 2019 WL 6829053, at *5. In fact, only the Twitter investment produced any positive returns to its Archipel investors. *Id.* To cover for those losses and keep Archipel afloat, Gray had used a majority of the funds raised to purchase Twitter shares to instead provide an appearance of profit to investors in the other Archipel entities. *Id.* Desperate to keep his house of cards standing for every second he could, Gray sought out William McEssy ("McEssy"), the most substantial Archipel investor, and presented him with an opportunity to purchase $5,000,000 worth of Uber stock. *Id.* at *6.

 **\*6**  But of course, the Uber stock did not exist. *McEssy*, 2019 WL 6829053, at *6. Instead, Gray used McEssy's funds to finally purchase the Twitter shares that he had failed to purchase when he had originally promised to because he instead used the money to paper over his earlier bad bets. *Id.* The SEC began to investigate Gray, and he pled guilty to securities fraud and perjury on December 23, 2015. *Id.* at *7. For his part, Edwards has declared that he was unaware of Gray's comingling of funds and unauthorized withdrawals until at least February of 2015, and never condoned it. Edwards Dec. ¶ 16.

Needless to say, Gray's guilty plea cued Archipel's requiem, but Goldberg and Amerio had already filed this suit on April 30, 2015 in an effort to recover the money they had lost. Dkt. 1. The case proceeded through discovery, but when discovery ended, no motion practice followed. Defendants BIM and Archipel never appeared to defend plaintiffs' suit, and thus on April 19, 2018 plaintiffs received an entry of default against them. Dkt. 160.

To streamline plaintiffs' claims against the other defendants into a format ready for trial, the Court issued a Memorandum-Decision and Order reopening the deadline to make dispositive motions on March 31, 2020. Dkt. 266. Plaintiffs moved for default judgment against Archipel and BIM on April 15, 2020, and to intervene five additional plaintiffs on April 22, 2020. Dkt. 267; 268. The moving defendants moved for summary judgment against all claims against them on May 12, 2020. Dkt. 273. Plaintiffs' claims against Gray, however, remain undisturbed.

## III. LEGAL STANDARD

### A. Default Judgment.

Under Rule 55, a district court may grant default judgment against a party for the failure to plead or otherwise defend an action. FED. R. CIV. P. 55; *see Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 95 (2d Cir. 1993). A party moving for default judgment must first attain an Entry of Default from the Clerk of the Court. FED. R. CIV. P. 55(a). Once the party attains an entry of default, they must serve the defendant with written notice of the application for default judgment under Rule 55(b)(2). Once default has been established as proper, the party moving for default is "entitled to all reasonable inferences from the evidence offered," but a district court still must determine whether the allegations establish liability as a matter of law. *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009).

### B. Summary Judgment.

Under Rule 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists.

Case 3:25-cv-01174-AMN-TWD   Document 10   Filed 11/04/25   Page 20 of 83

Amerio v. Gray, Not Reported in Fed. Supp. (2020)

2020 WL 4192618

*Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Id.* at 273.

The nonmoving party must do more than "rest upon the mere allegations ... of [the plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 & n.11 (1986). Instead, a dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). In short, summary judgment is the point in litigation where the record evidence is assembled to assess whether there exist any material disputed facts that necessitate trial, and thus the point at which the parties must "put up or shut up." *Weinstock v. Colum. Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

## IV. DISCUSSION

**\*7** There are three motions currently under consideration: (1) the intervenors' Rule 24(b) motion to intervene; (2) Edwards' and Bennington's motions for summary judgment in their favor; and (3) plaintiffs' motion for default judgment against BIM and Archipel.

### A. The Motion to Intervene.

A district court has broad discretion to grant a Rule 24(b) motion to intervene, but the intervenors must first prove that their motion is timely. *United States v. Pitney Bowes, Inc.*, 25 F.3d 66, 69-70 (2d Cir. 1994) (ruling that "intervention decisions are reviewed under an abuse of discretion standard" and making timely motion is "first hurdle"). If the motion is timely, then the intervenors must show that they pleaded a claim that shares a similar question of law or fact with the plaintiffs' original claim. FED. R. CIV. P. 24(b)(1)(B), (c); *see also Greer v. Blum*, 462 F. Supp. 619, 625 (S.D.N.Y. 1978) (requiring that the claim with the motion to intervene be substantially similar to the original claim).

To satisfy the threshold timeliness inquiry, a court weighs, in its discretion: (1) how long the intervenors had notice before they moved to intervene; (2) resulting prejudice to existing parties if intervention were permitted; (3) potential prejudice to the intervenors from denial of intervention; and (4) any unusual circumstances. *Pitney*, 25 F.3d 66 at 70. [3] However, the first factor—the duration of notice—is typically given greater weight than its fellows. *Catanzaro ex rel. Catanzano v. Wing*, 103 F.3d 223, 232 (2d Cir. 1996).

[3]     Although *Pitney* considered whether intervention was timely for plaintiffs intervening under Rule 24(a), the analysis of the timeliness of intervention under Rule 24(b) is treated the same. *See Hnot v. Willis Group Holdings, Ltd.*, 234 Fed.Appx. 13, 14 (2d Cir. 2007) (summary order) (applying *Pitney's* four timeliness factors to a Rule 24(b) motion); *Kamdem-Ouaffo v. Pepsico, Inc.*, 314 F.R.D. 130, 134 (S.D.N.Y. 2016) (same).

In considering the timeliness of a motion to intervene, the court has discretion to determine how long the intervenors had notice or should have had notice of their interest in the original claim before moving. *See Catanzano*, 103 F.3d at 232. In making that determination, the court first considers which event triggered the intervenors' notice of their interest in the claim being put at stake. *See Chen-Oster v. Goldman Sachs & Co.*, 2015 WL 4619663 at *6 (S.D.N.Y. Aug. 3, 2015), *aff'd* 2016 WL 11645644 (S.D.N.Y. June 6, 2016).

For interventions involving class actions, a party is deemed on notice once she learned or should have learned that class certification was denied. *See Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 353-54 (1983) (emphasizing parties' ability to intervene after denial of class certification); *Hnot v. Willis Group Holdings, Ltd.*, 234 F. App'x. 13, 14-15 (2d Cir. 2007) (summary order) (same).

Furthermore, Rule 24 requires that intervenors promptly move to intervene when they receive notice that their interests might not be protected rather than waiting until the danger to that interest becomes certain. *Floyd v. City of New York*, 302 F.R.D. 69, 86-87 (S.D.N.Y. 2014) (noting that "intervention law required [the intervenors] to move at the first instance that there was some doubt [that their interests were not protected in the action]"), *aff'd in part, appeal dismissed in part*, 770 F.3d 1051 (2d Cir. 2014).

**\*8** The moving defendants principally argue that the potential intervenors' motion is untimely because they were put on notice when the Court denied class certification seven months ago. They also argue that they would be prejudiced by the intervention because they would have to conduct discovery to ascertain the intervenors' individual claims and theories of the case. Lastly, they point out that intervention would disserve the Court because it would likely delay trial and a final resolution of the case.

For their part, the intervenors argue that it is common practice for parties who had their class certification denied to subsequently intervene. They further explain that it took around seven months to file the motion because of the holidays and the general disruption caused by the COVID-19 pandemic. The intervenors also argue that they are not adding any new allegations to the action, and so would not unduly prejudice the defendants. Critically, however, the intervenors point to no potential prejudice from a denial of intervention.

The lack of any articulated prejudice, combined with the extended, seven-month delay after class certification was denied on September 3, 2019, demands that the intervenors' motion be denied. *Compare* Dkt. 268 (intervenor's motion dated April 22, 2020), *with* Dkt. 252 (denying class certification dated September 3, 2019). The intervenors' explanation that the holidays delayed their motion cannot justify their delay. The holidays come every year, at the same time of year—roughly three months after the intervenors were denied class certification—and yet countless motions are filed, rebutted, and decided during that span.

The intervenors' argument that the COVID-19 pandemic also delayed their motion may have carried some weight but for one point: this Court never stopped accepting and deciding motions. As a result, although the pandemic may have made it more difficult to compile the necessary information to move to intervene, it fell far short of making it impossible. Additionally, the intervenors were already represented by plaintiffs' counsel, who are intimately familiar with the case, and by extension any need to compile the intervenors' information and allegations before moving would have been greatly reduced. Accordingly, the intervenor's motion is not timely.

This is especially true because the fraud claims the intervenors assert are necessarily distinct from the existing plaintiffs'. Each investor in the Archipel entities will present novel considerations in their investments and unique interactions with defendants. Accordingly, granting the intervenors' motion would require discovery to be reopened. This case is rapidly approaching its conclusion, in fact the entire purpose of the motion practice currently under consideration is to prepare this case for trial. *See generally* Dkt. 266.

The intervenors' justifications thus do not justify such a substantial step backwards in the resolution of this case, and their motion must be denied. *See, e.g., in re Holocaust Victim Assets Litig.*, 225 F.3d 191, 198-199 (2d Cir. 2000) (denying intervention when intervenors "waited another eight months [after submitting a letter objecting to the settlement in question] before moving to intervene").

## B. Edwards' Motion for Summary Judgment.

Plaintiffs have four remaining claims against Edwards: (1) securities fraud under Rule 10b-5; (2) common law fraud; (3) breach of fiduciary duty; and (4) negligent misrepresentation.

### 1. Securities Fraud.

The elements of a private securities fraud claim based on a material misrepresentation or omission under Rule 10b-5(b) are: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or

Case 3:25-cv-01174-AMN-TWD    Document 10    Filed 11/04/25    Page 22 of 83

Amerio v. Gray, Not Reported in Fed. Supp. (2020)

2020 WL 4192618

omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).

**\*9** Reliance is an "essential element" of a Rule 10b-5 action, which "ensures that, for liability to arise, the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury exists as a predicate for liability." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 159 (2008). "In assessing the reasonableness of a plaintiff's alleged reliance, [the Court] considers the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 195 (2d Cir. 2003).

" 'The traditional (and most direct) way' for a plaintiff to demonstrate reliance 'is by showing that he was aware of a company's statement and engaged in a relevant transaction ... based on that specific misrepresentation." *Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 462 (2013) (citing *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011)). Where a plaintiff can identify such a specific misrepresentation, a plaintiff "plainly would have relied on the company's deceptive conduct." *Halliburton*, 563 U.S. at 810.

Meanwhile, the economic loss element exists largely so that where a plaintiff is defrauded as to the value of a stock, but the stock he purchases nevertheless causes him economic gain, he cannot recover. *See Acticon AG v. China N.E. Petroleum Holdings Ltd.*, 692 F.3d 34, 3738 (2d Cir. 2012) (discussing whether subsequent increase in stock price above inflated value of which defendant misinformed plaintiff precluded finding of economic loss).

Additionally, a plaintiff must prove loss causation. *In re Omnicom Grp. Inc. Sec. Litig.*, 597 F.3d 501, 510 (2d Cir. 2010). Loss causation requires proving both that the wrongful act was the but-for cause of the economic loss and that the harm was proximately caused by the wrong to be of a sort that § 10(b) was intended to prevent. *Id.* As such, a misrepresentation is "the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations...." *Id.* at 513 (emphasis omitted).

Alternatively, a plaintiff can also prove securities fraud under Rule 10b-5(a) and (c) if he can prove that the defendant: (1) committed a manipulative or deceptive act; (2) in furtherance of the alleged scheme to defraud; (3) with scienter; and (4) plaintiff relied on the deceptive act to his detriment. *In re Glob. Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 336 (S.D.N.Y. 2004) (citing *SEC v. U.S. Envtl., Inc.*, 155 F.3d 107, 111 (2d Cir. 1998)). [4] A "manipulative or deceptive act" is defined broadly as "some act that gives the victim a false impression." *United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008).

[4]   The Second Circuit does not appear to have ever established the elements of private civil liability for a scheme to defraud under Rule 10b-5(a) or (c). *See U.S. Envtl.*, 155 F.3d at 111. However, at the least Second Circuit caselaw has established that the SEC in bringing a Rule 10b-5(a) or (c) enforcement action must prove a manipulative or deceptive act in furtherance of the scheme and scienter. *Id.* Additionally, a private plaintiff in more traditional securities fraud cases must also prove reliance, even though the SEC need not, and thus it would logically follow that the same additional requirement applies in scheme to defraud cases. *United States v. Vilar*, 729 F.3d 62, 88 (2d Cir. 2013).

**\*10** Essentially, Edwards argues that there are no disputed material facts, because there is no evidence that he ever made any misrepresentation or omission of material fact to either Goldberg or Amerio. Plaintiffs counter by arguing that nine material facts are in their favor: (1) Edwards met with McEssy in Chicago to induce him to invest in Gray's Uber scheme; (2) Edwards approved the PPMs despite their omission of Gray's disciplinary history; (3) Edwards' background was listed with prominence in the PPMs; (4) Edwards used Bennington to reassure DeCesare when she was unwilling to work with Gray; (5) Edwards showed a strong knowledge in one of the Archipel investments in a meeting with McEssy; (6) Edwards referred to himself as "chairman" and Gray's partner in Archipel when speaking with McEssy; (7) Edwards downplayed Gray's disciplinary history to DeCesare and McEssy; (8) Edwards told McEssy that he would have purchased some of the Uber shares had McEssy not purchased them all himself; and (9) Stelljes' comments to plaintiffs over the course of their investments. Additionally, Goldberg specifically

2020 WL 4192618

argues that Edwards did nothing to stop Gray once Goldberg brought to Edwards' attention Gray's concerns regarding the Twitter investment.

Plaintiffs' theory of the case follows two harmonic themes. First, they argue that Edwards misrepresented or omitted Gray's disciplinary history in the PPMs. Alternatively, plaintiffs argue Edwards engaged in a sprawling scheme with Gray to defraud all Archipel investors, and among them plaintiffs, by lending his own credibility in the investment industry to Gray's less vital reputation.

Ultimately, plaintiffs' argued evidence of Edwards' fraud falls into four camps: (1) acts plaintiffs would attribute to Edwards through BIM; (2) acts plaintiffs would attribute to Edwards through Stelljes; (3) acts done by Edwards which reached people other than plaintiffs; and (4) acts done by Edwards himself.

The first camp can be disposed of easily enough. A district court facing a state law question is bound to apply the choice-of-law rules of the state in which that court sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Under New York's choice of law rules, the law of the jurisdiction where the partnership was formed, in this case Delaware, dictates how the partnership will be construed. *See Dep't of Econ. Dev. v. Arthur Andersen & Co. (U.S.A.)*, 924 F. Supp. 449, 485 (S.D.N.Y. 1996) (noting that New York assesses liability of partners of an out-of-state partnership under laws of jurisdiction where partnership was organized); Gray Dep. 12.

Under Delaware law, there is no authority that suggests that general partners can be held liable for the general partnership's acts, and in fact it seems that Delaware's legislature consciously reduced the scope of general partnership liability to prevent that form of liability from attaching. *See McEssy*, 2019 WL 6829053, at *12-14. Accordingly, Edwards cannot be held liable based on BIM's actions, and plaintiffs' arguments tying BIM's alleged misconduct to Edwards is misplaced.

The second type of evidence plaintiffs rely on, namely Stelljes' comments to them throughout their investment experience, is similarly ineffectual. First, in the agency context, "New York's choice of law principles require a court to apply the law of the state with the most significant relationship with the particular issue in conflict...." *Indosuez Int'l Fin. B.V. v. Nat'l Reserve Bank*, 774 N.E.2d 696, 700 (N.Y. 2002). Presumably, Stelljes worked at Archipel's offices in Buffalo, New York, and given the relative lack of contact between Stelljes and Edwards, to the extent that Stelljes' work can be attributed to Edwards in an agency context, New York law should govern whether an agency relationship existed. Dkt. 279-5, p. 6, Edwards Dep. 52.

Under New York agency law, "an agency relationship results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the consent by the other to act." *N.Y. Marine & Gen. Ins. Co. v. Tradeline, (L.L.C.)*, 266 F.3d 112, 122 (2d Cir. 2001) (citation omitted). The authority for an agent to act on a principal's behalf can be either actual or apparent. *Meisel v. Grunberg*, 651 F. Supp. 2d 98, 110 (S.D.N.Y. 2009). Apparent authority is created by "the written or spoken words or any other conduct of the principal which, reasonably interpreted, causes [a] third person to believe that the principal consents to have [an] act done on his behalf by the person purporting to act for him[.]" *Minskoff v. Am. Express Travel Related Servs. Co., Inc.*, 98 F.3d 703, 708 (2d Cir. 1996). A principal is liable for the torts of his agent if the agent acted within the scope of his actual or apparent authority. *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 566 n.1304 (S.D.N.Y. 2014).

**\*11** Even assuming that because a principal can be held liable for a tort committed by his agent, the actions of his agent are attributable as evidence of the principal's own tortious misconduct, plaintiffs have no evidence of an agency relationship between Stelljes and Edwards. There is no evidence on the record that Edwards endowed Stelljes with actual authority, and although he might have had such a relationship with BIM, BIM's faults once again cannot be attributed to Edwards. *McEssy*, 2019 WL 6829053 at *12-14 (ruling that Delaware law does not impose liability on partners for tortious acts of partnership). Accordingly, in the absence of actual authority, plaintiffs can only hold Edwards liable for Stelljes' actions to whatever extent Stelljes occupied a position of apparent authority. *See Meisel*, 651 F. Supp. 2d at 110.

Case 3:25-cv-01174-AMN-TWD    Document 10    Filed 11/04/25    Page 24 of 83
Amerio v. Gray, Not Reported in Fed. Supp. (2020)
2020 WL 4192618

On that score, plaintiffs have offered nothing done by Edwards to confer on Stelljes the appearance of authority to act on his personal behalf. On the contrary, the record only shows distance between Stelljes and Edwards, who only rarely even met. Dkt. 279-5, p. 6. The closest Edwards ever comes to endorsing Stelljes in any way is sharing a biography page on the PPMs, but even those documents are silent as to Stelljes' relationship to Edwards. *See* Dkt. 279-8, p. 11. Accordingly, Stelljes did not have actual or apparent authority to act as Edwards' agent, and Stelljes' statements to plaintiffs do not advance plaintiffs' claims.

The third camp of evidence plaintiffs muster, actions performed by Edwards but directed at people other than plaintiffs—namely his meetings and statements to McEssy and his efforts to convince DeCesare to work with Archipel—do, finally, carry some weight. Contrary to defendants' arguments, Edwards' efforts to convince McEssy and DeCesare could present evidence of a larger scheme to defraud intended to induce plaintiffs' investment, as well as scienter, even if that conduct was not directed at them. After all, a reasonable jury could conclude that if Edwards was willing to use his reputation and presence to attempt to coax others into working with Archipel on other occasions, it is possible that he was willing to do the same to deceive plaintiffs.

Of course, plaintiffs had no idea that Edwards met with McEssy and demonstrated knowledge of and optimism in the Archipel entities. Although at least Goldberg was aware that BELP was named for Bennington, rather than Archipel, there is nothing in the record to suggest that distinction was relevant to him or that he appreciated what it meant. Edwards Dep. 52. As a result, even this third grouping of evidence provides no support for the notion that plaintiffs relied on Edwards' alleged deceptive act of concealing Gray's disciplinary history and using his own reputation to bolster Gray's through the PPMs.

Accordingly, plaintiffs depend on the fourth category of evidence, Edwards' own acts directed toward them, to carry the day. That category consists of Edwards' submitting his biography for inclusion in the PPMs and his failure to prevent the PPMs from misleadingly representing Gray's credentials.

At the outset, there is no evidence that Edwards had anything to do with giving plaintiffs the PPMs. Goldberg Dep. 9-10 (Goldberg acknowledging that he never spoke to Edwards prior to investing); Amerio Dep. 10 (Amerio noting that he read Edwards' name in the PPM as possibly his first time learning about Edwards). Further, contrary to plaintiffs' arguments, Edwards' stylistic and cosmetic suggestions on an early draft of the PPMs are not enough to make the entire document attributable to him. Edwards Dep. 14. The same is true of plaintiffs' argument that Edwards' role as a general partner of BIM, which was itself a general partner of the Archipel entities, lays responsibility for the contents of the PPMs at Edwards' feet. *McEssy*, 2019 WL 6829053, at *12-14.

 **\*12** Thus, nothing associated with them can be considered a misrepresentation or omission on Edwards' part, except for his biography. Because plaintiffs have not pointed to any portion of the biography itself that is either a misrepresentation or an omission, plaintiffs have not identified any misrepresentation or omission by Edwards to them. Accordingly, summary judgment must be granted to the extent plaintiffs are seeking to bring a Rule 10b-5(b) claim against Edwards.

As a result, the essential question becomes whether plaintiffs can establish that they reasonably relied on an alleged scheme to defraud involving Edwards' use of his reputation and concealment of Gray's discipline in investing in the Archipel entities.

As a first step, establishing what reliance would look like in terms of the scheme to defraud that plaintiffs argue is nettlesome. It could be argued that they relied on Gray's qualifications being intact, his disciplinary history being disclosed, and Edwards' involvement being as substantial as his credentials. Indeed, in a straightforward misrepresentation or omission case, plaintiffs could reasonably have relied on the truth of each of those perceptions, and Edwards would have been liable. But in the context of a larger scheme to defraud, ensuring that the element of reliance continues to do the work ascribed to it requires more care.

After all, the purpose of a plaintiff's burden of proving reliance is to ensure a causal link between a defendant's misconduct and a plaintiff's injury. *Stoneridge*, 552 U.S. at 159. By extension, plaintiffs must prove not only that they believed that Gray had never been disciplined, that he was still appropriately licensed, and that Edwards would be involved in managing Archipel, but also that it was Edwards' alleged scheme to defraud them which caused them to believe those things and invest. In other

Case 3:25-cv-01174-AMN-TWD    Document 10    Filed 11/04/25    Page 25 of 83

Amerio v. Gray, Not Reported in Fed. Supp. (2020)

2020 WL 4192618

words, plaintiffs must prove that they relied on Edwards to be the one to disclose Gray's discipline and that they relied on his reputation in investing. Neither plaintiff can.

Several factors counsel against Goldberg's argued reliance on Edwards' scheme to use his reputation and hide Gray's disciplinary history. First, as a college graduate, Goldberg is far from an unsophisticated party. Goldberg Dep. 3. Second, Goldberg had no direct interactions with Edwards until well after he had invested in the Archipel entities of which he was a member, at which point Goldberg only forwarded Edwards a single email chain. Edwards Dep. 39-40; Dkt. 279-22, pp. 7-8. Third, Gray's disciplinary history was not a well-kept secret; Goldberg's sister discovered it after a single internet search after having some concerns about Gray. Goldberg Dep. 15. Perhaps most critically of all, Goldberg remained invested in Archipel even after discovering Gray's disciplinary history, even though it clearly eroded his trust in Gray. Goldberg Dep. 17.

All told, Edwards' three actions of not revising the PPMs to clarify that Gray had been subjected to discipline, including his own expansive resume in the PPMs, and even agreeing to name BELP after Bennington does not count for much compared to a college graduate with easy access to the truth of Gray's past who stayed the course after discovering that truth. True, there is a difference between staying invested in a potentially lucrative venture and not entering that venture in the first place, but nevertheless it is impossible to believe that Goldberg relied on Edwards to insist on disclosing Gray's disciplinary history when the two shared precious little contact.

**\*13** The same is even more true to the extent that Goldberg hopes to prove reliance on Edwards' use of his own reputation to bolster Gray's sales pitch. After all, Goldberg never communicated with Edwards at any point before making an investment and in fact is unsure when he even first heard Edwards' name. Goldberg Dep. 10, 12. Of course, at some point Goldberg did learn about Edwards, and was impressed by his credentials, Dkt. 279-1, pp. 40-41, but being eventually impressed by Edwards' name and forwarding one email to Edwards after his relationship with Gray broke down is not enough to establish that Goldberg relied on Edwards' presence and reputation in investing in Archipel, Dkt. 279-1, p. 32; 279-22, pp. 7-8.

Amerio's claims fare no better. After all, Amerio is a highly sophisticated financial advisor in his own right. *See generally* Amerio Dep. 3-6. He knew going in that investing in startups such as those that Archipel finds is risky business, but he invested anyway. *Id.* at 15. What is more, Morakis, a trusted and respected friend, also vouched for the quality of the Archipel investments. *Id.* at 11. However, unlike Goldberg, Amerio at least knew that Edwards existed at the time he invested and that Gray referred to Edwards as his partner. *Id.* at 10. Both considerations and Edwards' credentials were factors, although not dispositive, in Amerio's decision to invest in Bloom. *Id.* at 12. However, despite his familiarity with Edwards in theory, the two never directly communicated. *Id.* at 27.

Weighing these competing factors, no reasonable jury could conclude that Amerio relied on Edwards to insist that the PPMs disclose Gray's disciplinary history and that Edwards was present as a partner. If Amerio truly relied on Edwards to bring Gray's disciplinary deficiencies to light, he would presumably have tried to confront Edwards in some way when he discovered the deception. But the record is utterly silent as to any such confrontation. Moreover, there are other actors equally or more responsible for the PPMs not disclosing Gray's discipline, including the attorney who assembled the PPM and of course Gray himself. Amerio provides no evidence to suggest that he relied on Edwards to insist on disclosure to the extent that he can be held culpable despite Gray's outright misrepresentation in the PPM and Archipel's lawyer's review of the document.

Moreover, Amerio never had any indication that Edwards would actively manage the Archipel entities, and Gray already had the strong backing of Morakis, whom Amerio deeply respected. Amerio Dep. 11-12. Given such a strong vote of confidence from an admired colleague, and given the dearth of evidence that Amerio actually expected Edwards to make the risky Archipel entities enough safer to tip his decision to invest from "maybe" to "yes," Amerio has not supplied sufficient evidence at the point of summary judgment to prove that Amerio relied on any scheme to defraud that Edwards may have concocted.

None of this is to suggest that Gray's disciplinary history was not an important concern, and that its being concealed from plaintiffs was not to their disadvantage. Rather, it is safe to say that Edwards' role in that concealment as related to plaintiffs

Case 3:25-cv-01174-AMN-TWD    Document 10    Filed 11/04/25    Page 26 of 83
Amerio v. Gray, Not Reported in Fed. Supp. (2020)
2020 WL 4192618

was incredibly minute. It simply cannot be said that plaintiffs reasonably relied on an individual with whom they had such minimal contact to be the one to tell them the truth. Accordingly, plaintiffs have failed to establish reliance on any scheme to defraud Edwards may have engaged in, and have altogether failed to prove reliance on any of Edwards' actions, fraudulent or otherwise. Accordingly, plaintiffs' securities fraud claims under Rule 10b-5 must be dismissed.

### 2. Common Law Fraud.

**\*14**  To recover damages for common law fraud under New York law, a plaintiff must prove four elements: "(1) a misrepresentation or a material omission of fact which was false and known to be false by [the] defendant; (2) made for the purpose of inducing the other party to rely upon it; (3) justifiable reliance of the other party on the misrepresentation or material omission; and (4) injury." [5]  *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009).

[5]     Defendants note the possibility that under the applicable choice of law rules, Amerio, as a New Jersey resident who interacted with defendants in that state, may be subject to New Jersey law. However, New York and New Jersey treat common law fraud much the same, so the distinction is without difference. *Winter v. Am. Inst. of Med. Scis. & Educ.*, 242 F. Supp. 3d 206, 225 (S.D.N.Y. 2017).

Neither party disputes that the analysis of common law fraud and securities fraud is identical for the purposes of this case, given that the central issues at stake are reliance and the existence of a misrepresentation, omission, or scheme to defraud. Accordingly, plaintiffs have also failed to establish a dispute of material fact as to whether Edwards defrauded them under the common law. Those claims must also be dismissed.

### 3. Negligent Misrepresentation.

Under New York law, a claim for negligent misrepresentation requires the plaintiff to allege that "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 114 (2d Cir. 2012) (citing *Hydro Inv'rs, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000)).

The first element of whether the defendant had a special relationship to the plaintiff weighs several factors, including "whether the person making the representation held or appeared to hold unique or special expertise; whether a special relationship of trust or confidence existed between the parties; and whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." *Suez Equity Inv'rs, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 103 (2d Cir. 2001) (citing *Kimmell v. Schaefer*, 675 N.E.2d 450, 454 (N.Y. 1996)).

Should a plaintiff prove the existence of a special relationship, the defendant is obligated to "exercise reasonable care in giving the information [because the] plaintiffs' reliance upon the information [is] foreseeable." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004).

Under New Jersey law, by contrast, a negligent misrepresentation claim requires the plaintiff to prove only that "an incorrect statement was negligently made" by the defendant upon which the plaintiff "justifiably relied [in order] to recover damages for economic loss or injury sustained as a consequence of that reliance." *Thomas v. JPMorgan Chase & Co.*, 811 F. Supp. 2d 781, 793 (S.D.N.Y. 2011).

A plaintiff must also show that he relied on the defendant's misstatement, and that reliance was the proximate cause of his injury. *Caspersen as Tr. for Samuel M.W. Caspersen Dynasty Tr. v. Oring*, 2020 WL 999209, at \*12 & n.8 (D.N.J. Feb. 28, 2020) (noting that for both fraud and negligent misrepresentation reliance must proximately cause injury). One means of demonstrating reliance is to show that the defendant possessed superior knowledge. *Id.*

Amerio v. Gray, Not Reported in Fed. Supp. (2020)

2020 WL 4192618

**\*15** First, Goldberg has plainly failed to establish that Edwards owed him a special relationship as required by New York law. *Anschutz Corp.*, 690 F.3d at 114. Perhaps sensing the vulnerability of his argument that he had a special relationship with a financial advisor that never actually managed his accounts and with whom the sum total of his communication is a single forwarded email chain, Edwards Dec. ¶ 14; Edwards Dep. 23, 40; Dkt. 279-1, p. 32; 279-22, pp. 7-8, this plaintiff relies on the doctrine of law of the case to hold the Court to its earlier determination on a motion to dismiss that Edwards had a special relationship to him through Archipel and BIM.

One circumstance in which law of the case is implicated is "when a court reconsiders its own ruling on an issue in the absence of an intervening ruling on the issue by a higher court." *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002). In such a circumstance, the court should generally follow the earlier decision unless "cogent and compelling reasons militate otherwise[.]" *Id.*

As defendants correctly note, law of the case is not applicable in the circumstances Goldberg presents. First, law of the case "is discretionary and does not limit a court's power to reconsider its own decision prior to final judgment." *Aramony v. United Way of Am.*, 254 F.3d 403, 410 (2d Cir. 2001). Accordingly, the Court is not bound to follow its earlier decision. In any event, the decision Goldberg relies on held only that, for the limited purposes of a motion to dismiss, he had adequately pled that Edwards owed him a duty of honesty arising from a special relationship. *Goldberg v. Gray*, 2016 WL 4099189, at \*10 (N.D.N.Y. Aug. 2, 2016).

The question now at issue is whether there is record evidence to support that Edwards had a special relationship with Goldberg. There is none. This plaintiff relies on partnership principles to impute a special relationship with this defendant, but there is nothing to suggest that under Delaware law Edwards' role as a general partner to BIM, which was itself a general partner of the Archipel entities in which Goldberg invested, would artificially create the necessary relationship. *McEssy*, 2019 WL 6829053, at \*12-14.

Additionally, as alluded to above, Goldberg has not created a disputed issue of material fact as to whether he and Edwards shared a special relationship based on their actual interactions. The record is barren as to any interactions between Edwards and Goldberg save the lone email chain that this plaintiff forwarded to this defendant. Edwards Dec. ¶ 14; Edwards Dep. 23, 40; Dkt. 279-1, p. 32; 279-22, pp. 7-8. Such a sparse record cannot sustain Goldberg's claim for a negligent misrepresentation, and thus that claim must be dismissed.

Similarly, neither plaintiff has alleged that Edwards actually made any misrepresentation to them. Unlike in cases of fraud, negligent misrepresentation claims require an actual misrepresentation, rather than a broader spectrum of deceptive conduct. [6] *See, e.g., Anschutz Corp.*, 690 F.3d at 114 (including misrepresentation as element of negligent misrepresentation under New York law); *Thomas*, 811 F. Supp. 2d at 793 (same for New Jersey law).

[6]    Of course, both New York and New Jersey alternatively allow for claims of fraudulent omission, *Clark v. Prudential Ins. Co. of Am.*, 736 F. Supp. 2d 902, 907 (D. N.J. 2010); *Mandarin Tr. Ltd. v. Wildenstein*, 994 N.E.2d 1104, 1108 (N.Y. 2011), but plaintiffs have not pled that claim against Edwards, and cannot assert that claim for the first time at this late stage in litigation. In any event, because the only statement that Edwards ever made either plaintiff on this record is his biography in the PPMs, he could hardly be expected to include an advertisement that Gray had a substantial disciplinary history in his own biography, that claim would be meritless in any case.

**\*16** The only statement that Edwards ever made to either plaintiff was providing his biography, which was adopted and included in the PPMs. Dkt. 279-8, p. 11. Plaintiffs have not alleged, argued, or proven that the biography itself contained any material misrepresentations, and thus plaintiffs have failed to provide any evidence on summary judgment that Edwards made a negligent misrepresentation to them. Accordingly, plaintiffs' negligent misrepresentation claims must be dismissed. [7]

Amerio v. Gray, Not Reported in Fed. Supp. (2020)
Case 3:25-cv-01174-AMN-TWD    Document 10    Filed 11/04/25    Page 28 of 83

2020 WL 4192618

7   Because the existence of a misrepresentation is a fundamental element under both New York and New Jersey law, the Court need not decide which law applies to Amerio's claim.

**4. Breach of Fiduciary Duty.**

Under New York law, [8] a claim for a breach of fiduciary duty requires a plaintiff to prove: (1) "the existence of a fiduciary duty"; (2) "a knowing breach of that duty"; and (3) "damages resulting therefrom." *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 138 (2d Cir. 2011).

8   Once again, New Jersey and New York law are treated substantially similarly, which both parties acknowledge. Accordingly, the Court will apply New York law. *See, e.g., Schwarz v. ThinkStrategy Capital Mgmt. LLC*, 797 F. Supp. 2d 439, 447 n.43 (S.D.N.Y. 2011).

A fiduciary duty can exist "when confidence is reposed on one side and there is resulting superiority and influence on the other." *Nuss v. Sabad*, 976 F. Supp. 2d 231, 248 (N.D.N.Y. 2013). One useful gauge in whether that superiority and influence exists are ongoing interactions of trust and reliance between the plaintiff and defendant. *Id.* Other barometers for a fiduciary duty include "reliance, de facto control and dominance." *United States v. Halloran*, 821 F.3d 321, 338 (2d Cir. 2016) (quoting *AG Capital Funding Partners, L.P. v. State St. Bank & Trust Co.*, 896 N.E.2d 61, 68 (N.Y. 2008)).

In all, exact definitions of what constitutes a fiduciary relationship are "impossible to [state]," but a fiduciary relationship may be found in cases where "influence has been acquired and abused, [or] in which confidence has been reposed and betrayed." *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 196 (S.D.N.Y. 2006). However, courts routinely hold that parties dealing at an arm's length are not in a situation "of confidence or trust sufficient to find the existence of a fiduciary relationship" and thus no fiduciary duty "will arise absent extraordinary circumstances." *In re Mid-Island Hosp., Inc.*, 276 F.3d 123, 130 (2d Cir. 2002). It is up to the factfinder to determine if there was a fiduciary duty owed to the plaintiff based on the available evidence. *See id.*

However, even if such a duty is owed, the defendant must have knowingly participated in the breach of that duty. *In re Platinum-Beechwood Litig.*, 400 F. Supp. 3d 2, 5 (S.D.N.Y. 2019). This requires the defendant to have taken some affirmative action in the breach by assisting in it, helping conceal it, or by otherwise failing to act when his duty requires he do so. *Id.* Finally, to support a claim for a breach of fiduciary duty, a plaintiff must establish that the breach proximately caused the damages he suffered. *Nordwind v. Rowland*, 584 F.3d 420, 433 (2d Cir. 2009).

Finally, plaintiffs have failed to establish that Edwards owed either of them a fiduciary duty. Familiar as the refrain must be by now, it must again be stressed that Edwards never managed their money or advised them on their investments. Edwards Dec. ¶ 14; *see* Edwards Dep. 23, 40. Neither did either plaintiff discuss their investments with Edwards at any point, except for when Goldberg forwarded him a single email chain. Dkt. 279-1, p. 32; 279-22, pp. 7-8. Plaintiffs had barely any relationship with Edwards at all, let alone one that would rise to the level of confidence or trust. *In re Mid-Island Hosp.*, 276 F.3d at 130. Instead, to the extent that plaintiffs interacted with Edwards, that relationship was at arms' length, and there is no further evidence to support a fiduciary relationship. *Id.*

**\*17**   Plaintiffs attempt to circumvent the lack of a direct connection between themselves and Edwards by describing the extent of his involvement in Archipel and BIM, but that is irrelevant to his relationship to plaintiffs specifically. Once again, it may be that BIM owed plaintiffs a fiduciary duty, and it may be that Edwards owed a fiduciary duty to BIM. But a fiduciary duty is inherently based on the relationship between the fiduciary and those relying on him, and it is not enough to be a fiduciary of a fiduciary. Accordingly, plaintiffs have failed to establish that Edwards was their fiduciary, and their breach of fiduciary duty claims against Edwards, and indeed all of their claims against Edwards, must be dismissed.

**C. Plaintiffs' Claims Against Bennington.**

Amerio v. Gray, Not Reported in Fed. Supp. (2020)

2020 WL 4192618

Defendants correctly note that given the paucity of evidence of Bennington or its agents acting within the scope of their agency to commit the torts plaintiffs allege, plaintiffs must establish "reverse" piercing of the corporate veil to hold Bennington liable for the tortious conduct they lay at Edwards' feet. *See Am. Fuel Corp. v. Utah Energy Dev. Co., Inc.*, 122 F.3d 130, 134 (2d Cir. 1997) (noting that piercing of corporate veil is necessary under New York law [9] to hold corporation liable for independent actions of its agents); *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 306 F. Supp. 2d 482, 485 (S.D.N.Y. 2004) (describing that "reverse" veil-piercing is necessary to hold corporation liable for unrelated actions of its agents).

[9]    Because Bennington is a Canadian corporation, Canadian law on piercing of the corporate veil technically applies, but because neither party identifies any meaningful difference between the two bodies of corporate law, the Court will apply the more readily-accessible New York law.

However, even assuming that plaintiffs could establish that reverse veil-piercing is appropriate in this case, for the reasons described above no conduct of Edwards, the only Bennington agent plaintiffs have identified, [10] amounted to a tort that could survive summary judgment. Accordingly, just as all claims must be dismissed against Edwards, all claims must also be dismissed against Bennington.

[10]    Bennington is a corporation whose sole purpose was to hold a Canadian securities license so that Edwards could provide advice to an unrelated venture capital fund. Edwards Dec. ¶ 9. Bennington was never directly involved in operating an Archipel entity. *Id.*

### D. Plaintiffs' Motion for Default Judgment.

A "corporation may appear in the federal courts only through licensed counsel." *Rowland v. Cal. Men's Colony*, 506 U.S. 194, 201-02 (1993). Therefore, "where a corporation repeatedly fails to appear by counsel, a default judgment may be entered against it pursuant to Rule 55[.]" *SEC v. Research Automation Corp.*, 521 F.2d 585, 589 (2d Cir. 1975); *accord Jacobs v. Patent Enf't Fund, Inc.*, 230 F.3d 565, 568 (2d Cir. 2000). The same prohibition extends to partnerships. *Leviton Mfg. Co., Inc. v. Fastmac Performance Upgrades, Inc.*, 2013 WL 4780045, at *2 (S.D.N.Y. July 8, 2013) (citing *Jones v. Niagara Frontier Transp. Auth.*, 722 F.2d 20, 22 (2d Cir. 1983)).

Having properly received an entry of default against BIM and Archipel ("the Archipel defendants"), plaintiffs have moved for default judgment against those defendants on Counts: (I) securities fraud; (IV) common law fraud; (V) negligent misrepresentation; and (VI) breach of fiduciary duty. [11] The Archipel defendants have still yet to appear with licensed counsel, and at this point that failure more than adequately establishes default. *Jacobs*, 230 F.3d at 568. Accordingly, plaintiffs are entitled to default judgment against these defendants so long as plaintiffs' allegations establish liability against them as a matter of law.

[11]    The SAC technically only asserts these claims against Gray, Edwards, and Bennington, without mention of BIM or Archipel as defendants for any claim. However, each count also includes a paragraph which re-alleges every other allegation of the complaint, and other paragraphs charge BIM and Archipel as culpable actors. Thus, plaintiffs' claims against BIM and Archipel will be considered.

### 1. Facts Attributable to Each Defendant.

**\*18** However, the antecedent question to be answered is which facts in the complaint are attributable to which Archipel defendant. To that end, under New York's choice of law rules, "the liability of partners of an out-of-state partnership [are judged] according to the laws of the jurisdiction where the partnership was organized." *Dep't of Econ. Dev. v. Arthur Andersen & Co. (U.S.A.)*, 924 F. Supp. 449, 485 (S.D.N.Y. 1996). Thus, because BIM was formed in Delaware, Delaware law applies. Gray Dep. 12.

Case 3:25-cv-01174-AMN-TWD    Document 10    Filed 11/04/25    Page 30 of 83

Amerio v. Gray, Not Reported in Fed. Supp. (2020)

2020 WL 4192618

Under Delaware law, a partnership is liable for a loss or injury caused to a third party as a result of a wrongful act or omission by a partner within the course of partnership business. 6 DEL. C. § 15-305. Therefore, BIM can be held liable both for the misconduct the complaint charges against it directly and for Gray's alleged misconduct within the course of partnership business.

The same cannot be said of Archipel, which is a limited liability company formed under New York law. Dkt. 132, ¶ 18. In assessing the liability of a limited liability company, New York courts apply the law of the state under which the company is organized. *See, e.g.*, *Finkelstein v. Warner Music Grp. Inc.*, 820 N.Y.S.2d 264, 266 (App. Div. 1st Dep't 2006) (noting that limited liability company formed in Delaware would have nature of claims as direct or derivative decided based on Delaware law).

To attribute the tortious acts of a member to a limited liability company under New York law, much like for corporate entities such as Bennington above, would-be plaintiffs must establish the "reverse" variant of the legal principle of piercing the corporate veil. *Monteleone v. Leverage Grp.*, 2008 WL 4541124, at *9 (E.D.N.Y. Oct. 7, 2008) (citing *Am. Fuel Corp. v. Utah Energy Dev. Co., Inc.*, 122 F.3d 130, 134 (2d Cir. 1997)) (applying reverse piercing the corporate veil to attribute liability for controller to limited liability company). To pierce the corporate veil, New York law requires a plaintiff to prove both: (1) "that the owner exercised complete domination over the [company] with respect to the transaction at issue"; and (2) that the domination itself was used to commit the wrong the injured party seeks to redress. *See Am. Fuel Corp.*, 122 F.3d at 134. Naturally, then, domination is necessary but not sufficient for the veil-piercing analysis. *Id.*

In determining whether Archipel can be held liable for Gray's misconduct as well as its own to establish entitlement to default judgment, plaintiffs have failed to sufficiently demonstrate complete domination by Gray or Edwards, and thus have failed to pierce the corporate veil. Although there can be little doubt that Gray exhibited a great deal of influence over Archipel, the SAC levies several allegations that both Edwards and Gray steered Archipel, and that Stelljes also exhibited a degree of control. *See, e.g.*, Dkt. 132 ("SAC"), ¶¶ 69-70, 86, 137, 168, 174. Moreover, the record evidence clarifies that Stelljes was a frequent point of contact between Archipel and Goldberg, and that he was Archipel's Managing Director. *See* Goldberg Dep. 8, 10; Dkt. 279-8, p. 11.

Accordingly, plaintiffs have not established that any one Archipel figure truly dominated its operations. Thus, Archipel's liability can only be measured against the allegations that the complaint aims directly at the company. *See, e.g., Monteleone*, 2008 WL 4541124, at *9.

### 2. Securities Fraud.

**\*19**  Once again, the elements of securities fraud under Rule 10b-5(b) are: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Matrixx*, 563 U.S. at 37-38.

At the outset, both plaintiffs have sufficiently alleged that the losses they suffered as a result of their Archipel entity investments were connected to a security. SAC ¶ 143. Both plaintiffs also alleged in no uncertain terms that both Archipel and BIM "intentionally and fraudulently" misrepresented Gray's disciplinary history in the PPMs, which establishes the elements of a material misrepresentation and scienter. *Id.* ¶ 162. The SAC also alleges that plaintiffs relied on the information provided them, and that they would not have invested in the Archipel entities and lost their money if not for those statements. *Id.* ¶¶ 181-82. Finally, plaintiffs allege that they have suffered economic loss. *Id.* ¶ 183. Accordingly, plaintiffs have sufficiently alleged each element of securities fraud against both Archipel defendants, and default judgment must be granted in plaintiffs' favor on Count I.

### 3. Common Law Fraud.

The elements of common law fraud applicable in this case are: "(1) a misrepresentation or a material omission of fact which was false and known to be false by [the] defendant; (2) made for the purpose of inducing the other party to rely upon it; (3) justifiable reliance of the other party on the misrepresentation or material omission; and (4) injury." *Equifax*, 583 F.3d at 108. Much as

Amerio v. Gray, Not Reported in Fed. Supp. (2020)

2020 WL 4192618

with the discussion of plaintiffs' securities and common law fraud claims above, there is sufficient overlap in the elements at play in the two counts that the analysis is identical. Plaintiffs have adequately pled every element of common law fraud against both Archipel defendants, and therefore their motion for default judgment on Count IV must be granted. SAC ¶¶ 162, 181-83.

#### 4. Negligent Misrepresentation.

To prove his New York negligent misrepresentation claims against the Archipel defendants, Goldberg must once again prove: "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." *Anschutz*, 690 F.3d at 114.

Goldberg has adequately alleged that defendants, a broad label that includes the Archipel defendants, failed to correct the misrepresentation in the PPMs that Gray was properly licensed despite knowing that the NYSE had stripped his licensure. SAC ¶ 226. He has also alleged that he reasonably relied on that information to his loss. *Id.* ¶¶ 181-83.

Where Goldberg runs into trouble is in establishing a special relationship. Of course, the SAC alleges that Gray and Edwards owed him such a relationship, which is enough for liability to attach to BIM as a partnership. SAC ¶ 225; 6 DEL. C. § 15-305. However, Goldberg does not allege that Archipel itself, being a limited liability company and thus only liable for its own actions, had a special relationship with him. *See* SAC ¶ 225. Nevertheless, Goldberg specifically alleges that all defendants owed them a duty to act with reasonable care in disseminating information. *Id.* ¶ 224.

**\*20** Under New York law, that duty of care in dissemination explicitly emerges only from the existence of a special relationship. *Anschutz*, 690 F.3d at 114 (noting that plaintiff must establish defendant's "duty, *as a result of* a special relationship, to give correct information" (emphasis added)). In other words, by pleading that the duty exists, the necessary implication is that the special relationship existed first. Accordingly, for the broad purposes of default judgment, Goldberg has sufficiently alleged that he and Archipel shared a special relationship, and default judgment must be granted in his favor as to Count V against both Archipel defendants.

To the extent that New York law governs Amerio's claims, the same logic requires default judgment in his favor on this count as well. Alternatively, if his claims fall under New Jersey law, Amerio must prove that "an incorrect statement was negligently made" by the Archipel defendants upon which he "justifiably relied" and that he is thus entitled "to recover damages for economic loss or injury sustained as a consequence of that reliance." *Thomas*, 811 F. Supp. 2d at 793. Amerio has adequately alleged reliance on a negligently-made statement. SAC ¶¶ 181-82, 226. Of course, he has also alleged economic loss and injury. *Id.* ¶ 183. As a result, default judgment must also be granted for Amerio against both Archipel defendants on Count V.

#### 5. Breach of Fiduciary Duty.

To sustain their claim for a breach of fiduciary duty, plaintiffs must again allege: (1) "the existence of a fiduciary duty"; (2) "a knowing breach of that duty"; and (3) "damages resulting therefrom." *Johnson*, 660 F.3d at 138. The issue of damages or breach is not at issue for either plaintiff against either defendant, because the complaint alleges misconduct up to and including outright fraud and resulting damages. SAC ¶¶ 162, 181-183. Similarly, plaintiffs have alleged that all defendants owed plaintiffs several duties as fiduciaries. *Id.* ¶ 223. Accordingly, plaintiffs have adequately alleged that all defendants owed them a fiduciary duty, and default judgment must be granted as to Count VI as well.

#### 6. Plaintiffs' Remaining Claims Against the Archipel Defendants.

Lastly, the Court informed plaintiffs in the March 31 decision that any count for which they did not move for default judgment would be dismissed for failure to prosecute under Rule 41(b). Plaintiffs timely moved for default judgment only on Counts (I) and (IV-VI). As a result, plaintiffs' claims under Counts (II-III) and (VII-XII) are dismissed for failure to prosecute under Rule

Case 3:25-cv-01174-AMN-TWD    Document 10    Filed 11/04/25    Page 32 of 83

Amerio v. Gray, Not Reported in Fed. Supp. (2020)

2020 WL 4192618

41(b). As for the claims to which plaintiffs are entitled to default judgment, an assessment of damages and final judgment shall wait until plaintiffs' claims against Gray are resolved.

### E. Plaintiffs' Claims Against Gray.

The bombardment of motion practice having at last grown silent, plaintiffs' claims against Gray remain untouched as the smoke clears. All twelve counts of plaintiffs' SAC remain in the field, and although trying this case will be much more manageable than it would have been in the absence of the present motions, nevertheless several of plaintiffs' claims against Gray would perhaps inject an unwarranted degree of complication. In this Court's August 2, 2016 Memorandum-Decision and Order, all claims were dismissed against Edwards and Bennington for failure to state a claim except Counts (I) and (IV-VI). *Goldberg v. Gray*, 2016 WL 4099189, at *16 (N.D.N.Y. Aug. 2, 2016). Accordingly, plaintiffs are ordered to show cause why Counts (II-III) and (VII-XII) should not be dismissed under Rule 56(f)(3) for the same reasons no later than Wednesday, August 12, 2020.

**\*21** Of course, according to plaintiffs' allegations, Gray is more culpable than Edwards and Bennington ever were, and it is possible that some additional claims could survive review. Should plaintiffs wish to preserve those additional counts, they may explain why they should remain and why dismissal would be inappropriate.

## V. CONCLUSION

Plaintiffs are understandably frustrated—to say the least—with their experience investing in the Archipel entities. This litigation and its scattered siblings sound an outraged keen at what they allege to be profound lies and manipulations which have taken from them an aggregate total of millions of dollars. The Court is not unmoved by their allegations, but nevertheless it must carefully safeguard its own mechanisms and procedures such that justice be done proportionate to whatever wrongs a finder of fact determines were caused by each defendant.

That justice would be best served to come swiftly. As a result, the would-be intervenors must be denied their intrusion into this case so that it can proceed to its resolution. Additionally, in the absence of any stronger indication of malfeasance than plaintiffs have mustered, Edwards and Bennington cannot be held to answer for the wrongs that plaintiffs allege. However, at the least plaintiffs have achieved an important victory in vindicating their rights by attaining default judgment against BIM and Archipel. All that remains now is to proceed onward toward trial of this matter, and the final determination of what else, if anything, plaintiffs are owed.

Therefore, it is

ORDERED that

1. The motion to intervene brought by Andrew C. Russo, Caroline Hardman, Lee Knight, Todd Morakis, and David Work is DENIED;

2. Gregory Edwards' and Bennington Investment Management, Inc.'s motions for summary judgment are GRANTED;

3. Plaintiffs' claims against Gregory Edwards and Bennington Investment Management, Inc. are DISMISSED;

4. Plaintiffs' motion for default judgment against BIM Management LP and Archipel Capital LLC under counts (I) securities fraud, (IV) common law fraud, (V) common law negligent misrepresentation, and (VI) common law breach of fiduciary duty is GRANTED;

5. Plaintiffs' claims against BIM Management LP and Archipel Capital LLC under Counts: (II) Control Person Liability under § 20(a) of the Exchange Act, 15 U.S.C. § 78t; (III) the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962; (VII) common law conversion; (VIII) common law unjust enrichment; and (IX-XII) New York's Debtor and Creditor Law §§ 273-76 are DISMISSED for failure to prosecute under Rule 41(b);

6. Plaintiffs' damages under Counts (I), (IV), (V), and (VI) owed by BIM Management LP and Archipel Capital LLC will be ascertained after plaintiffs' claims against Gregory Gray are resolved;

7. Plaintiffs are ordered to show cause why summary judgment should not be granted in Gregory Gray's favor as to counts (II-III) and (VII-XII) no later than Wednesday, August 12, 2020; and

8. A date for a jury trial on the merits of plaintiffs' remaining claims against defendant Gregory Gray and for damages as to BIM Management LP and Archipel Capital LLC will be set.

It is SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 4192618

---

**End of Document**                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Milea v. Hoveman, Not Reported in Fed. Supp. (2024)

2024 WL 2272879

2024 WL 2272879

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Frank Louis MILEA, and Carpet Alley Incorporated, Plaintiffs,

v.

Virginia HOVEMAN, et al., Defendants.

5:24-cv-0407 (DNH/TWD)

|

Signed May 20, 2024

**Attorneys and Law Firms**

FRANK LOUIS MILEA, Plaintiff, pro se, 6961 Exline Road, Jacksonville, FL 32222.

CARPET ALLEY INCORPORATED, Plaintiff, pro se.

## REPORT-RECOMMENDATION AND ORDER

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

## I. INTRODUCTION

 **\*1**  The Clerk has sent the *pro se* amended complaint in the above-captioned action together with an application to proceed *in forma pauperis* ("IFP"), and two motions for counsel filed by Frank Louis Milea ("Plaintiff") to the Court for review. (Dkt. Nos. 2, 3, 6, 7.)

## II. IFP APPLICATION

Plaintiff has not paid the filing fee for this action and seeks to proceed IFP. Upon review, Plaintiff's IFP application demonstrates economic need. (Dkt. No. 2.) Therefore, he is permitted to proceed IFP.

## III. BACKGROUND

Plaintiff's original complaint was received on March 25, 2024, which named Virginia Hoveman, Grace Ghezzi, and Madison County, New York as the Defendants. (Dkt. No. 1.[1]) In the accompanying IFP application Plaintiff stated:

> This Law Suit is all about a estate attorney who has scammed me and worked for me for 15 years and has paid officials in Madison County, New York with my money to help scam me out of my rightful inheritance and has ruined my life for the last 8 years in her attempt to kill me like she did my mother. These three entities are the prime source of me going to jail for 6 months because of there lies in a last will and testament of my mother leaving me broke and heart broken and completely friendless from even my own children.

(Dkt. No. 2 at 1.)

Case 3:25-cv-01174-AMN-TWD    Document 10    Filed 11/04/25    Page 35 of 83

Milea v. Hoveman, Not Reported in Fed. Supp. (2024)
2024 WL 2272879

[1]      Citations to Plaintiff's submissions will be to the pagination generated by CM/ECF, the Court's electronic filing system. Unless otherwise indicated, excerpts from the record are reproduced exactly as they appear in the original and errors in spelling, punctuation, and grammar have not been corrected.

On March 25, 2024, a Text Notice of Filing Deficiency was issued: "Pro Se Plaintiff needs to file a Civil Cover Sheet, Summons for each defendant, a signed, dated Complaint to contain name, address and phone number." (Text Notice 03/25/2024.) Plaintiff was directed to make the appropriate corrections and forward the documents to the Clerk's office. *Id.*

On April 8, 2024, Plaintiff submitted an amended complaint entitled: "This is RICO Act Complaint." (Dkt. No. 7 at 1.) In the civil cover sheet, Plaintiff indicated the basis of jurisdiction was "U.S. Government Plaintiff." (Dkt. No. 7-1.) In the nature of suit portion of the sheet, Plaintiff checked the following boxes: Other Contract, Other Personal Injury, Other Fraud, All Other Real Property, and Freedom of Information Act. *Id.* Plaintiff identified "RICO Act" as the statute under which he filed and listed "Inherantance" as a brief description. *Id.*

In the amended complaint, Plaintiff listed himself and Carpet Alley Incorporated as the plaintiffs and named the following as Defendants: (1) Lorie Milea; (2) Virginia Hoveman, Attorney; (3) Bousquet Holstein Law Firm; (4) Grace Ghezzi; (5) Frank Milea, Jr.; (6) Elizabeth M. Milea; (7) David J. Milea; (8) John A. Milea; (9) Theresa Martin; (10) Scott Martin; (11) Michael Besner; (12) Michelle Besner; (13) Traci D'Ambrosio; (14) Joseph D'Ambrosio; (15) Ford-Marrin Law Firm; (16) Anthony Grizzanti, Attorney; (17) Douglas Mahr, Attorney; (18) Scolaro, Fetter, Grizanti & McGough, P.C.; (19) Madison County, Madison, New York; (20) Andrew Fredrickson, Attorney; and (21) Rick Britton, Attorney. *Id.* at 1-2.

**\*2** On April 9, 2024, without direction from the Court, Plaintiff submitted a second "amended complaint" adding two more Defendants: David Sieling and Brenna Boyce, P.L.C. (Dkt. No. 10.) Then, on April 22, 2024, again without direction from the Court, Plaintiff filed a third "amended complaint" adding Duval County, Jacksonville, Florida as a Defendant. (Dkt. No. 13.) Like the original complaint, Plaintiff's so-called second and third amended complaints are not signed in violation of Federal Rule of Civil Procedure 11(a), which prescribes that "[e]very pleading, written motion, and other paper must be signed ... by a party personally if the party is unrepresented." Fed. R. Civ. P. 11(a).

Therefore, the Court deems the amended complaint, the only signed pleading, the operative pleading. (Dkt. No. 7.) However, out of an abundance of caution and in light of the solicitude generally afforded to *pro se* litigations, the Court will consider the unsigned pleadings as supplements to the amended complaint for purposes of initial review. [2]

[2]      However, Plaintiff is advised he may not attempt to amend his pleadings in a piecemeal manner. *See* L.R. 15.1; *see also Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect." (internal quotation marks omitted)).

## IV. STANDARD OF REVIEW

### A. Legal Standard

Section 1915(e) directs that, when a plaintiff seeks to proceed IFP, "the court shall dismiss the case at any time if the court determines that ... the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B); *see Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998). The court must also dismiss a complaint, or portion thereof, when the court lacks subject matter jurisdiction. *See* Fed. R. Civ. P. 12(h)(3).

While the law mandates dismissal on any of these grounds, the court is obliged to construe *pro se* pleadings liberally, *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), and interpret them to raise the "strongest arguments that they *suggest*." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474-75 (2d Cir. 2006) (internal quotation marks and citation omitted) (emphasis in original). A claim is frivolous when it "lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989),

Milea v. Hoveman, Not Reported in Fed. Supp. (2024)

2024 WL 2272879

*abrogated on other grounds Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *see Denton v. Hernandez*, 504 U.S. 25, 33 (1992) (holding "a finding of factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible"); *see also Livingston*, 141 F.3d at 437 ("[A]n action is 'frivolous' when either: (1) the factual contentions are clearly baseless ... or (2) the claim is based on an indisputably meritless legal theory.").

To survive dismissal for failure to state a claim, a complaint must contain a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). This short and plain statement of the claim must be "plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). It must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (internal quotation marks and citations omitted); *see also* Fed. R. Civ. P. 8(a)(2). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief.' " *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

**\*3** In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citations omitted). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 663.

### B. Overview of the Amended Complaint as Supplemented

The amended complaint is drafted in narrative form and is difficult to understand. (*See generall*y, Dkt. No. 7.) For example, the amended complaint states: "Probate Court is a Sacred Court in this county but I was meet with sarcasm and foolery in Madison County. No matter which way I went. I was given a hard time and lies." *Id.* at 3. From what the Court can discern, Plaintiff alleges that pursuant to his mother's 2001 will, he "had 1/3 of the Theresa Milea estate coming to me plus a home." *Id.* Grace Ghezzi was the financial advisor. *Id.* But in 2015, Plaintiff's 93-year-old-mother was coerced by Virginia Hoveman into signing a new will naming Plaintiff's daughters, Lorie Milea and Theresa Martin, "as executors and Fiduciaries." *Id.* at 3-4. Plaintiff alleges the beneficiaries of the 2001 will did not know about the existence of the 2015 will so Defendants "could embezzle this estate completely of over 4 million dollars in assets as proven by Grace Ghezzi and Virginia Hoveman who are not talking." *Id.* at 4.

It appears Plaintiff took "them" to court in Jacksonville, Florida and Madison County, New York because of "their non transparency." *Id.* But "Lorie Milea's criminal attorney protected her from her embezzlement and was awarded $6,000.00 judgment against me by Judge Cerio of the Supreme Court Madison County New York by falsifying motions that he falsely said he made against me." *Id.*

Plaintiff requests a "minimum of 5 million each" from the defendants, and 10 million from Virginia Hoveman and Grace Ghezzi. *Id.* at 5. Plaintiff claims defendants "could not have engineered this violent act if they all did not take part in this heinous act of corruption." *Id.* In conclusion, Plaintiff states:

> Father in Heaven I stand before you today in are heavenly world. These 21 people have made a disgrace of my mother and fathers life work for their own advancement and made a living hell out of my life. With the special power you have granted them all. I ask you to treat them all equally and to give me strength and guidance enough to tear them apart and achieve my goals that only you know of.

*Id.*

Milea v. Hoveman, Not Reported in Fed. Supp. (2024)

Case 3:25-cv-01174-AMN-TWD    Document 10    Filed 11/04/25    Page 37 of 83

2024 WL 2272879

For a complete statement, reference is made to the amended complaint as supplemented. (Dkt. Nos. 7, 10, 13.) The Court notes Plaintiff has also filed numerous letters on the docket addressed to the Court as well as a RICO Act Statement, among other submissions. (*See, e.g.*, Dkt. Nos. 5, 6, 12, 14, 15, 17.)

## V. ANALYSIS

### A. Allied Carpet Incorporated

As a preliminary matter, Plaintiff, who is proceeding *pro se* and requests *pro bono* counsel, lists Carpet Alley Incorporated as plaintiff in this action. (Dkt. No. 7 at 1; *see* Dkt. Nos. 3, 6.) The statute governing appearances in federal court, 28 U.S.C. § 1654, "allow[s] two types of representation: 'that by an attorney admitted to the practice of law by a governmental regulatory body, and that by a person representing himself.' " *Lattanzio v. COMTA*, 481 F.3d 137, 139 (2d Cir. 2007) (quoting *Eagle Assocs. v. Bank of Montreal*, 926 F.2d 1305, 1308 (2d Cir. 1991)). A nonlawyer cannot bring suit on behalf of another person and "may not represent a separate legal entity such as a corporation." *Id.*; *see United States ex rel. Mergent Servs. v. Flaherty*, 540 F.3d 89, 92 (2d Cir. 2008); *Iannaccone v. Law*, 142 F.3d 553, 558 (2d Cir. 1998). A "corporation may appear in the federal courts only through licensed counsel." *Amerio v. Gray*, No. 5:15-CV-538, 2020 WL 4192618, at *17 (N.D.N.Y. July 21, 2020) (quoting *Rowland v. Cal. Men's Colony*, 506 U.S. 194, 201-02 (1993)).

**\*4** Accordingly, the Court recommends that any claims Plaintiff purportedly asserts on behalf of Allied Carpet Incorporated be dismissed. 28 U.S.C. § 1915(e)(2)(B)(ii).

### B. Rules 8 and 10 of the Federal Rules of Civil Procedure

Next, the amended complaint fails to meet the standards of Federal Rules of Civil Procedure 8 and 10. (*See generally*, Dkt. No. 7.) Rule 8 requires a "short and plain statement" of a claim, showing that "the pleader is entitled to relief." *Whitfield v. Johnson*, 763 F. App'x 106, 107 (2d Cir. 2019) (quoting Fed. R. Civ. P. 8(a)). Each statement must be "simple, concise, and direct," and give "fair notice of the claims asserted." *Whitfield*, 763 F. App'x at 107 (quoting *Simmons v. Abruzzo*, 49 F.3d 83, 86 (2d Cir. 1995)). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). "A complaint may be dismissed under Rule 8 if it is 'so confused, ambiguous, or otherwise unintelligible that its true substance, if any, is well disguised.' " *Id.*

Moreover, Rule 10 provides that "[a] party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances[.]" Fed. R. Civ. P. 10(b). Rule 10's purpose is to "provide an easy mode of identification for referring to a particular paragraph in a prior pleading[.]" *Clervrain v. Robbins*, No. 22-CV-1248 (MAD/DJS), 2022 WL 17517312, at *2 (N.D.N.Y. Dec. 8, 2022) (citation omitted), *report-recommendation adopted*, 2023 WL 3170384 (N.D.N.Y. May 1, 2023).

A complaint that does not comply with these Rules "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [the plaintiff's] claims," and may properly be dismissed by the Court. *Gonzales v. Wing*, 167 F.R.D. 352, 355 (N.D.N.Y. 1996).

Given its lack of clarity, the Court recommends dismissal of the amended complaint, as supplemented, because it is not acceptable under Rules 8 and 10 of the Federal Rules of Civil Procedure.

### C. Failure to State a Claim

Lastly, insofar as the amended complaint, as supplemented, is liberally construed as asserting claims under the civil provision of RICO, which "creates a private right of action for individuals to enforce the RICO statute," *Mathon v. Feldstein*, 303 F. Supp. 2d 317, 322 (E.D.N.Y. 2004), the Court recommends it be dismissed. 28 U.S.C. § 1915(e)(2)(B)(ii).

2024 WL 2272879

The civil RICO enforcement provision states that "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. § 1962] ... may sue ... in any appropriate United States district court and shall recover threefold the damages[.]" 18 U.S.C. § 1964(c). In order to state a violation of Section 1962, and thus, a claim under the civil RICO enforcement provision, a plaintiff must allege facts showing: "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir. 1983) (quoting Section 1962(a)-(c)). Such a plaintiff must also "allege that he was 'injured in his business or property *by reason* of a violation of section 1962.' " *Id.* (quoting Section 1964(c)) (emphasis in original).

**\*5** To state a claim of a civil RICO conspiracy under Section 1962(d), a plaintiff must allege facts showing that the defendants "agreed to form and associate themselves with a RICO enterprise and that they agreed to commit two predicate acts in furtherance of a pattern of racketeering activity in connection with the enterprise." *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 244 (2d Cir. 1999). A plaintiff must also show that "if the agreed upon predicate acts had been carried out, they would have constituted a pattern of racketeering activity." *Id.* at 244-45.

Plaintiff's allegations as to these claims are conclusory, without factual support, and suggest that Plaintiff is merely dissatisfied with the rulings and/or actions of the probate court and other courts with regard to his mother's estate. Even when liberally construed, Plaintiff does not allege any plausible facts that would support any claim under the civil RICO statute. Plaintiff fails to plausibly allege any predicate acts, much less a pattern of RICO activity, nor does he sufficiently allege the existence of a RICO enterprise that affects interstate or foreign commerce. (*See generally*, Dkt. Nos. 7, 10, 13.) Further, wholly absent are any factual allegations from which the Court could reasonably construe an agreement among the Defendants to commit RICO violations. *Id.* Rather, Plaintiff alleges, in conclusory fashion, that "These 21 people could not have engineered this violent act if they all did not take part in this heinous act of corruption. *Id.* at 5.

Therefore, the Court recommends Plaintiff's civil RICO claims stemming from his "Inherantance" be dismissed for failure to state a claim. 28 U.S.C. § 1915(e)(2)(B)(ii).

### D. Leave to Amend

For the reasons stated above, the Court recommends dismissal of the amended complaint, as supplemented, for failure to comply with the Rule 8 and 10 of the Federal Rules of Civil Procedure and for failure to state a claim upon which which relief may be granted.

Generally, a court should not dismiss a *pro se* complaint "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999) (citation and internal quotation marks omitted). However, an opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

Although this Court has serious doubts whether Plaintiff can assert a cognizable RICO claim against the Defendants, in light of his *pro se* status, prior to outright dismissal of this action, the Court recommends that Plaintiff be afforded the opportunity to file a second amended complaint to cure the deficiencies identified above.

The second amended complaint must comply with Rules 8, 10, and 11 of the Federal Rules of Civil Procedure. It must also demonstrate that a case or controversy exists between the Plaintiff and the Defendants which Plaintiff has a legal right to pursue, and over which this Court has jurisdiction. It must be a complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the Court.

## VI. MOTIONS FOR COUNSEL

Case 3:25-cv-01174-AMN-TWD    Document 10    Filed 11/04/25    Page 39 of 83

Milea v. Hoveman, Not Reported in Fed. Supp. (2024)

2024 WL 2272879

It is well-settled there is no right to appointment of counsel in civil matters. *See, e.g.*, *Burgos v. Hopkins*, 14 F.3d 787, 789 (2d Cir. 1994). Pursuant to 28 U.S.C. § 1915(e), the court may request an attorney to represent an indigent party. 28 U.S.C. § 1915(e)(1) (authorizing the court to "request an attorney to represent any person unable to afford counsel."). The Court must consider the issue of appointment carefully because "every assignment of a volunteer lawyer to an undeserving client deprives society of a volunteer lawyer available for a deserving cause." *Cooper v. A. Sargenti Co., Inc.*, 877 F.2d 170, 172 (2d Cir. 1989). Thus, the appointment must be done carefully in order to preserve the "precious commodity" of volunteer lawyers for those litigants who truly need a lawyer's assistance. *Id.* at 172-73.

**\*6** Courts cannot utilize a bright-line test in determining whether counsel should be appointed on behalf of an indigent party. *Hendricks v. Coughlin*, 114 F.3d 390, 392-93 (2d Cir. 1997). Instead, a number of factors must be carefully considered by the court in ruling upon such a motion:

> [The Court] should first determine whether the indigent's position seems likely to be of substance. If the claim meets this threshold requirement, the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

*Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1341 (2d Cir. 1994) (quoting *Hodge v. Police Officers*, 802 F.2d 58, 61 (2d Cir. 1986)) (internal quotation marks omitted). This is not to say that all, or indeed any, of these factors are controlling in a particular case. Rather, each case must be decided on its own facts. *Velasquez v. O'Keefe*, 899 F. Supp. 972, 974 (N.D.N.Y. Oct. 16, 1995) (citing *Hodge*, 802 F.2d at 621).

The Court finds appointment of counsel is not warranted at this time. Because the Court is recommending dismissal of the amended complaint, the Court is unable to determine, as a threshold matter, whether Plaintiff's claims are likely to be of substance. *Id.*

Accordingly, Plaintiff's motions for counsel are denied without prejudice. (Dkt. Nos. 3, 6.) Any future motion for counsel must be accompanied by documentation that substantiates Plaintiff's efforts to obtain counsel from both the public and private sectors.

## VII. CONCLUSION

**ACCORDINGLY**, it is hereby

**ORDERED** that Plaintiff's IFP application (Dkt. No. 2) is **GRANTED**,[3] and it is further

[3]    Although Plaintiff's application to proceed IFP has been granted, he will still be required to pay fees incurred in the future regarding this action, including, but not limited to, copying and/or witness fees.

**RECOMMENDED** that Plaintiff's amended complaint as supplemented (Dkt. Nos. 7, 10, 13), be **DISMISSED WITH LEAVE TO AMEND**; and it is further

**ORDERED** that Plaintiff's motions for counsel (Dkt. Nos. 3, 6) are **DENIED WITHOUT PREJUDICE**; and it is further

2024 WL 2272879

**ORDERED** that the Clerk provide to Plaintiff a copy of this Report-Recommendation and Order, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. [4] Such objections shall be filed with the Clerk of the Court. <u>**FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**</u>. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

---

[4]     If you are proceeding *pro se* and are served with this Report-Recommendation and Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation and Order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

**\*7  IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2024 WL 2272879

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:25-cv-01174-AMN-TWD    Document 10    Filed 11/04/25    Page 41 of 83

Gosier v. Collins, Not Reported in Fed. Supp. (2024)

2024 WL 1016392

2024 WL 1016392
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Willie Thomas GOSIER, Plaintiff,

v.

David J. COLLINS, et al., Defendants.

6:23-cv-1485 (DNH/TWD)

|

Signed March 8, 2024

**Attorneys and Law Firms**

WILLIE THOMAS GOSIER, Plaintiff, pro se, 22-B-2574, Elmira Correctional Facility, P.O. Box 500, Elmira, NY 14902.

**ORDER AND REPORT-RECOMMENDATION**

THÉRÈSE WILEY DANCKS, United States Magistrate Judge

## I. INTRODUCTION

**\*1** The Clerk has sent to the Court for review a *pro se* civil rights complaint filed by Willie Thomas Gosier ("Plaintiff") pursuant to 42 U.S.C. § 1983 ("Section 1983"), asserting claims arising out of June 11, 2023, traffic stop in Rome, New York. (Dkt. No. 1.) Plaintiff has not paid the filing fee for this action and seeks leave to proceed *in forma pauperis* ("IFP"). (Dkt. No. 2.)

## II. IFP APPLICATION

"28 U.S.C. § 1915 permits an indigent litigant to commence an action in a federal court without prepayment of the filing fee that would ordinarily be charged." *Cash v. Bernstein*, No. 09-CV-1922, 2010 WL 5185047, at *1 (S.D.N.Y. Oct. 26, 2010). "Although an indigent, incarcerated individual need not prepay the filing fee at the time of filing, he must subsequently pay the fee, to the extent he is able to do so, through periodic withdrawals from his inmate accounts." *Id.* (citing 28 U.S.C. § 1915(b) and *Harris v. City of New York*, 607 F.3d 18, 21 (2d Cir. 2010)).

At the time Plaintiff commenced this action, he was an inmate at the Oneida County Correctional Facility. (Dkt. Nos. 1, 2.) Section 1915(g) prohibits a prisoner from proceeding IFP where, absent a showing of "imminent danger of serious physical injury," a prisoner has filed three or more actions that were subsequently dismissed as frivolous, malicious, or failing to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915(g). The Court has reviewed Plaintiff's litigation history on the Federal Judiciary's Public Access to Court Electronic Records ("PACER") Service. [1] Based on that review, it does not appear Plaintiff had acquired three strikes for purposes of Section 1915(g) as of the date this action was commenced. [2]

[1]    *See* http://pacer.uspci.uscourts.gov (last visited Mar. 8, 2024).

[2]    *See Gosier v. Oneida Cnty. District Atty's Office*, No. 6:23-cv-01118 (DNH/TWD) (N.D.N.Y. filed on Sept. 1, 2023; closed on Nov. 2, 2023) ("*Gosier I*"); *Gosier v. Utica Police Dep't*, No. 6:23-cv-01119 (DNH/TWD) (N.D.N.Y. filed on Sept. 1, 2023) ("*Gosier II*"); *Gosier v. Oneida Cnty. Corr. Fac.*, No. 9:23-cv-01134 (DNH/CFH) (N.D.N.Y. filed on Sept. 5, 2023) ("*Gosier III*"); *Gosier v. Paolozzi*, No. 9:23-cv-01135 (GTS/TWD) (N.D.N.Y. filed on Sept. 5, 2023;

closed on Jan. 30, 2024) ("*Gosier IV*"). The Court notes *Gosier I* and *Gosier IV* were *sua sponte* dismissed on initial review and Plaintiff has been granted leave to file amended complaints in *Gosier II* and *Gosier III*.

Upon review of Plaintiff's IFP application, the Court finds Plaintiff has demonstrated sufficient economic need and filed the inmate authorization form required in this District. (Dkt. Nos. 2, 3.) Accordingly, Plaintiff's IFP application is granted. [3]

[3]     "Although an indigent, incarcerated individual need not prepay the filing fee at the time ... of filing, he must subsequently pay the fee, to the extent he is able to do so, through periodic withdrawals from his inmate accounts." *Cash*, 2010 WL 5185047, at *1 (citing 28 U.S.C. § 1915(b); *Harris v. City of New York*, 607 F.3d 18, 21 (2d Cir. 2010)). Plaintiff should also note that although his motion to proceed IFP has been granted, he will still be required to pay fees that he may incur in this action, including copying and/or witness fees.

## III. SUFFICIENCY OF THE COMPLAINT

### A. Standard of Review

 **\*2**  Having found Plaintiff meets the financial criteria for commencing this action IFP, and because Plaintiff seeks relief from an officer or employee of a governmental entity, the Court must consider the sufficiency of the allegations set forth in the complaint in light of 28 U.S.C. §§ 1915(e) and 1915A. Section 1915(e) of Title 28 of the United States Code directs that, when a plaintiff seeks to proceed IFP, "the court shall dismiss the case at any time if the court determines that ... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). [4]

[4]     To determine whether an action is frivolous, a court must look to see whether the complaint "lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).

Similarly, under 28 U.S.C. § 1915A, a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); *see also Carr v. Dvorin*, 171 F.3d 115, 116 (2d Cir. 1999) (per curiam) (noting Section 1915A applies to all actions brought by prisoners against government officials even when plaintiff paid the filing fee).

Additionally, when reviewing a complaint, the Court looks to the Federal Rules of Civil Procedure. Rule 8 provides that a pleading which sets forth a claim for relief shall contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 10 provides in pertinent part that: "[a] party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances." Fed. R. Civ. P. 10(b). Rule 10's purpose is to "provide an easy mode of identification for referring to a particular paragraph in a prior pleading[.]" *Clervrain v. Robbins*, No. 22-CV-1248 (MAD/DJS), 2022 WL 17517312, at *2 (N.D.N.Y. Dec. 8, 2022) (citation omitted), *report and recommendation adopted*, 2023 WL 3170384 (N.D.N.Y. May 1, 2023). A complaint that does not comply with these Rules "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [the plaintiff's] claims," and may properly be dismissed by the Court. *Gonzales v. Wing*, 167 F.R.D. 352, 355 (N.D.N.Y. 1996).

A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While the court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing

Gosier v. Collins, Not Reported in Fed. Supp. (2024)

2024 WL 1016392

*Twombly*, 550 U.S. at 555). Thus, a pleading that contains only allegations which "are so vague as to fail to give the defendants adequate notice of the claims against them" is subject to dismissal. *Sheehy v. Brown*, 335 F. App'x 102, 104 (2d Cir. 2009).

**B. Background**

**\*3** The complaint in this action, brought against defendants David J. Collins, Chief of Police of the Rome Police Department, and two unknown police officers, consists of two form complaints—one on the form complaint for civil rights violations pursuant to 42 U.S.C. § 1983 and one on the form complaint for *pro se* prisoner complaints—and four attached narrative pages. (Dkt. No. 1.) The narrative section spans five handwritten pages and is essentially one paragraph with limited punctuation. *See id.* at 8-13. [5] The Court will construe the allegations in the complaint with the utmost leniency. *See Haines v. Kerner*, 404 U.S. 519, 520 (1972) (holding that a *pro se* litigant's complaint is to be held "to less stringent standards than formal pleadings drafted by lawyers"). The following facts are taken from Plaintiff's complaint.

[5]   The Court will refer to the CM/ECF pagination when citing to the complaint. Unless otherwise indicated, excerpts from the complaint are reproduced exactly as they appear in the original and errors in spelling, punctuation, and grammar have not been corrected.

On June 11, 2023, between the hours of 6:00 a.m. and 5:00 p.m., Plaintiff was "stopped" by Rome Police Officers "John Doee and John Doee (the "defendant police officers") in the City of Rome for "speeding" near the Colonial Laundromat. *Id.* at 8. The defendant police officers claimed Plaintiff was going "50 in a 30 zone." *Id.* But Plaintiff "was only doing 35 in a 30 zone which is legal." *Id.* Plaintiff believes he was "targeted and labeled" because he is a young "black mixed person." *Id.* at 11. Plaintiff claims when a "person of color" has "valuable things" like a car, "they ... label you as a drug dealer or a person who conduct's crime." *Id.*

During the traffic stop, the defendant police officers "searched" Plaintiff's name, told Plaintiff he "was under suspention," and instructed him to "get out of [the] car." *Id.* at 8. Plaintiff was "unlawfully" handcuffed, and the defendant police officers conducted a "patdown search" and "searched" the car. *Id.* He was "placed" in the back of the patrol car and "witntnessed" the defendant police officers "pull" his female friend out of the car. *Id.* at 8-9. While holding her arms, "one officer pulled her pant's/panties a way from her body" and "the other reached into her pant's/panties and pulled some thing out completely illegal search." *Id.* at 9. They then took Plaintiff's "book bag's out of the car and trunk 1 book bag was her's with personal paper's, document's item's and looked thru it all[.]" *Id.* "They even took our cell phones" and "searched thru them with no warrent." *Id.* "Still to this date have not gotten my property back none of it they impounded my car. [6] *Id.*

[6]   Plaintiff was able to "get" his car "out" but it "cost me a lot" on a Sunday. (Dkt. No. 1 at 9.) But when he picked up his car, he "had a flat tire and a dent on the passenger side .. [and] had to pay to get inside of car done due to coffiee being spilt on ... swade seats and glitter being all over." *Id.*

Plaintiff claims "driving under a suspention is a misdemeaner and dose not justify handcuffing or conducting a pat down search." *Id.* at 12. "It was a complete unlawful stop and all evidence need's to be suppressed." *Id.*

When Plaintiff "arrived at RPD" on June 11, 2023, the "RPD" did not read Plaintiff his *Miranda* rights, and he was "interrogated" without a lawyer being present and without being told he could have a lawyer. *Id.* at 9-12. "They" asked him questions like, "why was i in Rome what was i doing where did i go in rome why how long ect." *Id.* at 12.

A "couple" of months later, Plaintiff was "charged with what they found in her pant's/panties." *Id.* at 9. On July 15, 2023, he also was "charged with criminal possession of weapon 2nd: loaded firearm-other than person's home/business which charge is still pending against me till this day." *Id.* at 9-10.

**\*4** Plaintiff alleges the "Rome Police Officers and Chief of Police all took part in such conduct and letting such conduct commence" and violated his constitutional rights. *Id.* at 10. Plaintiff claims "they" had "no ground's to pull me over" and the

Gosier v. Collins, Not Reported in Fed. Supp. (2024)

2024 WL 1016392

defendant police officers "should have had a female cop come and conduct that search" of his female friend. *Id.* at 9. "But even so it would still have been unlawful due to them not having probable cause to search me, my car, or my friend what so ever." *Id.* According to Plaintiff, "it is 100% legal" to drive "35 in a 30 zone" therefore, the stop was "1000% not a valid traffic stop at all" and that he "did not [break] any traffic violations or rule/law's." *Id.* at 10. Plaintiff further claims "it is said in supreme and other higher courts that you do not need a license to drive a car, SUV, truck in the United States ... it is protected by my con. Amendment right travel 4 th, 5 th amendment rights's." *Id.*

In his prayer for relief, Plaintiff seeks $2,000,000 and "for the officer's to be charged and procicuted for act's and investigate RPD misconduct." *Id.* at 4,13.

#### C. Nature of Action

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which establishes a cause of action for " 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990) (citations omitted); *see also Myers v. Wollowitz*, No. 95-CV-0272, 1995 WL 236245, at *2 (N.D.N.Y. Apr. 10, 1995) (finding that "§ 1983 is the vehicle by which individuals may seek redress for alleged violations of their constitutional rights").

"Section 1983 itself creates no substantive rights, [but] ... only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993). To establish liability against a government official under section 1983, "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.' " *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676). Moreover, the theory of respondeat superior is not available in a section 1983 action. *See Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003). Instead, "[t]he violation must be established against the supervisory official directly." *Tangreti*, 983 F.3d at 618.

#### IV. ANALYSIS

The Court construes the allegations in the complaint with the utmost leniency. *See, e.g.*, *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (holding that a *pro se* litigant's complaint is to be held "to less stringent standards than formal pleadings drafted by lawyers."). Upon review and for the reasons below, the Court finds Plaintiff's complaint fails to comply with the basic pleading requirements and fails to state a claim. Accordingly, the Court recommends dismissal of the complaint in its entirety pursuant to 28 U.S.C. §§ 1915(e)(2)(B), 1915A(b) for failure to state a claim.

#### A. Rules 8 and 10

A complaint is subject to dismissal if its "form or substance prevents the defendant from forming a 'fair understanding' of the plaintiff's allegations or otherwise prejudices the defendant in responding to the complaint." *Ong v. Park Manor (Middletown Park) Rehab. & Healthcare Ctr.*, 51 F. Supp. 3d 319, 345 (S.D.N.Y. 2014). Ultimately, a complaint must give "fair notice" to the defendants. *See Simmons v. Abruzzo*, 49 F.3d 83, 86 (2d Cir. 1995) ("The function of pleadings under the Federal Rules is to give fair notice of the claims asserted." (internal quotation marks omitted)). Rule 8 "demands more than an adorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678.

In this instance, Plaintiff's rambling complaint consists almost entirely of legal conclusions, rather than well-pleaded factual allegations. As explained in more detail below, Plaintiff's complaint does not comply with Rule 8 because Plaintiff does not make a short and plain statement showing that he is entitled to relief from the named defendants. Additionally, Plaintiff's complaint does not comply with Rule 10 because it lacks numbered paragraphs, each limited as far as practicable to a single set of circumstances.

#### B. Official Capacity Claims

Case 3:25-cv-01174-AMN-TWD    Document 10    Filed 11/04/25    Page 45 of 83

Gosier v. Collins, Not Reported in Fed. Supp. (2024)

2024 WL 1016392

**\*5** Plaintiff's complaint does not specify whether he intends to bring claims against the named defendants in their individual or official capacities. "A claim asserted against an individual in his official capacity ... is in effect a claim against the governmental entity itself, rather than a suit against the individual personally, for 'official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent.' " *Lore v. City of Syracuse*, 670 F.3d 127, 164 (2d Cir. 2012) (quoting *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691 n.55 (1978)); *Bryant v. Maffucci*, 923 F.2d 979, 986 (2d Cir. 1991) ("In bringing suit against defendants in their official capacities, Bryant has effectively brought suit against the governmental unit that employs them, Westchester County[.]"). Thus, the Court considers whether Plaintiff has stated constitutional claims against the City of Rome, who is the real party in interest.

"A municipality is liable under section 1983 only if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality." *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 62 (2d Cir. 2014) (citing *Monell*, 436 U.S. at 691). Thus, to hold a municipality liable under Section 1983 for the unconstitutional actions of its employees, "a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (quoting *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)).

Here, Plaintiff's claim construed against the City of Rome appears to stem from an isolated instance of alleged unconstitutional conduct by the defendant police officers in the course of a traffic stop. Such an isolated act by a non-policymaking municipal employee is "generally not sufficient to demonstrate a municipal custom, policy, or usage that would justify liability." *Matusick*, 757 F.3d 31 at 62 (2d Cir. 2014) (quoting *Jones v. Town of E. Haven*, 691 F.3d 72, 82 (2d Cir. 2012)). But such isolated instances would be a basis for municipal liability if they were done

> pursuant to municipal policy, or were sufficiently widespread and persistent to support a finding that they constituted a custom, policy, or usage of which supervisory authorities must have been aware, or if a municipal custom, policy, or usage would be inferred from evidence of deliberate indifference of supervisory officials to such abuses.

*Jones*, 691 F.3d at 81. The only factual allegations potentially bearing on any such basis for municipal liability are the allegations that Plaintiff is "being targeted" for being a "young and black mixed person of color." (Dkt. No. 1 at 11.) Plaintiff states:

> i feel this is at most descrimination at it's finest and racel profiling. That's a huge violation of my con. Amendment right's. it's not okay or right one bit. Just because im a young black mixed person of color. it is not right that RPD get's a way with thing's like this all the time, nothing ever get's done about it. They do as they please and they find it okay to do such conduct's its completely not okay or right for such act's. This need's to change it's not right at all, right is right wrong is wrong."

*Id.* at 12. The Court infers this is an allegation of racially motivated police conduct. Plaintiff also list "harassment" as a cause of action. [7] *Id.* at 13.

[7]    To the extent the complaint could be construed as asserting a verbal harassment claim, allegations of verbal harassment are insufficient to support a Section 1983 claim. *See Johnson v. Eggersdorf*, 8 F. App'x 140, 143 (2d Cir. 2001) (citing *Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986) ("allegations of verbal harassment are insufficient to base a § 1983 claim if no specific injury is alleged")); *Shabazz v. Pico*, 994 F. Supp. 460, 474 (S.D.N.Y. 1998) (holding that "verbal harassment or profanity alone, unaccompanied by any injury no matter how inappropriate, unprofessional,

Case 3:25-cv-01174-AMN-TWD    Document 10    Filed 11/04/25    Page 46 of 83
Gosier v. Collins, Not Reported in Fed. Supp. (2024)
2024 WL 1016392

or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983") (quotation omitted); *see also Rivera v. Goord*, 119 F. Supp. 2d 327, 342 (S.D.N.Y. 2000) (collecting cases).

**\*6**  "The Second Circuit has admonished that courts should 'not condone racially motivated police behavior' and must 'take seriously an allegation of racial profiling.' " *Floyd v. City of New York*, 959 F. Supp. 2d 540, 660 (S.D.N.Y. 2013) (quoting *United States v. Davis*, 11 F. App'x 16, 18 (2d Cir. 2001)). In this case, however, Plaintiff's "general and conclusory" allegations are insufficient to establish any plausible claim of municipal liability. *Littlejohn v. City of New York*, 795 F.3d 297, 315 (2d Cir. 2015). Plaintiff alleges no other specific conduct by City of Rome officials, nor does he cite any other facts or circumstances in support of any claim that a policy of racial profiling or racial animus exists in the City. Moreover, insofar as the complaint may allege that employees of the Rome Police Department violated Plaintiff's constitutional rights, those allegations fail to state a claim against the City of Rome because a municipality may not be liable on the basis of respondeat superior. *See Monell*, 436 U.S. at 691.

Accordingly, it is recommended that Plaintiff's official capacity claims be dismissed pursuant to 28 U.S.C. §§ 1915(e)(2)(B), 1915A(b) for failure to state a claim. If Plaintiff intends to pursue claims against the City of Rome, he must name the City of Rome as a defendant in the list of parties and state facts suggesting that a City policy, custom, or practice caused the violation of his rights during or after the traffic stop.

### C. Individual Capacity Claims Against Defendant David J. Collins

It is well-settled that "[d]ismissal is appropriate where a defendant is listed in the caption, but the body of the complaint fails to indicate what the defendant did to the plaintiff." *Cipriani v. Buffardi*, No. 9:06-CV-889 (GTS/DRH), 2007 WL 607341, at *1 (N.D.N.Y. Feb. 20, 2007) (citing *Gonzalez v. City of New York*, No. 97-CV-2246, 1998 WL 382055, at *2 (S.D.N.Y. July 9, 1998)); *see also Crown v. Wagenstein*, No. 96-CV-3895, 1998 WL 118169, at *1 (S.D.N.Y. Mar. 16, 1998) (mere inclusion of warden's name in complaint insufficient to allege personal involvement); *Taylor v. City of New York*, 953 F. Supp. 95, 99 (S.D.N.Y. 1997) (same).

In this case, Plaintiff names David J. Collins as a defendant in the recitation of parties, but the complaint lacks any specific allegations of wrongdoing by this defendant. Rather, it appears Plaintiff has sued defendant Collins due to the supervisory position he holds. The only reference to defendant Collins in the body of the complaint is as follows, "Rome Police Officers and Chief of Police all took part in such conduct and letting such conduct commence violated my Con. Amendment right's 2nd, 4th, 5th, 14th. So i Willie T. Gosier's Jr's right's have been violated due to an illegal/unlawful stop they had no ground's to pull me over." (Dkt. No. 1 at 10.) Thus, the complaint does not include any plausible allegations of personal involvement by defendant Collins.

Accordingly, it is recommended that Plaintiff's Section 1983 claims against defendant Collins be dismissed pursuant to 28 U.S.C. §§ 1915(e)(2)(B), 1915A(b) for failure to state a claim. If Plaintiff intends to pursue Section 1983 claims against defendant Collins, Plaintiff must sufficiently alleged defendant Collins' personal involvement in the claimed violations.

### D. Individual Capacity Claims Against Defendants John Doee # 1 and # 2

#### 1. Unlawful Search and Seizure

The Fourth Amendment protects "against unreasonable searches and seizures." U.S. Const. amend. IV. A police officer may briefly detain a suspect, consistent with the Fourth Amendment, when the officer has a reasonable suspicion that "criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 30 (1968).

2024 WL 1016392

In the context of traffic laws, "reasonable suspicion of a traffic violation provides a sufficient basis under the Fourth Amendment for law enforcement officers to make a traffic stop." *United States v. Stewart*, 551 F.3d 187, 193 (2d Cir. 2009). Even a "minor" traffic violation meets this standard and provides probable cause for a stop. *United States v. Scopo*, 19 F.3d 777, 782 (2d Cir. 1994) (finding police had probable cause to arrest defendant for "not signaling lane changes"), *cert. denied*, 513 U.S. 877 (1994).

 **\*7** Here, Plaintiff's claims alleging violations of constitutional rights arising from the traffic stop are undermined by his own admissions in the complaint. [8] Specifically, Plaintiff claims he was pulled over for speeding. (Dkt. No. 1 at 8.) Contrary to Plaintiff's assertion, travelling over maximum speed limits is a violation of New York State Vehicle and Traffic Law, thus providing probable cause for the traffic stop. *See* N.Y. Veh. & Traf. Law § 1180(d).

[8]    As described above, Plaintiff also takes issue with the June 11, 2023, search of his female friend. However, a *pro se* plaintiff cannot bring any claims on behalf of any other plaintiff. *See Iannaccone v. Law*, 142 F.3d 553, 558 (2d Cir. 1998) (because *pro se* means to appear for oneself, a person may not appear on another person's behalf in the other's cause).

Though Plaintiff contends the reason cited by the defendant police officers was pretextual, the subjective intent of an officer performing a traffic stop is irrelevant. *United States v. Dhinsa*, 171 F.3d 721, 724-25 (2d Cir. 1998) ("[A]n officer's use of a traffic violation as a pretext to stop a car in order to obtain evidence for some more serious crime is of no constitutional significance."); *see, e.g.*, *Aikman v. Cnty. of Westchester*, 491 F. Supp. 2d 374, 381 (S.D.N.Y. 2007) (dismissing the plaintiff's Fourth Amendment "racial profile claim" where the officers "had probable cause to believe [the plaintiff] violated New York traffic laws").

Once a lawful traffic stop based on probable cause has occurred, a police officer may make "ordinary inquiries incident to the traffic stop," and "[t]ypically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez v. United States*, 575 U.S. 348, 355 (2015) (alterations omitted). Additionally, if the traffic stop is lawful, neither the driver nor any passengers have a "Fourth Amendment interest in not being ordered out of the stopped vehicle." *Mollica v. Volker*, 229 F.3d 366, 369 (2d Cir. 2000). Indeed, "a police officer may as a matter of course, order" a passenger or a driver out of "a lawfully stopped car." *Maryland v. Wilson*, 519 U.S. 408, 410 (1997) (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 108-09 (1977) (per curiam)).

Based on the information provided in the complaint, it appears the defendant police officers learned Plaintiff did not have a valid driver's license. Plaintiff alleges after the stop, the defendant police officers "searched my name they then returned told me i was under suspension which i was not under suspension told me get out of my car and unlawfully handcuffed me conducted a patdown search of me searched my car with out probable cause place me in the back of the patrole car." (Dkt. No. 1 at 8.) The defendant police officers also searched Plaintiff's friend and "some thing" was "pulled" from her "pant's/panties." *Id.* at 8-9. Plaintiff also accuses the defendant police officers of invading his "privacy" when they conducted a "pat down search," searched his car, and "took" his personal belongings including paperwork, documents, cell phones, and book bags without consent or a warrant. (Dkt. No. 1 at 3.) Plaintiff was then apparently taken to the Rome Police Department. *Id.* at 11-12. There are no allegations that the stop lasted any longer than necessary. As such, Plaintiff has not stated a constitutional claim concerning a prolonged and unconstitutional seizure. *See Rodriguez*, 575 U.S. at 354.

 **\*8** Insofar as Plaintiff claims that "driving under a suspention is a misdemeanor" and does "not justify handcuffing and or conducting a patdown search," and "you do not need a license to drive a car ... in the United States of America," Plaintiff is mistaken. (Dkt. No. 1 at 10, 12.) Under New York's Vehicle & Traffic Laws, a valid driver's license is required to operate a motor vehicle. *See* N.Y. Veh. & Traf. Law § 509; *see also id.* § 511 (prohibiting operating a car without a valid license). Thus, while the precise details are unclear, it appears the defendant police officers likely had probable cause to believe Plaintiff had committed a criminal offense. And a search incident to an arrest, "constitutes an exception to the warrant requirement" imposed by the Fourth Amendment. [9] *Riley v. California*, 573 U.S. 373, 382 (2014).

9   In New York a person is guilty of Criminal Possession of a Weapon in the second degree if he or she possesses a loaded firearm and does not have a license to possess such a firearm. *See Bannister v. Luis*, No. 18-CV-7285, 2022 WL 19402512, at *45 (E.D.N.Y. Feb. 16, 2022) (citing N.Y. Penal Law § 265.03), *report and recommendation adopted as modified*, 2023 WL 2325680 (E.D.N.Y. Mar. 2, 2023). Under New York law, the existence of a firearm in an automobile creates a permissive presumption that all occupants of the vehicle have common constructive possession of the firearm, absent certain statutory exceptions which are inapplicable here. *Id.* "If a jury may make a presumption of possession under the law, it is reasonable for a police officer to do the same." *Id.* Thus, regardless of whether the firearm was found on the Plaintiff's person or in his car, the officers had probable cause for his arrest.

Additionally, the automobile exception to the warrant requirement of the Fourth Amendment permits officers to "conduct a warrantless search of a vehicle if they have probable cause to believe it contains contraband or other evidence of a crime." *United States v. Wilson*, 699 F.3d 235, 245 (2d Cir. 2012). Probable cause requires only a "fair probability" that evidence of a relevant violation will be found in the place to be searched. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). When the exception applies, officers may search any area of the vehicle in which they have "probable cause to believe contraband or evidence is contained." *California v. Acevedo*, 500 U.S. 565, 580 (1991); *see also United States v. Ross*, 456 U.S. 798, 825 (1982) ("If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search."); *see also United States v. Harris*, No. 21-CR-376, 2022 WL 13798289, at *2 (E.D.N.Y. Oct. 21, 2022).

In sum, based on the information provided in Plaintiff's complaint, it appears the defendant police officers likely had probable cause to stop and arrest Plaintiff. Armed with probable cause, the search of Plaintiff's person and vehicle appears to have been a lawful search incident to arrest. *See United States v. Jenkins*, 496 F.2d 57, 79 (2d Cir. 1974) (finding search prior to arrest to be lawful "as long as probable cause to arrest existed at the time of the search"); *see generally Thornton v. United States*, 541 U.S. 615, 617 (2004) (holding search of vehicle's passenger compartment to be contemporaneous incident of arrest, though driver arrested outside vehicle).

Accordingly, it is recommended that Plaintiff's Section 1983 illegal search and seizure claim against the defendant police officers be dismissed pursuant to 28 U.S.C. §§ 1915(e)(2)(B), 1915A(b) for failure to state a claim. [10]

10   Plaintiff claims he was "charged" with "what they found" on his friend's person and also charged with "possession of a weapon 2nd: loaded firearm-other than person's home/business." (Dkt. No. 1 at 9-10.) Plaintiff states "the loaded firearm charge" is "still pending against me till this day." *Id.* at 10. The Court notes, however, that under abstention principles, the Court typically refrains from intervening in a state-court criminal proceeding. *See, e.g.*, *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 73 (2013). Moreover, to the extent that Plaintiff seeks the remedy of "suppression" of any items seized during the search, that remedy is simply inapplicable in a § 1983 suit. *See Townes v. City of New York*, 176 F.3d 138, 145 (2d Cir. 1999) ("The fruit of the poisonous tree doctrine ... is inapplicable to civil § 1983 actions.").

### 2. False Arrest

**\*9** "A [Section] 1983 claim for false arrest[ ] resting on the Fourth Amendment ... is substantially the same as a claim for false arrest under New York law." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (citations omitted). "Under New York law, a plaintiff claiming false arrest must show, inter alia, that the defendant intentionally confined him without his consent and without justification." *Id.* Probable cause "is a complete defense to an action for false arrest" brought under New York law or section 1983. *Id.* (citation omitted). Police officers have probable cause to arrest when they possess "knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007) (collecting cases); *see, e.g.*, *Johnson v. Harron*, No. 91 Civ. 1460, 1995 WL 319943, at *9 (N.D.N.Y. May 23, 1995) (concluding that DMV computer information showing driver's license was suspended established probable cause for arrest).

Case 3:25-cv-01174-AMN-TWD    Document 10    Filed 11/04/25    Page 49 of 83
Gosier v. Collins, Not Reported in Fed. Supp. (2024)
2024 WL 1016392

Read liberally, the complaint may raise a claim for false arrest. Plaintiff claims he was handcuffed, placed in the patrol car, was taken to the Rome Police Department, and was not read his *Miranda* rights. (Dkt. No. 1 at 8-12.) But the complaint focuses on the initial traffic stop and search and does not include details about the basis for the arrest that would allow the Court to evaluate whether he was arrested without justification. Accordingly, it is recommended that Plaintiff's Section 1983 false arrest claim be dismissed pursuant to 28 U.S.C. §§ 1915(e)(2)(B), 1915A(b) for failure to state a claim. [11]

[11]    If Plaintiff intends to bring such a claim, he should amend his complaint to add facts establishing that he was arrested without justification and the disposition of any charges.

### 3. Excessive Force

"The Fourth Amendment prohibits the use of unreasonable and therefore excessive force by a police officer in the course of effecting an arrest." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010). To succeed on an excessive force claim, "a plaintiff must ultimately demonstrate that the defendant's use of force was objectively unreasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Hulett v. City of Syracuse*, 253 F. Supp. 3d 462, 491 (N.D.N.Y. 2017) (internal quotations omitted). The "objective reasonableness" inquiry is "case and fact specific and requires balancing the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake." *Tracy*, 623 F.3d at 96 (citing *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 123 (2d Cir. 2004)).

Here, "excessive force" is listed as a cause of action. (Dkt. No. 1 at 13.) Plaintiff claims he was "unlawfully pulled out of [his] car," "handcuffed" and subjected to a "pat down search." *Id.* at 8. With this allegation and nothing more, there are simply not enough facts present to establish a plausible excessive force claim. *See Burroughs v. Petrone*, 138 F. Supp. 3d 182, 214 (N.D.N.Y. 2015) (excessive force claim based on rough pat and frisk and push by officers, without other facts or injury alleged, dismissed); *see also Bancroft v. City of Mount Vernon*, 672 F. Supp. 2d 391, 406 (S.D.N.Y. 2009) (declining to find any constitutional violation from plaintiff's allegations of officers' forceful behavior, including a "single push," during the time he was handcuffed).

Accordingly, it is recommended that Plaintiff's Section 1983 excessive force claim be dismissed pursuant to 28 U.S.C. §§ 1915(e)(2)(B), 1915A(b) for failure to state a claim.

### 4. Due Process

The complaint lists "5th Due Prosses" as a claim and Plaintiff states "I also have a privilege aganced self incrimination suspect's statement's, comment's remark's before *Miranda* rights cant be used in court." (Dkt. No. 1 at 12, 13.) "While a defendant has a constitutional right not to have a coerced statement used against him, the failure to provide *Miranda* warnings does not constitute a Fifth Amendment violation or a violation of federal law." *Jallow v. Geffner*, No. 23-CV-3969, 2024 WL 37073, at *10 (S.D.N.Y. Jan. 2, 2024) (citing *Vega v. Tekoh*, 597 U.S. 134, 142-152 (2022)); *see also Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 346 (2d Cir. 1998) (relying on *New York v. Quarles*, 467 U.S. 649, 654 (1984) (a defendant does not have a constitutional right to receive *Miranda* warnings because warnings are only a procedural safeguard designed to protect a person's right against self-incrimination)).

 **\*10** Generally, "no cause of action exists under 42 U.S.C. § 1983 for *Miranda* violations." *Gentry v. New York*, No. 1:21-CV-319 (GTS/ML), 2021 WL 3037709, at *7-8 (N.D.N.Y. June 14, 2021), *report and recommendation adopted*, 2021 WL 3032691 (N.D.N.Y. July 19, 2021) (quoting *Hernandez v. Llukaci*, No. 16-CV-1030, 2019 WL 1427429, at *7 (N.D.N.Y. Mar. 29, 2019) (Hurd, J.) (citing *Chavez v. Martinez*, 538 U.S. 760, 767 (2003))). "The failure to inform a plaintiff of his rights under *Miranda*, 'does not, without more, result in § 1983 liability.' " *Id.* (quoting *Deshawn E. v. Safir*, 156 F.3d at 346). "The

Case 3:25-cv-01174-AMN-TWD    Document 10    Filed 11/04/25    Page 50 of 83

Gosier v. Collins, Not Reported in Fed. Supp. (2024)

2024 WL 1016392

remedy for a violation of the right against self-incrimination is 'the exclusion from evidence of any ensuing self-incriminating statements' and 'not a § 1983 action.' " *Id.* (quoting *Neighbour v. Covert*, 68 F.3d 1508, 1510 (2d Cir. 1995)) (internal quotations omitted). However, " '[a] *Miranda* violation that amounts to actual coercion based on outrageous government misconduct is a deprivation of a constitutional right that can be the basis for a § 1983 suit, even when a confession is not used against the declarant in any fashion.' " *Id.* (quoting *Deshawn E. v. Safir*, 156 F.3d at 348 (internal citations omitted)).

Here, the complaint does not allege any facts that would plausibly suggest police coercion led to inculpatory statements. As a result, it is recommended that Plaintiff's Section 1983 due process claim be dismissed pursuant to 28 U.S.C. §§ 1915(e)(2) (B), 1915A(b) for failure to state a claim.

### 5. Right to Travel

The complaint lists "5th right to travel" as a claim. (Dkt. No. 1 at 3, 13.) "The Constitution protects a fundamental right to travel within the United States," *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 99 (2d Cir. 2009), but "travelers do not have a constitutional right to the most convenient form of travel, and minor restrictions on that travel simply do not amount to the denial of a fundamental right[.]" *Scott v. Crossway*, No. 1:22-CV-500 (BKS/CFH), 2022 WL 16646531, at *10 (N.D.N.Y. Nov. 3, 2022) (quoting *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 54 (2d Cir. 2007) (alterations, citations, and quotation marks omitted)), *report and recommendation adopted*, 2023 WL 34543 (N.D.N.Y. Jan. 4, 2023);

Even liberally construed, Plaintiff has not alleged any facts to suggest a violation of his constitutional right to travel. Plaintiff's allegations regarding his right to travel relate to the traffic stop and seizure of his vehicle, which is akin to his illegal search and seizure claim. *See, e.g.*, *Wellington v. Foland*, No. 3:19-CV-0615 (GTS/ML), 2019 WL 3315181, at *6 (N.D.N.Y. July 24, 2019), *report and recommendation adopted*, 2019 WL 6485157 (N.D.N.Y. Dec. 3, 2019); *Bey v. D.C.*, No. 17-CV-6203, 2018 WL 5777021, at *6 (E.D.N.Y. Nov. 1, 2018) (dismissing the plaintiff's "right to travel claim" where the plaintiff retained his ability and constitutional right to travel even if "inconvenienced" by the seizure of his motor vehicle.");[12] *see also Johnson El v. Bird*, No. 19-CV-5102, 2020 WL 5124920, at *5 n.8 (S.D.N.Y. Aug. 31, 2020) ("To the extent Plaintiff means to argue that traffic enforcement violates his right to travel, that claim is dismissed as frivolous.") (citing *Annan v. State of N.Y. Dep't of Motor Vehicles*, No. 15-CV-1058, 2016 WL 8189269, at *5 (E.D.N.Y. Mar. 2, 2016), *aff'd*, 662 F. App'x 85 (2d Cir. 2016) (summary order)).

[12]    To the extent Plaintiff claims the defendant police officers deprived him of a property interest by impounding his car, Plaintiff has not pled facts sufficient to establish that he was deprived of that interest without due process. *See, e.g.*, *Hawthorne by Hawthorne v. Cnty. of Putnam*, 492 F. Supp. 3d 281, 304 (S.D.N.Y. 2020) (noting that where the defendants' impounded the plaintiff's car following a traffic stop the conduct did not implicate procedural due process concerns); *Vasquez v. Yadali*, No. 16-CV-895, 2020 WL 1082786, at *12 (S.D.N.Y. Mar. 5, 2020) (noting that the plaintiff fails to allege the inadequacy of any post-deprivation hearings following the impoundment of his vehicle); *Domeneck v. City of New York*, No. 18-CV-7419, 2019 WL 5727409, at *10 (S.D.N.Y. Nov. 5, 2019) (dismissing plaintiff's Fourteenth Amendment claim regarding the deprivation of his vehicle because the plaintiff has not plausibly alleged that the process he received was insufficient).

 **\*11** The Court therefore recommends dismissing Plaintiff's Section 1983 right to travel claim pursuant to 28 U.S.C. §§ 1915(e) (2)(B), 1915A(b) for failure to state a claim.

### 6. Right to Bear Arms

The complaint lists "2nd Bear Arm's" as a claim. (Dkt. No. 1 at 13.) The "Second Amendment protects 'an individual right to keep and bear arms.' " *District of Columbia v. Heller D.C. v. Heller*, 554 U.S. 570, 595 (2008). But "[l]ike most rights, the right

Case 3:25-cv-01174-AMN-TWD    Document 10    Filed 11/04/25    Page 51 of 83

Gosier v. Collins, Not Reported in Fed. Supp. (2024)
2024 WL 1016392

secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. For example, the Second Amendment allows "prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 627-28.

Here, Plaintiff's conclusory allegation regarding his right to "Bear Arm's" provided by the Second Amendment is insufficient to state a plausible claim for relief given the numerous limitations on an individual's right to bear arms. *See, e.g.*, *McClenic v. Shmettan*, No. 15-CV-00705, 2016 WL 3920219, at *8 (E.D.N.Y. July 15, 2016) (dismissing the plaintiff's conclusory allegation that defendant detectives violated his Second Amendment right "to keep and bear arms" where, *inter alia*, was charged with criminal possession of a weapon second degree in a felony complaint); *see also Partin v. Gevatoski*, No. 6:19-CV-1948-AA, 2020 WL 4587386, at *4 (D. Or. Aug. 10, 2020) ("The mere occurrence of a firearm seizure during a traffic stop, however, is not enough to establish a Second Amendment violation. Police seize and confiscate firearms routinely, and this Court will not presume that each and every one of those seizures is an automatic Second Amendment violation without specific facts indicating such.").

Accordingly, the Court recommends dismissing Plaintiff's Section 1983 right to bear arms claim pursuant to 28 U.S.C. §§ 1915(e)(2)(B), 1915A(b) for failure to state a claim. [13]

[13]    *See also supra* note 10 and accompanying text.

### E. Private Prosecution

To the extent Plaintiff seeks an order from this Court directing the defendants to be "charged and prosicuted for Act's and investigate RPD misconduct," (Dkt. No. 1 at 3, 13), he is not entitled to such an order because "the decision to prosecute is solely within the discretion of the prosecutor." *Leeke v. Timmerman*, 454 U.S. 83, 87 (1981). Neither Plaintiff nor the Court can direct prosecutors to initiate a criminal proceeding against any defendant because prosecutors possess discretionary authority to bring criminal actions and they are "immune from control or interference by citizen or court[.]" *Conn. Action Now, Inc. v. Roberts Plating Co.*, 457 F.2d 81, 87 (2d Cir. 1972).

### F. Supplemental Jurisdiction

A district court may decline to exercise supplemental jurisdiction over state law claims when it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Generally, "when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). Having recommended dismissal of the federal claims of which the Court has original jurisdiction, it is also recommended that the District Court decline to exercise its supplemental jurisdiction of any state law claims Plaintiff may be asserting. *See Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) ("Subsection (c) of § 1367 'confirms the discretionary nature of supplemental jurisdiction by enumerating the circumstances in which district courts can refuse its exercise.' ") (quoting *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997)).

### V. OPPORTUNITY TO AMEND

**\*12** Generally, before the Court dismisses a *pro se* complaint or any part of the complaint *sua sponte*, the Court should afford the plaintiff the opportunity to amend at least once; however, leave to re-plead may be denied where any amendment would be futile. *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993). Futility is present when the problem with plaintiff's causes of action is substantive such that better pleading will not cure it. *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation omitted).

Case 3:25-cv-01174-AMN-TWD    Document 10    Filed 11/04/25    Page 52 of 83
Gosier v. Collins, Not Reported in Fed. Supp. (2024)
2024 WL 1016392

For reasons set forth above, the Court finds Plaintiff's complaint is subject to dismissal in its entirety pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii), 1915A(b)(1) for failure to state a claim. However, in light of his *pro se* status, prior to outright dismissal of this action, the Court recommends that Plaintiff be given an opportunity to amend his pleading.

Plaintiff is advised that, should the District Court permit Plaintiff to file an amended complaint, and if he chooses to avail himself of an opportunity to amend, such amended pleading must cure the defects set forth above. [14] Specifically, the pleading must set forth a short and plain statement of the facts on which he relies to support any legal claims asserted. Fed. R. Civ. P. 8(a). The body of the pleading must contain sequentially numbered paragraphs containing only one act of alleged misconduct per paragraph. Fed. R. Civ. 10. No portion of any prior complaint shall be incorporated into the amended complaint and piecemeal pleadings are not permitted.

[14] Plaintiff should not submit an amended complaint before the District Court issues a Decision and Order on this Report-Recommendation. As noted below, however, Plaintiff may file written objections to this Court's Report-Recommendations.

The Court notes that in *Gosier II*, Plaintiff alleged he was "pulled over" on June 11, 2023, by officers of the Utica Police Department "without probable cause and proceeded to illegally search [his] vehicle." *Gosier II*, No. 6:23-cv-01119 (DNH/TWD), ECF Dkt. No. 1 at 9. Plaintiff also alleged he was "maliciously prosecuted" and "arrested and charged with Criminal Possession of a Controlled Substance 7th and Aggravated Unlicensed Operation of Motor Vehicle 3rd." *Id.* Plaintiff's original complaint was *sua sponte* dismissed on initial review with leave to amend. *Id.*, ECF Dkt. Nos. 10, 12. On February 5, 2024, Plaintiff's request for an extension of time until March 16, 2024, to submit his amended complaint was granted. *Id.*, ECF Dkt. No. 19. At this juncture, it is unclear whether the subject traffic stop in *Gosier II* is the same traffic stop at issue in this action. Plaintiff should explain the relationship, if any, between the June 11, 2023, traffic stop at issue in this action and the June 11, 2023, traffic stop at issue in *Gosier II*.

## VI. CHANGE OF ADDRESS

According to information publicly available on the website maintained by the New York State Department of Corrections and Community Supervision ("DOCCS"), Willie Gosier (DIN 22B2574) was released from custody on parole on February 26, 2024. [15] Plaintiff is reminded that he must update his address with the Court immediately upon relocating. For the orderly disposition of cases, it is essential that litigants honor their continuing obligation to keep the Court informed of address changes. "Failure to notify the Court of a change of address in accordance with L.R. 10.1(c)(2) may result in the dismissal of any pending action." L.R. 41.2(b).

[15] *See* http://nysdoccslookup.doccs.ny.gov (last visited Mar. 8, 2024).

## VII. CONCLUSION

**\*13 WHEREFORE**, it is hereby

**ORDERED** that Plaintiff's IFP application (Dkt. No. 2) is **GRANTED**, and it is further

**RECOMMENDED** that Plaintiff's complaint be **DISMISSED** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) with **LEAVE TO AMEND**; and it is further

**RECOMMENDED** that the District Court decline to exercise its supplemental jurisdiction of any state law claims Plaintiff may be asserting; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam); and it is further

**ORDERED** that Plaintiff is required to promptly notify the Clerk's Office and all parties or their counsel, in writing, of any change in his address; the failure to do so will result in the dismissal of his action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. [16] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a).

[16] If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2024 WL 1016392

---

**End of Document**                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:25-cv-01174-AMN-TWD    Document 10    Filed 11/04/25    Page 54 of 83

Gosier v. Collins, Not Reported in Fed. Supp. (2024)

2024 WL 1307035

2024 WL 1307035

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Willie Thomas GOSIER, Plaintiff,

v.

David J. COLLINS et al., Defendants.

6:23-CV-1485

|

Signed March 27, 2024

**Attorneys and Law Firms**

WILLIE THOMAS GOSIER, Plaintiff, Pro Se, 22-B-2574, Elmira Correctional Facility, P.O. Box 500, Elmira, NY 14902.

**ORDER ON REPORT & RECOMMENDATION**

DAVID N. HURD, United States District Judge

**\*1** On November 29, 2023, *pro se* plaintiff Willie Thomas Gosier ("plaintiff"), who was recently released to State parole, filed this 42 U.S.C. § 1983 action alleging that the defendants violated his civil rights during a traffic stop in Rome, New York. Dkt. No. 1. Along with his complaint, plaintiff moved for leave to proceed *in forma pauperis* ("IFP Application"). Dkt. Nos. 2, 3.

On March 8, 2024, U.S. Magistrate Judge Thérèse Wiley Dancks granted plaintiff's IFP Application and advised by Report & Recommendation ("R&R") that plaintiff's complaint be dismissed with leave to amend. Dkt. No. 4.

Plaintiff has not filed objections, and the time period in which to do so has expired. *See* Dkt. No. 4. Upon *de novo* review, the R&R is accepted and will be adopted. *See* 28 U.S.C. § 636(b)(1)(C).

Therefore, it is

ORDERED that

1. The Report & Recommendation is ACCEPTED;

2. Plaintiff's complaint is DISMISSED with leave to amend;

3. Plaintiff shall have thirty (30) days in which to file an amended complaint that conforms with the specific instructions set forth in the R&R;

4. If plaintiff timely files an amended pleading, the Clerk is directed to return the matter to Judge Dancks for further review as appropriate;

5. If plaintiff does not timely file an amended pleading, the Clerk is directed to close this matter without further Order of the Court.

IT IS SO ORDERED.

Case 3:25-cv-01174-AMN-TWD    Document 10    Filed 11/04/25    Page 55 of 83

**Gosier v. Collins, Not Reported in Fed. Supp. (2024)**

2024 WL 1307035

**All Citations**

Not Reported in Fed. Supp., 2024 WL 1307035

---

**End of Document**                                        © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Jackson v. Wilcox, Not Reported in Fed. Supp. (2023)
2023 WL 2756489

Case 3:25-cv-01174-AMN-TWD    Document 10    Filed 11/04/25    Page 56 of 83

2023 WL 2756489
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Raymond L. JACKSON, Plaintiff,

v.

Lt. Col. Scott A. WILCOX, Defendant.

No. 1:23-CV-130 (MAD/CFH)
|
Signed April 3, 2023

**Attorneys and Law Firms**

Raymond L. Jackson, 15-A-3740, Fishkill Correctional Facility, P.O. Box 1245, Beacon, New York 12508, Plaintiff pro se.

**REPORT-RECOMMENDATION AND ORDER**

Christian F. Hummel, United States Magistrate Judge

### I. Background

**\*1** Plaintiff pro se Raymond L. Jackson ("plaintiff") purported to commence this action on January 30, 2023, by filing a complaint. See Dkt. No. 1 ("Compl."). Plaintiff did not pay the filing fee for his complaint or submit a motion to proceed in forma pauperis ("IFP"), and the Court administratively closed the action. See Dkt. No. 4. The Court ordered plaintiff to either pay the full $402.00 filing fee or to submit a complete IFP application. See id. Plaintiff then filed an IFP application. See Dkt. No. 6. The Court reopened, but then again closed, the case for failure to submit a complete and certified application. See Dkt. Nos. 7, 8. On March 13, 2023, plaintiff filed a complete IFP application. See Dkt. Nos. 9, 10. The undersigned has reviewed plaintiff's IFP motion and determines that he financially qualifies to proceed IFP for the purpose of filing. [1]

[1]    Plaintiff is advised that although he has been granted IFP status, he is still required to pay any fees and costs he may incur in this action.

### II. Initial Review

#### A. Legal Standard

Section 1915 of Title 28 of the United States Code directs that, when a plaintiff seeks to proceed IFP, "the court shall dismiss the case at any time if the court determines that ... the action or appeal (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). It is a court's responsibility to determine that a plaintiff may properly maintain his complaint before permitting him to proceed with his action.

Where, as here, the plaintiff proceeds pro se, "the court must construe his [or her] submissions liberally and interpret them to raise the strongest arguments that they suggest." Kirkland v. Cablevision Sys., 760 F.3d 223, 224 (2d Cir. 2014) (per curiam) (citation and internal quotation marks omitted). This does not mean the Court is required to accept unsupported allegations

Case 3:25-cv-01174-AMN-TWD    Document 10    Filed 11/04/25    Page 57 of 83

Jackson v. Wilcox, Not Reported in Fed. Supp. (2023)

2023 WL 2756489

that are devoid of sufficient facts or claims. Although detailed allegations are not required at the pleading stage, the complaint must still include enough facts to provide the defendants with notice of the claims against them and the grounds on which these claims are based. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atlantic v. Twombly, 550 U.S. 544, 555-56 (2007). Pro se litigants are "not exempt ... from compliance with relevant rules of procedural and substantive law[.]" Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir. 1983) (citation omitted). Ultimately, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citation omitted).

Pleading guidelines are set forth in the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). Specifically, Rule 8 provides that a pleading which sets forth a claim for relief shall contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). "The purpose ... is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." Flores v. Graphtex, 189 F.R.D. 54, 55 (N.D.N.Y. 1999) (internal quotation marks and citations omitted). Rule 8 also requires the pleading to include "a short and plain statement of the grounds for the court's jurisdiction" and "a demand for the relief sought...." FED. R. CIV. P. 8(a)(1), (3). Although "[n]o technical form is required," the Federal Rules make clear that each allegation contained in the pleading "must be simple, concise, and direct." Id. at 8(d)(1).

**\*2** Further, Rule 10 provides in pertinent part that:

> [a] party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances. A later pleading may refer by number to a paragraph in an earlier pleading. If doing so would promote clarity, each claim founded on a separate transaction or occurrence – and each defense other than a denial – must be stated in a separate count or defense.

FED. R. CIV. P. 10(b). This serves the purpose of "provid[ing] an easy mode of identification for referring to a particular paragraph in a prior pleading[.]" Flores, 189 F.R.D. at 55 (internal quotation marks and citations omitted). A complaint that fails to comply with the pleading requirements "presents far too [ ] heavy [a] burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of their claims." Gonzales v. Wing, 167 F.R.D. 352, 355 (N.D.N.Y. 1996). The Second Circuit has held that "[w]hen a complaint does not comply with the requirement that it be short and plain, the court has the power, on its own initiative ... to dismiss the complaint." Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988) (citation omitted). However, "[d]ismissal ... is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." Id. (citation omitted). If dismissal is warranted and the plaintiff is pro se, the court generally affords the plaintiff leave to amend the complaint. See Simmons v. Abruzzo, 49 F.3d 83, 86-87 (2d Cir. 1995).

## B. Plaintiff's Complaint

Plaintiff seeks to bring this action against Lieutenant Colonel Scott A. Wilcox, a New York State Trooper, for purported statutory violations and violations of his constitutional rights pursuant to 42 U.S.C. § 1983. See generally Compl.

Plaintiff alleges that he filed a request under New York's Freedom of Information Law ("FOIL") to the New York State Police headquarters in Albany, New York, for "information in regards to three (3) criminal sale's in plaintiff's criminal case." Compl. at 2. In a letter dated December 19, 2016, Wilcox "made available (2) JPEG images burned on CD/DVD, and contact sheet for the criminal sales for a total of $75.00." Id. Plaintiff paid the requested amount and Wilcox sent a follow-up letter on February 14, 2019, confirming receipt of the money. See id. Plaintiff alleges that he did not receive the documents he paid for. See id.

Case 3:25-cv-01174-AMN-TWD    Document 10    Filed 11/04/25    Page 58 of 83

Jackson v. Wilcox, Not Reported in Fed. Supp. (2023)

2023 WL 2756489

Plaintiff subsequently filed two Article 78 petitions which were unsuccessful. See id. The first petition was dismissed "for failure to provide the A.G. Office[ ]" and the second petition was denied "for procedural process." Id. They were denied on October 15, 2019, and January 4, 2021, respectively. See id. Plaintiff alleges that he appealed to the Appellate Division and both appeals were dismissed. See id. at 2-3. The Court of Appeals then informed plaintiff on February 23, 2022, that unless he "can show motion to leave appeal, proof of service, timeliness of an appeal, and a Notice of Entry from the 3rd Dep't etc. plaintiff cannot appeal." Id. at 3.

**\*3**  Plaintiff contends that "[t]he Appellate Court failed to hear the case on it[s] merits leaving [him] with nowhere else to[ ] go." Compl. at 3. Plaintiff asserts that the appellate "process is fundamentally inadequate to protect plaintiff substantive rights to a fair procedural due process protection." Id. Plaintiff "seeks injunction [sic] relief and declaratory judgment [h]opefully to obtain the evidence." Id. Plaintiff asserts that Wilcox was acting under the color of state law and violated a "statutory law", plaintiff's "liberty interest of life a U.S. Const. of a substantive right of a fair procedural due process", and his "substantive rights and procedural due process right of equal protection of the U.S. Const. and N.Y.S. Const." Id. at 4. Plaintiff asks the Court to "compel NYSP Agency to turn over the documents so that the plaintiff can challenge his state conviction." Id. at 5.

### C. Additional Background

Plaintiff filed two Article 78 petitions both of which sought to compel Wilcox to produce specific evidence in response to plaintiff's FOIL request. See Jackson v. Wilcox, 136 N.Y.S.3d 696, 2, n.1 (Sup. Ct. 2021) (Table). Plaintiff's first petition was dismissed on October 19, 2019, for lack of jurisdiction. See id. at 2. His second was dismissed on January 4, 2021, because it was untimely filed. See id. However, the Albany County Supreme Court analyzed the merits of plaintiff's petition assuming that it was timely and determined that "there is no merit to his Petition." Id. at 3. The court concluded that "[t]he record amply establishes that the respondent provided the petitioner with all the information it was required to provide[ ]" because plaintiff "admitted on several occasions that he has been provided with the images he sought, and made no attempt to differentiate between hard copy photos, contact sheets, or CD/DVD." Id. The court stated that plaintiff's "argument that sought images might be altered on the hard copy photos, but not on the CD/DVD is nonsensical." Id. Thus, the court concluded that plaintiff "failed to demonstrate that the respondent has not fully complied with his FOIL request, and his Petition must also be denied on the merits." Id.

On February 3, 2020, plaintiff filed a complaint in this Court under 42 U.S.C. § 1983 seeking the exact same relief that he presently seeks. See Jackson v. Wilcox, et al., 1:20-CV-110 (MAD/ATB), Dkt. No. 1 at 12. Following initial review of the complaint pursuant to 28 U.S.C. § 1915A, the Court dismissed plaintiff's complaint without prejudice for lack of subject matter jurisdiction. See id., Dkt. Nos 7, 9. The Court explained, "to the extent that [p]laintiff's claims are premised on a violation of New York State FOIL, it is well settled that such a claim, standing alone, is insufficient to support a Section 1983 claim."

Jackson v. Wilcox, No. 1:20-CV-110 (MAD/ATB), 2020 WL 1899142, at \*2 (N.D.N.Y. Apr. 17, 2020). [2]

[2]       On December 13, 2019, plaintiff filed a habeas corpus petition stating, among other things, that he filed an Article 78 petition "hoping to receive a tangible document of the CD jpeg disc, and contact sheet to bolster a stronger argument and to show the claims have merits." Jackson v. Capra, 9:19-CV-1542 (DNH/CFH), Dkt. No. 9 at 4-5. Plaintiff's petition for a writ of habeas corpus is fully briefed and pending the Court's review. See id., Dkt. No. 72.

On September 24, 2021, the Appellate Division, Third Department, denied plaintiff motions to proceed as a poor person and for FOIL relief, but granted his application for time to perfect his appeal. See Raymond L. Jackson v. Lt. Col. Scott A. Wilcox New York State Police, 2021 NY Slip Op 72455 (App. Div. Sept. 24, 2021). On July 22, 2022, the Appellate Division denied plaintiff's motion for an Article 78 petition. See Raymond L. Jackson v. Lt. Col. Scott A. Wilcox New York State Police, 2022 NY Slip Op 69225 (App. Div. July 22, 2022). Then, on December 8, 2022, the court denied plaintiff's "[m]otion to vacate dismissal of appeal, for extension of time to perfect appeal and for further relief." Raymond L. Jackson v. Lt. Col. Scott A. Wilcox, N.Y. State Police, 2022 NY Slip Op 75394 (App. Div. Dec. 8, 2022). [3]

3      New York State court decisions can be searched through the following website: https://nycourts.gov/reporter/
       Decisions.shtml.

### D. Analysis

**\*4**  The doctrine of res judicata bars an individual from relitigating the same things if "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; [and] (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." Soules v. Connecticut, Dep't of Emergency Servs. & Pub. Prot., 882 F.3d 52, 55 (2d Cir. 2018) (quoting Monahan v. N.Y.C. Dep't of Corr., 214 F.3d 275, 285 (2d Cir. 2000)).

There is no question that prongs two and three are satisfied here by plaintiff's previous § 1983 action: it involved the same plaintiff and identical claims were raised. Compare Compl. at 5, with Jackson, 2020 WL 1899142, at \*1. [4] However, the 2020 action was dismissed without prejudice for lack of subject matter jurisdiction and "[a] dismissal without prejudice for lack of subject matter jurisdiction is not a dismissal 'on the merits' for claim preclusion purposes." Diaz v. Judge Advoc. Gen. of the Navy, 413 F. App'x 342, 343 (2d Cir. 2011) [5] (summary order) (citations omitted); St. Pierre v. Dyer, 208 F.3d 394, 400 (2d Cir. 2000) ("[A] dismissal for lack of subject matter jurisdiction is not an adjudication on the merits and hence has no res judicata effect."); Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp., 549 U.S. 422, 431 (2007) (citation and quotation marks omitted) ("Without jurisdiction the court cannot proceed at all in any cause; it may not assume jurisdiction for the purpose of deciding the merits of the case."). As plaintiff's previous § 1983 action was dismissed without prejudice for lack of subject matter jurisdiction, it does not bar the Court from considering his present complaint.

4      Plaintiff named additional defendants, not only Wilcox, in his 2020 complaint. See Jackson v. Wilcox, No. 1:20-CV-110 (MAD/ATB), 2020 WL 871180, at \*2 (N.D.N.Y. Feb. 21, 2020), report and recommendation adopted, 2020 WL 1899142 (N.D.N.Y. Apr. 17, 2020).

5      All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff. The undersigned will not provide plaintiff copies of the unpublished cases that are his, such as the state court cases, the 2020 § 1983 action, or his writ for a habeas corpus petition.

However, as was determined in his 2020 action, this Court lacks jurisdiction to review the merits of plaintiff's present complaint as it is based on the alleged denial of his FOIL request. See Jackson, 2020 WL 1899142, at \*2. This is because "[i]t appears that federal district courts do not have jurisdiction to consider FOIL claims." Jeanty v. Utica Police Dep't, No. 6:20-CV-00221 (BKS/TWD), 2021 WL 1055153, at \*4 (N.D.N.Y. Mar. 19, 2021) (collecting cases), appeal dismissed, No. 21-1797, 2021 WL 5071864 (2d Cir. Aug. 26, 2021); see also Ataroua v. Tamir, No. 22-CV-10371 (LTS), 2022 WL 17822720, at \*3 (S.D.N.Y. Dec. 19, 2022) ("[The p]laintiff's allegations that, in 2021, [defendants] ... did not respond to letters about his FOIL requests that were directed to them personally, do not indicate that [the p]laintiff can establish any right to relief that turns on resolution of a question of federal law."); Cammarata v. City Univ. of N.Y., No. 17-CV-6456 (MKB), 2019 WL 3859401, at \*9 (E.D.N.Y. Aug. 15, 2019) (citations omitted) ("Federal courts, however, do 'not have jurisdiction to enforce state laws granting public access to official state records.' "); Youngs v. Orange Cnty. Sheriffs Org., No. 22-CV-4918 (LTS), 2022 WL 4124796, at \*3 (S.D.N.Y. Sept. 2, 2022) ("[The p]laintiff's allegation that his FOIL request for video footage was denied does not give rise to a constitutional claim, and thus the facts alleged do not state a viable Section 1983 claim."). Rather, "[t]he appropriate vehicle for challenging denials of access guaranteed by the New York Freedom of Information Law is a state court proceeding pursuant to N.Y.C.P.L.R. Article 78 upon exhaustion of administrative remedies." Ramos v. Culick, No. 6:16-CV-01312 (FJS/TWD), 2017 WL 835406, at \*4 (N.D.N.Y. Feb. 9, 2017) (quoting Schuloff v. Fields, 950 F. Supp. 66, 67-68 (E.D.N.Y. 1997)), report and recommendation adopted, 2017 WL 823580 (N.D.N.Y. Mar. 2, 2017); see also Posr v. City of New York, No. 10-CV-2551, 2013 WL 2419142, at \*14 (S.D.N.Y. June 4, 2013) (finding that the court was "without jurisdiction to consider [p]laintiff's FOIL-related claims" because the proper remedy would be through "an administrative appeal or seek remedies in state court"),

Case 3:25-cv-01174-AMN-TWD    Document 10    Filed 11/04/25    Page 60 of 83

Jackson v. Wilcox, Not Reported in Fed. Supp. (2023)

2023 WL 2756489

aff'd sub nom., Posr v. Ueberbacher, 569 F. App'x 32 (2d Cir. 2014) (summary order); Abreu v. Bascue, No. 9:18-CV-0186 (MAD/ATB), 2018 WL 11466956, at *25 (N.D.N.Y. May 1, 2018) ("[A] violation of New York State FOIL does not give rise to a federal claim under 42 U.S.C. § 1983. Rather, plaintiff's remedy for an alleged violation of FOIL is to follow procedures set forth in state laws or regulations.").

**\*5** As courts have repeatedly held that federal courts lack jurisdiction to review FOIL claims, this Court lacks jurisdiction to review Wilcox' alleged denial of plaintiff's FOIL request. Thus, it is recommended that the complaint be dismissed without prejudice for lack of subject matter jurisdiction.

The undersigned notes, however, that even if plaintiff could state a cognizable § 1983 claim from the alleged denial of his FOIL request, review of the claim would likely be barred by the statute of limitations. "Congress did not statutorily create a limitations period for actions brought in federal court under 42 U.S.C. § 1983[.]" Branch v. Guilderland Cent. Sch. Dist., 239 F. Supp. 2d 242, 248 (N.D.N.Y. 2003). "[T]he Supreme Court held ... that claims brought under § 1983 are governed by the limitations period for personal injury suits under the laws of state where the cause of action arose." Id. (citing Lounsbury v. Jeffries, 25 F.3d 131, 133 (2d Cir. 1994)). "In New York, the statute of limitations for personal injury actions, and thus claims under § 1983, is three years." Id. (citations omitted). "[W]hen that statute of limitations begins to run, i.e., when the cause of action 'accrues,' is governed by federal law." Id. (citing Jaghory v. N.Y. State Dep't. of Educ., 131 F.3d 326, 331 (2d Cir. 1997)). "Under federal law, the accrual date for a § 1983 claim is when 'the plaintiff knows or has reason to know of the injury which is the basis of his action.' " Id. (quoting Pinaud v. Cty. of Suffolk, 52 F.3d 1139, 1156 (2d Cir. 1995)).

Plaintiff alleges that Wilcox acknowledged the receipt of plaintiff's payment but did not produce the specific evidence in response his FOIL request on February 14, 2019. See Compl. at 2. This means that plaintiff would have had until January 14, 2022, to bring a § 1983 action alleging due process and equal protection claims. He did not bring this action until January 30, 2023. See generally Compl. Thus, any possible constitutional claims that plaintiff could bring would be time barred. This is the case even though he filed Article 78 proceedings and appeals therefrom because such proceedings do not toll the statute of limitations for a § 1983 action. See Abbas v. Dixon, 480 F.3d 636, 641 (2d Cir. 2007) ("[A] plaintiff's pursuit of a state remedy, such as an Article 78 proceeding, does not toll the statute of limitations for filing a claim pursuant to section 1983.").

Finally, even if the Court were to be able to consider the merits of plaintiff's complaint, the complaint would likely be dismissed for failure to state a claim. For a due process claim, "[t]he threshold issue is always whether the plaintiff has a property or liberty interest protected by the Constitution." Narumanchi v. Bd. of Trustees of Conn. State Univ., 850 F.2d 70, 72 (2d Cir. 1988). "If a protected interest is identified, a court must then consider whether the government deprived the plaintiff of that interest without due process." Id. "As several courts in th[is] Circuit have held, 'a plaintiff has no property interest in obtaining FOIL documents.' " Lawrence v. Baxter, No. 03-CV-228S, 2004 WL 1941347, at *3 (W.D.N.Y. Aug. 31, 2004) (collecting cases) (citations omitted), aff'd, 139 F. App'x. 365 (2d Cir. 2005) (summary order). "Specifically, because FOIL documents need only be produced after a request and investigation by the state entity, individuals making such request do not have anything beyond a mere expectation in such documents, and, thus, do not have an entitlement to requested documents that is protected by the Fourteenth Amendment." Simpson v. Town of South Hampton, No. 06-CV-6743, 2007 WL 1755749, at *4 (E.D.N.Y. 2007); see also Abreu, 2018 WL 11466956, at *25 ("Multiple district courts in this circuit have held that a plaintiff has no constitutionally protected interest in obtaining FOIL documents.").

**\*6** Further, "[t]he sufficiency of Article 78 proceedings to satisfy due process requirements is well established." Ramos, 2017 WL 835406, at *4 (citing, inter alia, Hellenic Am. Neighborhood Action Comm., 101 F.3d 877, 880-81 (2d Cir. 1996) ("An Article 78 proceeding is adequate for due process purposes even though the petitioner may not be able to recover the same relief that he could in a § 1983 suit."); Davis v. Guarino, 52 F. App'x. 568, 569 (2d Cir. 2002) (summary order) (denial of a plaintiff's FOIL request did not violate due process because "an Article 78 proceeding is a perfectly adequate post-deprivation remedy.")). Thus, this Court has concluded that a plaintiff failed to assert a § 1983 claim for denial of a FOIL request because "the New York FOIL procedures are sufficient to protect any property interest [the p]laintiff may have in the receipt of FOIL documents." Id.; see also Lawrence v. Antonucci, No. 04-CV-356S, 2005 WL 643457, at *4 (W.D.N.Y. Mar. 16, 2005) ("[T]he

Case 3:25-cv-01174-AMN-TWD    Document 10    Filed 11/04/25    Page 61 of 83

Jackson v. Wilcox, Not Reported in Fed. Supp. (2023)

2023 WL 2756489

procedures set forth under New York law are sufficient to protect any property interest that a person might have in the receipt of FOIL documents."), aff'd, 144 F. App'x 193 (2d Cir. 2005) (summary order).

Here, plaintiff summarily states, "[t]he appeal process is fundamentally inadequate to protect plaintiff['s] substantive rights to a fair procedural due process protection." Compl. at 3. However, he does not allege any facts indicating that the process is inadequate; rather, he complains that the "[t]he Appellate Court failed to hear the case on it[s] merits[.]" Id. Plaintiff's disagreement with the state court decisions does not establish a due process claim. See Torres v. City of New York through New York City Dep't, 590 F. Supp. 3d 610, 618 (S.D.N.Y. 2022) (citation omitted) ("[F]or a procedural due process claim, 'the relevant inquiry is what process [the plaintiff] received, not whether the state court decided the case correctly.' "). Further, he has not asked for any relief concerning the state court decisions and instead names only Wilcox as a defendant and seeks relief from his denial of the FOIL request. [6] See Compl. at 4-5. As plaintiff does not have a property interest in the FOIL documents, the sufficiency of Article 78 proceedings is well-established, and plaintiff has not stated any facts indicating that the state appellate procedures were inadequate, any possible due process claim against Wilcox would fail as a matter of law.

[6]    Any potential challenge to the state court's Article 78 decision or appeals would likely be barred by the Rooker-Feldman doctrine which prohibits a federal court's review of a state court decision in which the plaintiff lost. See Dorce v. City of New York, 2 F.4th 82, 101 (2d Cir. 2021) (citation and quotation marks omitted) ("[O]ur court has articulated four requirements that must be met for Rooker-Feldman to apply: (1) the federal-court plaintiff must have lost in state court[;]" (2) the plaintiff must complain of injuries caused by a state-court judgment[;]" (3) the plaintiff must invite district court review and rejection of that judgment[;] and (4) the state-court judgment must have been rendered before the district court proceedings commenced.").

To the extent plaintiff summarily mentions "equal protection", to state such a claim, plaintiff must plead "adverse treatment of individuals compared with other similarly situated individuals and that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Compl. at 4; Terrill v. Windham-Ashland-Jewett Cent. Sch. Dist., 176 F. Supp. 3d 101, 110 (N.D.N.Y. 2016) (quoting Miner v. Clinton County, 541 F.3d 464, 474 (2d Cir. 2008)). Plaintiff has not alleged any facts that could be construed as stating an equal protection claim; thus, his complaint would likely be dismissed for failure to state a claim. See generally Compl. [7]

[7]    The undersigned also notes that review of plaintiff's complaint is likely barred by res judicata because of the January 2021 Article 78 proceeding. "The doctrine of claim preclusion ... holds that 'a prior decision dismissed 'on the merits' is binding in all subsequent litigation between the same parties on claims arising out of the same facts, even if based upon different legal theories or seeking different relief on issues which were or might have been litigated in the prior action but were not.' " N. Assur. Co. of Am. v. Square D Co., 201 F.3d 84, 87 (2d Cir. 2000) (citation omitted). "The import of claim preclusion is that it operates in two ways: (1) it bars claims that were brought and decided in a prior litigation; and (2) it bars all other claims relating to the same transaction against the same defendant that could have been brought at that time." Id. "[G]enerally[,] res judicata 'does not operate to bar a § 1983 suit following the resolution of an Article 78 proceeding, since the full measure of relief available in the former action is not available in the latter.' " D.B. v. Sullivan, No. 1:22-CV-282 (MAD/CFH), 2023 WL 2456070, at *6 (N.D.N.Y. Mar. 9, 2023) (quoting Colon v. Coughlin, 58 F.3d 865, 870 n.3 (2d Cir. 1995), abrogated on other grounds by Tangreti v. Bachmann, 983 F.3d 609 (2d Cir. 2020)). However, plaintiff did not seek relief in his Article 78 proceeding that was unavailable in that proceeding, but available in a section 1983 action. Rather, he sought identical relief in his Article 78 proceeding that he seeks here, and which was available in the Article 78 proceeding: for Wilcox to be compelled to produce specific evidence. See Compl. at 5; see also Jackson, 136 N.Y.S.3d at 1-2; Vandor, Inc. v. Militello, 301 F.3d 37, 39 (2d Cir. 2002) (per curiam) ("Article 78 is a form of proceeding available to compel public officials to comply with their responsibilities."); N.Y.C.P.L.R. § 7806 ("The judgment may grant the petitioner the relief to which he is entitled, ... and may direct or prohibit specified action by the respondent."). As the Albany County Supreme Court ruled on the merits of plaintiff's petition in the January 2021 Article 78 proceeding, it is likely that his complaint is barred by res judicata. See Jackson, 136 N.Y.S.3d at 2; see also

Case 3:25-cv-01174-AMN-TWD    Document 10    Filed 11/04/25    Page 62 of 83

Jackson v. Wilcox, Not Reported in Fed. Supp. (2023)

2023 WL 2756489

D.B., 2023 WL 2456070, at *6 (explaining that in Kern v. Joyce, 857 F. App'x 691, 694 (2d Cir. 2021) (summary order), the Second Circuit determined that "the plaintiff's Section 1983 claims were barred by res judicata applied to a prior Article 78 proceeding because the plaintiff did not seek damages in federal court, but simply the same relief of vacating an ALJ's determination."). However, the undersigned does not make a more definitive conclusion because it is not clear whether plaintiff raised his constitutional challenges in the Article 78 proceeding and whether the court treated his petition as a hybrid petition. See D.B., 2023 WL 2456070, at *6 (explaining that res judicata may apply when the Article 78 proceeding was a "hybrid" proceeding which concerns relief that is and is not available in an Article 78 proceeding).

**\*7** In sum, it is recommended that plaintiff's complaint be dismissed without prejudice for lack of subject matter jurisdiction. Generally, "[a] *pro se* complaint should not be dismissed without the Court granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." Nielsen v. Rabin, 746 F.3d 58, 62 (2d Cir. 2014) (citation omitted). "However, if the problems with a complaint are 'substantive' rather than the result of an 'inadequately or inartfully pleaded' complaint, an opportunity to re-plead would be 'futile' and 'should be denied.' " Edwards v. Penix, 388 F. Supp. 3d 135, 144-45 (N.D.N.Y. 2019) (quoting Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000)). As the problem with plaintiff's complaint is substantive—the Court lacks subjective matter jurisdiction—amendment would be futile. See Ramos, 2017 WL 835406, at *4 (dismissing complaint alleging improper denial of FOIL request without prejudice but without leave to amend); see also Kirschenbaum v. Fed. Ins. Co., 505 B.R. 126, 131 (E.D.N.Y. 2014) (citation omitted) ("An amendment is considered futile if, for example, it could not defeat a motion to dismiss for failure to state a claim or for lack of subject matter jurisdiction."); Johnson v. Oneida Nation Enters., LLC, No. 5:19-CV-853 (MAD/ATB), 2019 WL 5091952, at *2 (N.D.N.Y. Oct. 11, 2019) ("[A]mendment would be futile as [the p]laintiff has not alleged any claims which would give the Court subject matter jurisdiction."). Thus, it is recommended that plaintiff's complaint be dismissed without prejudice, but without leave to amend.

### III. Conclusion

**WHEREFORE**, for the reasons set forth herein, it is hereby

**ORDERED**, that plaintiff's application to proceed in forma pauperis (Dkt. No. 9) is **GRANTED** for purposes of filing only; and it is further

**RECOMMENDED**, that plaintiff's complaint (Dkt. No. 1) be **DISMISSED WITHOUT PREJUDICE AND WITHOUT LEAVE TO AMEND**; and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1), plaintiff has **FOURTEEN (14)** days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Sec'y of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); see also 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a). [8]

---

[8]    If you are proceeding pro se and are served with this Report-Recommendation & Order by mail, three (3) additional days will be added to the fourteen (14) day period, meaning that you have seventeen (17) days from the date the Report-Recommendation & Order was mailed to you to serve and file objections. FED R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(c).

Case 3:25-cv-01174-AMN-TWD   Document 10   Filed 11/04/25   Page 63 of 83
**Jackson v. Wilcox, Not Reported in Fed. Supp. (2023)**
2023 WL 2756489

**All Citations**

Not Reported in Fed. Supp., 2023 WL 2756489

---

**End of Document**                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:25-cv-01174-AMN-TWD   Document 10   Filed 11/04/25   Page 64 of 83

Jackson v. Wilcox, Not Reported in Fed. Supp. (2023)

2023 WL 4230351

2023 WL 4230351
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Raymond L. JACKSON, Plaintiff,

v.

Lt. Col. Scott A. WILCOX, NYSP/State Trooper, Defendant.

1:23-CV-130 (MAD/CFH)
|
Signed June 28, 2023

**Attorneys and Law Firms**

RAYMOND L. JACKSON, 15-A-3740, Fishkill Correctional Facility, P.O. Box 1245, Beacon, New York 12508, Plaintiff, Pro Se.

**ORDER**

Mae A. D'Agostino, United States District Judge:

 **\*1**  On January 30, 2023, [1] Plaintiff Raymond L. Jackson ("Plaintiff") filed a complaint with a jury demand. *See* Dkt. No. 1. On February 16, 2023, and again on March 13, 2023, Plaintiff filed a motion to proceed *in forma pauperis* ("IFP"). *See* Dkt. Nos. 6, 9. On April 3, 2023, Magistrate Judge Christian F. Hummel issued a Report-Recommendation and Order granting Plaintiff's request to proceed IFP and recommending the complaint be dismissed without prejudice and without leave to amend. *See* Dkt. No. 12. On April 24, 2023, Plaintiff filed an untimely objection. *See* Dkt. No. 13; Dkt. No. 12 (instructing Plaintiff to file within seventeen days of the sending of the Report-Recommendation and Order).

[1]  On January 31, 2023, and February 27, 2023, Magistrate Judge Hummel entered orders directing administrative closure. *See* Dkt. Nos. 4, 8. The case was reopened on February 16, 2023, and most recently on March 13, 2023. *See* Dkt. Nos. 7, 11.

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)) (other citations omitted). The Second Circuit has held that the court is obligated to " 'make reasonable allowances to protect *pro se* litigants' " from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan*, 289 F. Supp. 2d at 295 (quoting *Taguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). However, as Plaintiff appears IFP, "the court shall dismiss the case at any time if the court determines ... the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B)(i)-(iii).

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a "de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). When a party declines to file objections to a magistrate judge's report-recommendation or files "[g]eneral or conclusory objections or objections which merely recite the same arguments [presented] to the magistrate judge," the district court reviews those recommendations for clear error. *O'Diah v. Mawhir*, No. 9:08-CV-322, 2011 WL 933846, at *1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted); *see also McAllan v. Von Essen*, 517 F. Supp. 2d 672, 679 (S.D.N.Y. 2007). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by

Case 3:25-cv-01174-AMN-TWD    Document 10    Filed 11/04/25    Page 65 of 83

Jackson v. Wilcox, Not Reported in Fed. Supp. (2023)

2023 WL 4230351

the magistrate judge." 28 U.S.C. § 636(b)(1). Plaintiff failed to file a timely objection. However, even reviewing the subjects of the objections *de novo*, the Court adopts Magistrate Judge Hummel's findings in their entirety.

First, Plaintiff argues that Magistrate Judge Hummel utilized the wrong portion of *Jeanty v. Utica Police Dep't* in its analysis, and that the Court should exercise supplemental jurisdiction over this complaint as "the argument ... arises out of the same controversy" of his pending *habeas corpus* petition. Dkt. No. 13 at 1; *see Jeanty v. Utica Police Dep't*, No. 6:20-CV-00221, 2021 WL 1055153, *4 (N.D.N.Y. Mar. 19, 2021). Magistrate Judge Hummel correctly quoted *Jeanty*'s finding "that federal district courts do not have jurisdiction to consider FOIL claims." *Jeanty*, 2021 WL 1055153, at *4. However, Plaintiff argues that Magistrate Judge Hummel utilized the wrong or inapplicable finding in *Jeanty* and should have instead applied the decision's section discussing supplemental jurisdiction. *See* Dkt. No. 13 at 1-2. The *Jeanty* court declined to exercise supplemental jurisdiction over the FOIL claims as the state claims and federal claims were unrelated. *Jeanty*, 2021 WL 1055153, at *4 (quoting *Sovereign Bank, N.A. v. Lee*, 968 F. Supp. 2d 515, 518 (E.D.N.Y. 2013)) ("While the supplemental jurisdiction statute allows a district court to exercise jurisdiction over claims that are 'so related' that they 'form part of the same case or controversy,' 28 U.S.C. § 1367, that statute cannot form the basis for removal"). Here, too, the state law claims for FOIL denials and the federal claim for habeas relief are not connected by a "common nucleus of operative fact." *See Jeanty*, 2021 WL 1055153, at *4 (quoting *Young v. New York City Transit Auth.*, 903 F.2d 146, 164 (2d Cir. 1990)). As such, the Court declines to exercise supplemental jurisdiction.

 **2** Next, Plaintiff seems to argue that Magistrate Judge Hummel incorrectly found that his Article 78 petition was time barred, as Plaintiff claims it is nonsensical that the lower court found the petition was time-barred but still reviewed it in the alternative on the merits. *See* Dkt. No. 13 at 2. However, this was a recitation of the background of the complaint, rather than a finding by Magistrate Judge Hummel. As such, this "objection" is not pertinent to the matter at hand. Magistrate Judge Hummel recommended the complaint be dismissed for lack of federal subject matter jurisdiction over § 1983 cases relating to FOIL claims and for failure to state equal protection or due process claims. *See* Dkt. No. 12 at 6. As such, this is not an objection that the Court need address.

Magistrate Judge Hummel correctly determined that the Court lacks subject matter jurisdiction over the complaint as federal courts do not have jurisdiction over claims related to FOIL request denials. *See McTerrell v. Koenigsmann*, No. 18-CV-1028, 2021 WL 1298488, *1 (W.D.N.Y. Apr. 7, 2021) (quoting *Jeanty*, 2021 WL 1055153, at *4); *see also Rios v. Mantellino*, No. 16-CV-726, 2016 WL 927181, *2 (E.D.N.Y. Mar. 4, 2016) ("FOIL claims which are not resolved by the state or city agency must be brought in the New York State Supreme Court pursuant to Article 78 of the New York Civil Practice Law and Rules").

Even if Plaintiff had a cognizable claim for the FOIL request, such claim would likely be barred by the statute of limitations. *See* Dkt. No. 12 at 10. For § 1983 actions, "courts apply the statute of limitations for personal injury actions under state law," *Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013), which is three years in New York State. *See Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002). Plaintiff filed his claim nearly four years after the alleged injury, *see* Dkt. No. 1 at 2, and thus the claim is time-barred. Plaintiff's Article 78 petitions did not toll the statute of limitations. *See Brown v. Bullis*, No. 9:11-CV-647, 2013 WL 1294488, at *3 (N.D.N.Y. Mar. 26, 2013) (citing *Abbas v. Dixon*, 480 F.3d 636, 641 (2d Cir. 1997)).

Magistrate Judge Hummel correctly found that there is no due process claim for the process of obtaining FOIL documents because Plaintiff lacks a property or liberty interest in the documents. *See Sharp v. Inc. Vill. of Farmingdale*, No. 16-CV-2994, 2017 WL 9485681, *14 (E.D.N.Y. Aug. 21, 2017) (quoting *Simpson v. Town of Southampton*, No. 06-CV-6743, 2007 WL 1755749, *4 (E.D.N.Y. June 15, 2007)). Further, an Article 78 proceeding for FOIL claims is adequate for due process purposes. *See Blount v. Brown*, No. 10-CV-01548, 2010 WL 1945858, at *2 (E.D.N.Y. May 11, 2010) ("[T]he procedures set forth under New York law are sufficient to protect any property interest that a person might have in the receipt of FOIL documents").

To the extent Plaintiff sought to allege an equal protection claim, Plaintiff failed to do so as Plaintiff did not plead that he, " 'compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race ... to punish or inhibit the exercise of constitutional

2023 WL 4230351

rights, or by a malicious or bad faith intent to injure the person[.]' " *Knighton v. City of Syracuse Fire Dep't,* 145 F. Supp. 2d 217, 222–23 (N.D.N.Y. 2001) (quoting *Laverpool v. New York City Transit Auth.,* 835 F. Supp. 1440, 1459 (E.D.N.Y. 1993) (quotation marks omitted)).

For *pro se* plaintiffs appearing IFP,

> [a]lthough the language of § 1915 is mandatory, stating that "the court shall dismiss the case" in the enumerated circumstances, we conclude that a *pro se* plaintiff who is proceeding *in forma pauperis* should be afforded the same opportunity as a *pro se* fee-paid plaintiff to amend his complaint prior to its dismissal for failure to state a claim, unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim.

 **\*3** *Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 796 (2d Cir. 1999). "[M]otions to amend should be granted freely in the interests of justice, [and] a *pro se* complaint generally should not be dismissed without granting the plaintiff leave to amend at least once." *Id.*; *see also Romano v. Lisson,* 711 Fed. Appx. 17, 19 (2d Cir. 2017). As Plaintiff cannot cure the Court's lack of subject matter jurisdiction, the complaint is dismissed without leave to amend.

After carefully reviewing the Report-Recommendation and Order, the entire record in this matter, and the applicable law, the Court hereby

**ORDERS** that the Report-Recommendation and Order (Dkt. No. 12) is **ADOPTED in its entirety**; and the Court further

**ORDERS** that Plaintiff's complaint (Dkt. No. 1) is **DISMISSED without leave to amend**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendant's favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2023 WL 4230351

---

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:25-cv-01174-AMN-TWD    Document 10    Filed 11/04/25    Page 67 of 83
Syfert v. City of Rome, Not Reported in Fed. Supp. (2020)
2020 WL 7053542

2020 WL 7053542
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Mark SYFERT, Plaintiff,

v.

CITY OF ROME, Defendant.

6:19-CV-0775 (GTS/ML)

|

Signed 12/02/2020

**Attorneys and Law Firms**

MARK SYFERT, Pro Se Plaintiff, 422 West Embargo Street #2, Rome, New York 13440.

OF COUNSEL: GERARD F. FEENEY, ESQ., OFFICE OF THE CORPORATION COUNSEL, Counsel for the Defendant, 198 North Washington Street, Rome City Hall, Rome, New York 13440.

<u>**DECISION and ORDER**</u>

MIROSLAV LOVRIC, United States Magistrate Judge

 **\*1**  Currently before the Court in this *pro se* civil rights action filed by Mark Syfert ("Plaintiff") against the City of Rome ("Defendant") are Plaintiff's (1) motion for appointment of counsel (Dkt. No. 24), (2) motion for joinder of parties (Dkt. No. 26), (3) motion to file a second amended complaint (Dkt. No. 27), (4) notice (Dkt. No. 28), and (5) jurisdiction motion or venue motion (Dkt. No. 29). For the reasons discussed below, Plaintiff's (1) motion for appointment of counsel (Dkt. No. 24) is denied without prejudice, (2) motion for joinder of parties (Dkt. No. 26) is stricken from the docket, (3) motion to file a second amended complaint (Dkt. No. 27) is denied without prejudice, (4) notice (Dkt. No. 28) is stricken from the docket, and (5) jurisdiction motion or venue motion (Dkt. No. 29) is stricken from the docket.

**I. MOTION FOR APPOINTMENT OF COUNSEL**

It is well-settled that there is no right to appointment of counsel in civil matters. *Burgos v. Hopkins*, 14 F.3d 787, 789 (2d Cir. 1994). Title 28 of United States Code Section 1915 specifically provides that a court may request an attorney to represent any person "unable to afford counsel." 28 U.S.C. § 1915(e)(1). Appointment of counsel must be done carefully in order to preserve the "precious commodity" of volunteer lawyers for those litigants who truly need a lawyer's assistance. *Cooper v. A. Sargenti, Inc.*, 877 F.2d 170, 172-73 (2d Cir. 1989). Courts cannot utilize a bright-line test in determining whether counsel should be appointed on behalf of an indigent party. *Hendricks v. Coughlin*, 114 F.3d 390, 392-93 (2d Cir. 1997). Instead, a number of factors must be carefully considered by the court in ruling upon such a motion:

> [The Court] should first determine whether the indigent's position seems likely to be of substance. If the claim meets this threshold requirement, the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross-examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the

Case 3:25-cv-01174-AMN-TWD    Document 10    Filed 11/04/25    Page 68 of 83

Syfert v. City of Rome, Not Reported in Fed. Supp. (2020)

2020 WL 7053542

legal issues and any special reason in th[e] case why appointment of counsel would be more likely to lead to a just determination.

*Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1341 (2d Cir. 1994) (quoting *Hodge v. Police Officers*, 802 F.2d 58, 61-62 (2d Cir. 1986)). This is not to say that all, or indeed any, of these factors are controlling in a particular case. Rather, each case must be decided on its own facts. *Velasquez v. O'Keefe*, 899 F. Supp. 972, 974 (N.D.N.Y. 1995) (McAvoy, C.J.) (citing *Hodge*, 802 F.2d at 61). The Court must consider the issue of appointment carefully because "every assignment of a volunteer lawyer to an undeserving client deprives society of a volunteer lawyer available for a deserving cause." *Cooper*, 877 F.2d at 172.

Plaintiff is a frequent litigator in this district (Dkt. No. 4 at 1-6) and has demonstrated that he is capable of presenting his case. *Terminate Control Corp.*,28 F.3d at 1341. This case does not involve complex legal issues and there is no indication that Plaintiff is unable to investigate the facts alleged. *Id.* Moreover, Plaintiff has not identified any special reason why the appointment of counsel at this stage would be more likely to lead to a just determination. *Id.* As a result, Plaintiff's motion for appointment of counsel (Dkt. No. 24) is denied without prejudice.


## II. MOTION FOR JOINDER OF PARTIES

**\*2**  Plaintiff's filed an "Application [for] Joinder of Parties." (Dkt. No. 26.) Plaintiff's motion lists the names of several individuals and states, *inter alia*, "The Calling to be a Plumber. Just like the calling to be a judge. A successful individual." (Dkt. No. 26, at 2 [emphasis in original].) It is unclear what relief, if any, Plaintiff is requesting and what the grounds are for that relief.

In addition, Plaintiff's motion does not comply with Local Rule 7.1(a), which requires that all motions include a memorandum of law, supporting affidavit, and proof of service on all the parties. Moreover, any motion for joinder "must attach an unsigned copy of the proposed amended pleading to [his] motion papers." N.D.N.Y. L.R. 7.1(a)(4). As a result, the Clerk of the Court is directed to strike Plaintiff's motion for joinder of parties (Dkt. No. 26), and it will not be considered by the Court.


## III. MOTION TO FILE A SECOND AMENDED COMPLAINT

A motion to amend is evaluated under Federal Rule of Civil Procedure 15(a), which provides that "[t]he court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2); *see also Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 339 (2d Cir. 2000). "[T]o the extent that [a plaintiff] raises a legitimate claim, the policy considerations that undergird the Federal Rules counsel in favor of affording litigants an opportunity to resolve their claims on the merits." *Fershtadt v. Verizon Commc'ns Inc.*, 262 F.R.D. 336, 338 (S.D.N.Y. 2009) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

District courts have broad discretion in ruling on a motion for leave to amend. *See, e.g., McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). A court may deny leave "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *McCarthy*, 482 F.3d at 200. "Mere delay," however, "is not, of itself, sufficient to justify denial of a Rule 15(a) motion." *Parker*, 204 F.3d at 339.

A movant seeking to amend a pleading "must attach an unsigned copy of the proposed amended pleading to [his] motion papers.... The motion must set forth specifically the proposed insertions and deletions of language and identify the amendments in the proposed pleading, either through the submission of a redline/strikeout version of the pleading sought to be amended or through other equivalent means." N.D.N.Y. L.R. 7.1(a)(4).

Plaintiff's "Application [for] Amendment of Pleading," much like his Complaint (Dkt. No. 1) and Amended Complaint (Dkt. No. 9) includes incomplete sentences that present a mélange of thoughts that are meandering and indecipherable. (Dkt. No. 27.) Moreover, Plaintiff's application does not include a redline/strikeout (or other equivalent) version of the pleading sought

Syfert v. City of Rome, Not Reported in Fed. Supp. (2020)

2020 WL 7053542

Case 3:25-cv-01174-AMN-TWD    Document 10    Filed 11/04/25    Page 69 of 83

to be amended, which identifies the amendments to the proposed pleading, as required by Local Rule 7.1(a)(4).[1] As a result, Plaintiff's motion to file a second amended complaint is denied without prejudice.

[1]     The Court notes that Plaintiff's application also purports to include his mandatory disclosures. (Dkt. No. 27 at 6-32.) Pursuant to Local Rule 26.2, "[p]arties shall not file ... disclosures ... unless the Court orders otherwise." The Court has not ordered otherwise, and Plaintiff's inclusion of these materials with his application is improper and in violation of Local Rule 26.2.

## IV. NOTICE

**\*3**  Plaintiff filed a document that was docketed as a "Notice." The Notice states "Defendant can not stop Plaintiff's F.O.I.L.s Eric Seelig is stopping them." (Dkt. No. 28 at 1.) As with Plaintiff's motion for joinder of parties (Dkt. No. 26), it is unclear what relief, if any, Plaintiff is requesting and what the grounds are for that relief. As a result, the Clerk of the Court is directed to strike Plaintiff's Notice (Dkt. No. 28), and it will not be considered by the Court.[2]

[2]     The Court notes that "New York law provides a remedy for the improper denial of a FOIL request. A person denied access to requested documents may appeal the denial to the 'head, chief executive or governing body" of the entity or agency in possession of the documents. N.Y. Pub. Off. Law § 89(4)(a). The person must then challenge the denial of the FOIL request on appeal by commencing a proceeding under Article 78 of the New York Civil Practice Law and Rules. N.Y. Pub. Off. Law § 89(4)(b)." *Blount v. Brown*, 10-CV-1548, 2010 WL 1945858, at \*2 (E.D.N.Y. May 11, 2010) (citing *Schuloff v. Fields*, 950 F. Supp. 66, 67-68 (E.D.N.Y. 1997) ("The appropriate vehicle for challenging denials of access guaranteed by the New York Freedom of Information law is a state court proceeding pursuant to N.Y. C.P.L.R. Article 78 upon exhaustion of administrative remedies.")).

## V. JURISDICTION MOTION OR VENUE MOTION

Plaintiff filed a document with the heading "Jurisdiction Motion or Venue Motions?" (Dkt. No. 29.) Plaintiff's submission appears to be requesting that the Court resolve the dispute that was referenced in Plaintiff's Complaint (Dkt. No. 1) regarding the building code violations at 422 West Embargo Street, Rome New York. (*Compare* Dkt. No. 29, *with Syfert v. City of Rome*, 19-CV-0775, 2019 WL 7602180, at \*4-6 (N.D.N.Y. Aug. 14, 2019) (Lovric, M.J.)). Those claims were dismissed with prejudice by Chief United States District Judge Glenn T. Suddaby on November 14, 2019, pursuant to 28 U.S.C. § 1915(e)(2)(B). (Dkt. No. 8.) Therefore, it is unclear what relief, if any, Plaintiff is requesting and what the grounds are for that relief.

In addition, Plaintiff's motion does not comply with Local Rule 7.1(a), which requires that all motions include a memorandum of law, supporting affidavit, and proof of service on all the parties.

As a result, the Clerk of the Court is directed to strike Plaintiff's Jurisdiction Motion or Venue Motion (Dkt. No. 29), and it will not be considered by the Court.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's motion for appointment of counsel (Dkt. No. 24) is **DENIED without prejudice**; and it is further

**ORDERED** that the Clerk of the Court shall **STRIKE** Plaintiff's motion for joinder of parties (Dkt. No. 26); and it is further

**ORDERED** that Plaintiff's motion to file a second amended complaint (Dkt. No. 27) is **DENIED without prejudice**; and it is further

**ORDERED** that the Clerk of the Court shall **STRIKE** Plaintiff's Notice (Dkt. No. 28); and it is further

2020 WL 7053542

**ORDERED** that the Clerk of the Court shall **STRIKE** Plaintiff's Jurisdiction Motion or Venue Motion (Dkt. No. 29); and it is further

**ORDERED** that the Clerk of the Court shall serve a copy of this Decision and Order on Plaintiff, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

**All Citations**

Not Reported in Fed. Supp., 2020 WL 7053542

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:25-cv-01174-AMN-TWD    Document 10    Filed 11/04/25    Page 71 of 83
Thomas v. Pingotti, Not Reported in Fed. Supp. (2017)

2017 WL 3913018

2017 WL 3913018
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

William D. THOMAS, Plaintiff,

v.

L. PINGOTTI; et al., Defendants.
William D. Thomas, Plaintiff,

v.

Polizzi; et al., Defendants.

9:17-CV-0300 (GTS/DEP)

|

9:17-CV-0377 (GTS/ATB)

|

Signed 09/06/2017

**Attorneys and Law Firms**

WILLIAM D. THOMAS, Plaintiff, pro se, 13-A-2123, Downstate Correctional Facility, Box F, Fishkill, NY 12524.

**DECISION and ORDER**

Hon. Glenn T. Suddaby, Chief U.S. District Judge

## I. INTRODUCTION

 **\*1**  The Clerk of the Court has sent to the Court for review two complaints filed pro se by plaintiff William D. Thomas in the above-captioned actions.[1] Plaintiff, who is confined at Downstate Correctional Facility, asserts claims arising out of his confinement at Shawangunk Correctional Facility ("Shawangunk C.F.") in 2016. Plaintiff has not paid the filing fee in either action, and seeks leave to proceed in forma pauperis ("IFP").

[1]     Since March 2017, plaintiff has filed five civil rights actions in this District.

## II. Duplicative Actions

A court reviewing a complaint pursuant to 28 U.S.C. § 1915(e)(2) and 28 U.S.C. § 1915A may properly consider whether the claims asserted by the plaintiff are duplicative of claims asserted in another action.[2] As the Second Circuit has recognized, "plaintiffs have no right to maintain two actions on the same subject in the same court, against the same defendant at the same time." *Curtis v. Citibank, N.A.*, 226 F.3d 133, 138-39 (2d Cir. 2000). The principles which guide courts addressing duplicative and repetitive claims rest on considerations of "(w)ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation." *Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.*, 342 U.S. 180, 183 (1952). The doctrine is also meant to protect parties from "the vexation of concurrent litigation over the same subject matter." *Adam v. Jacob*, 950 F.2d 89, 93 (2d Cir. 1991). Thus, "[c]ourts generally look to the identity of the parties, legal claims, factual allegations including temporal circumstances, and the relief sought to determine if the complaint is repetitive or malicious." *Hahn v. Tarnow*, No. 06-CV-12814, 2006 WL 2160934, at *3 (E.D. Mich. July 31, 2006).

Case 3:25-cv-01174-AMN-TWD    Document 10    Filed 11/04/25    Page 72 of 83

Thomas v. Pingotti, Not Reported in Fed. Supp. (2017)

2017 WL 3913018

2      The dismissal of an action as duplicative has been found on several occasions to fall within the ambit of the court's power to dismiss a complaint which is frivolous or malicious pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b). *See, e.g., Abreu v. Travers*, No. 9:15-CV-0540 (MAD/ATB), 2015 WL 10741194, at *4 (N.D.N.Y. Sept. 14, 2015) (citing cases), reconsideration denied, No. 9:15-CV-0540 (MAD/ATB), 2016 WL 1717204 (N.D.N.Y. Apr. 28, 2016); *see also Denton v. Hernandez*, 504 U.S. 25, 30 (1992) (recognizing Congress's concern that "a litigant whose filing fees and court costs are assumed by the public, unlike a paying litigant, lacks an economic incentive to refrain from filing frivolous, malicious, or repetitive lawsuits") (citation omitted).

In managing the litigation in its court, there are several approaches to the proper disposition of duplicative actions, including dismissal without prejudice, and consolidation. *Curtis*, 226 F.3d at 138. The district court has broad discretion in making this determination, and the exercise of its power is reviewed by the Court of Appeals for abuse of discretion. *Id.*; *see also Lopez v. Ferguson*, 361 Fed.Appx. 225, 226 (2d Cir. 2010) ("We review a district court's dismissal of claims as duplicative for abuse of discretion."); *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1284-85 (2d Cir. 1990) ("The trial court has broad discretion to determine whether consolidation is appropriate.").

**\*2**  The pleading submitted by plaintiff in *Thomas* I is styled as a "Complaint under [New York] Civil Service Law Section 75." *See* Dkt. No. 1 at 5.[3] While nominally directed towards Shawangunk C.F. Acting Supt. Pingotti, the pleading identifies sixteen additional corrections and medical staff as "respondents" and alleges numerous claims of misconduct by those individuals during plaintiff's confinement at Shawangunk C.F. in 2016. *Id.* at 5-9. Liberally construed, plaintiff claims that he has been subjected to adverse actions in retaliation for his having filed grievances and complaints (related primarily to his participation in the Sex Offender Treatment Program ("SOTP")), disciplined without due process, denied proper and adequate mental health care, and denied proper investigation of and redress for the misconduct complained of his grievances.

3      Section 75 provides for the availability of a hearing upon stated charges prior to dismissal of certain government employees in New York. *See Russell v. Hodges*, 470 F.2d 212, 215 (2d Cir. 1972). Civil Service Law Section 75 does not afford plaintiff any basis for relief in this action; in light of plaintiff's pro se status the Court has liberally construed the pleading as seeking redress pursuant to 42 U.S.C. § 1983 ("Section 1983").

In *Thomas* II, plaintiff submitted a twenty-five page complaint utilizing the form civil rights complaint available to litigants in the Northern District of New York. *See* Dkt. No. 1 ("Compl."). All seventeen of the defendants named in *Thomas* I are defendants in this complaint. *Id.* at 1-7. The complaint in *Thomas* II sets forth, with some additional factual support, the instances of misconduct complained of in *Thomas* I, as well as additional claims and three additional defendants. *Id.* at 9-23.[4] Plaintiff seeks an award of compensatory and punitive damages as well as declaratory and injunctive relief. *Id.* at 24-25.

4      The additional defendants are Shawangunk C.F. Supt. Lamanna, Shawangunk C.F. C.O. Cunningham, and Shawangunk C.F. C.O. North. *Thomas* II, Compl. at 2, 6-7.

Upon review of the two pleadings, the Court finds that there is considerable duplication and repetition of claims and defendants in these two actions, as to which common questions of law and fact exist. To the extent that these actions differ in any significant way, the differences arise only from the additional claims and defendants in *Thomas* II. The Court also finds that the pleading in *Thomas* II sets forth plaintiff's claims in a more comprehensive and well-organized manner than does the pleading in *Thomas* I which, as noted, purports to be a state court petition under Civil Service Law Section 75.

Based upon the foregoing, and in order to conserve judicial resources and avoid duplicative litigation, the Court hereby dismisses *Thomas* I without prejudice in favor of *Thomas* II.[5]

5      In light of the dismissal of *Thomas* I, plaintiff's IFP application in that case, *see* Dkt. No. 11, is denied as moot. Except as specifically noted, all further references in this Decision and Order to the docket shall be to *Thomas* II.

Thomas v. Pingotti, Not Reported in Fed. Supp. (2017)

2017 WL 3913018

## III. IFP STATUS

"28 U.S.C. § 1915 permits an indigent litigant to commence an action in a federal court without prepayment of the filing fee that would ordinarily be charged." *Cash v. Bernstein*, No. 09-CV-1922, 2010 WL 5185047, at *1 (S.D.N.Y. Oct. 26, 2010). [6] "Although an indigent, incarcerated individual need not prepay the filing fee at the time of filing, he must subsequently pay the fee, to the extent he is able to do so, through periodic withdrawals from his inmate accounts." *Id.* (citing 28 U.S.C. § 1915(b) and *Harris v. City of New York*, 607 F.3d 18, 21 (2d Cir. 2010)).

[6]  Section 1915(g) prohibits a prisoner from proceeding in forma pauperis where, absent a showing of "imminent danger of serious physical injury," a prisoner has filed three or more actions or appeals that were subsequently dismissed as frivolous, malicious, or failing to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915(g). The Court has reviewed plaintiff's litigation history on the Federal Judiciary's Public Access to Court Electronic Records ("PACER") Service. *See* http://pacer.uspci.uscourts.gov. Based upon that review, it does not appear that plaintiff has accumulated three "strikes" for purposes of 28 U.S.C. § 1915(g).

 **\*3**  Upon review, the Court finds that plaintiff has submitted a completed IFP application which has been certified by an appropriate official at his facility, *see* Dkt. No. 10, and which demonstrates economic need. *See* 28 U.S.C. § 1915(a)(2). Plaintiff has also filed the inmate authorization required in the Northern District. Dkt. No. 3.

Accordingly, plaintiff's application to proceed with this action IFP is granted.

## IV. SUFFICIENCY OF THE COMPLAINT

Having found that plaintiff meets the financial criteria for commencing this action in forma pauperis, and because plaintiff seeks relief from officers and employees of a governmental entity, the Court must consider the sufficiency of the allegations set forth in his complaint in light of 28 U.S.C. § 1915(e) and 28 U.S.C. § 1915A. Section 1915(e)(2)(B) directs that, when a plaintiff seeks to proceed in forma pauperis, "(2) ... the court shall dismiss the case at any time if the court determines that—... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). [7] Similarly, Section 1915A(b) directs that a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); *see also Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (stating that both Sections 1915 and 1915A are available to evaluate prisoner pro se complaints).

[7]  To determine whether an action is frivolous, a court must look to see whether the complaint "lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).

In reviewing a complaint, the Court has a duty to show liberality toward pro se litigants, *see Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam), and should exercise "extreme caution ... in ordering *sua sponte* dismissal of a *pro se* complaint *before* the adverse party has been served and both parties (but particularly the plaintiff) have had an opportunity to respond," *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983) (internal citations omitted). A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Although the court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Thus, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

Case 3:25-cv-01174-AMN-TWD    Document 10    Filed 11/04/25    Page 74 of 83
Thomas v. Pingotti, Not Reported in Fed. Supp. (2017)
2017 WL 3913018

**\*4** Plaintiff seeks relief in this action pursuant to Section 1983, which establishes a cause of action for " 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983); *see also Myers v. Wollowitz*, No. 95-CV-0272, 1995 WL 236245, at \*2 (N.D.N.Y. Apr. 10, 1995) (McAvoy, C.J.) (finding that Section 1983 "is the vehicle by which individuals may seek redress for alleged violations of their constitutional rights"). To be held liable for damages in a Section 1983 action, a defendant must have been personally involved in the alleged violation. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977). Thus, to set forth a cognizable claim under Section 1983, a "plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas*, No. 04-CV-7263, 2008 WL 857528, at \*2 (S.D.N.Y. Mar. 31, 2008) (quoting *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986)).

Plaintiff asserts numerous claims for the violation of his rights protected under the First, Eighth, and Fourteenth Amendments to the U.S. Constitution. The sufficiency of those claims, as set forth in the complaint in seven causes of action, is addressed below.

### A. First Cause of Action—Retaliation

To state a claim of retaliation under the First Amendment, a plaintiff must allege facts plausibly suggesting the following: (1) the speech or conduct at issue was "protected;" (2) the defendants took "adverse action" against the plaintiff—namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action—in other words, the protected conduct was a "substantial or motivating factor" in the defendant's decision to take action against the plaintiff. *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (citing *Dawes v. Walker*, 239 F.3d 489, 492 (2d. Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)).

The Second Circuit has long instructed that because virtually any adverse action taken against a prisoner by a prison official can be characterized as a constitutionally proscribed retaliatory act, courts must examine claims of retaliation with "skepticism and particular care." *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (quoting *Dawes*, 239 F.3d at 491). Analysis of retaliation claims thus requires thoughtful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the factual allegations tending to link the two. "[A] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone." *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983).

Here, plaintiff alleges that he was retaliated against "for filing grievances and voicing opinion. And filing the 42 U.S.C. 1983 lawsuit." Compl. at 10. [8] Plaintiff identifies the following instances in which defendants took allegedly adverse action against him: C.O. Bertone threatened plaintiff with physical harm if he "continue[d] to make complaints;" C.O. Cutler and C.O. Stefanik wrote false reports against plaintiff "due to plaintiff voicing his opinion, and views;" and C.O. Clayburn issued a false misbehavior report to plaintiff after learning that plaintiff had written several inmate grievances against "fellow employees." *Id.* at 12.

[8]    No other facts are alleged regarding the timing or subject matter of plaintiff's complaints and grievances.

It is well-settled that "verbal harassment, or even threats, are generally held not to rise to the level of adverse action that will support a First Amendment retaliation claim." *Rosales v. Kikendall*, 677 F. Supp.2d 643, 648 (W.D.N.Y. 2010) (citing *Cabassa v. Smith*, No. 08 Civ. 480 (LEK/DEP), 2009 WL 1212495, at \*7 (N.D.N.Y. Apr. 30, 2009)); *see Bartley v. Collins*, No. 95 Civ. 10161, 2006 WL 1289256, at \*6 (S.D.N.Y. May 10, 2006) ("[V]erbal threats such as 'we going to get you, you better drop the suit,' do not rise to the level of adverse action."); *Kemp v. LeClaire*, No. 03 Civ. 844, 2007 WL 776416, at \*15 (W.D.N.Y. Mar. 12, 2007) (threats such as "your day is coming," "you'll be sent to your mother in a black box," and "you'll get your black ass kicked" are indistinguishable from those that have been found insufficient to establish a constitutional violation).

Case 3:25-cv-01174-AMN-TWD    Document 10    Filed 11/04/25    Page 75 of 83
Thomas v. Pingotti, Not Reported in Fed. Supp. (2017)
2017 WL 3913018

**\*5**  Upon review, the Court finds that C.O. Bertone's statement that he would "make something happen" to plaintiff if he continued to make complaints, without more, does not suffice to state a cognizable First Amendment retaliation claim against this defendant.

Plaintiff does not enjoy a protected constitutional right "to be free from false and inaccurate information" in his prison records. The creation of a false report in a prisoner's file is not, on its own, a due process violation. *See Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) ("a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report"); *Hollman v. Bartlett*, No. 08-CV-1417, 2011 WL 4382191, at \*12 (E.D.N.Y. Aug. 26, 2011) (the placement of a false report in an inmate's file, without more, is not a due process violation). The only way that false accusations contained in a misbehavior report can rise to the level of a constitutional violation is when there has been more such as "retaliation against the prisoner for exercising a constitutional right." *Boddie*, 105 F.3d at 862.

Here, while plaintiff alleges that C.O. Cutler and C.O. Stefanik created false reports about plaintiff which were retaliatory in nature, plaintiff has not provided any facts regarding the type of records or reports that were created, the manner in which these records were falsified, or how such falsity harmed plaintiff. Upon review, the Court finds that plaintiff has not alleged facts sufficient to plausibly suggest that these defendants took actions against him which were sufficiently "adverse" for purposes of the First Amendment. As a result, plaintiff's claims against C.O. Cutler and C.O. Stefanik do not survive initial review and are dismissed without prejudice. *Sheehy v. Brown*, 335 Fed.Appx. 102, 104 (2d Cir. 2009) (summary order) (allegations that "are so vague as to fail to give the defendants adequate notice of the claims against them" are subject to dismissal.).

The Court also considered the sufficiency of plaintiff's claim that C.O. Clayburn issued a false misbehavior report in retaliation for grievances plaintiff had filed against other corrections officers. *See* Compl. at 12. [9] "Generally, alleged retaliation motivated by an action the prisoner took which did not personally involve the prison officials is insufficient for a retaliation claim." *Ortiz v. Russo*, No. 13 CIV. 5317, 2015 WL 1427247, at \*11 (S.D.N.Y. Mar. 27, 2015) (citing *Wright v. Goord*, 554 F.3d 255, 274 (2d Cir. 2009) (dismissing a pro se prisoner's claim that he was assaulted by the defendant in retaliation for an earlier letter he wrote which did not name or address defendant)); *see also Guillory v. Ellis*, No. 9:11-CV-0600 (MAD/ATB), 2014 WL 4365274, at \*18 (N.D.N.Y. Aug. 28, 2014) ("it is difficult to establish one defendant's retaliation for complaints against another defendant"); *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 369 (S.D.N.Y. 2011) (plaintiff "failed to provide any basis to believe that [defendant] retaliated for a grievance that she was not personally named in"). Here, because plaintiff has not alleged facts sufficient to plausibly suggest that grievances he wrote against other officers were a "substantial or motivating factor" in C.O. Clayburn's decision to issue the challenged misbehavior report, this claim does not survive initial review.

[9]      Plaintiff's claim is asserted in wholly conclusory terms; no facts are provided regarding the date(s) of these grievances, the officers against whom the grievances were filed, or the nature of plaintiff's complaints.

**\*6**  Based upon the foregoing, plaintiff's retaliation claims against C.O. Bertone, C.O. Cutler, C.O. Stefanik, and C.O. Clayburn set forth in the First Cause of Action are dismissed without prejudice for failure to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 19215A(b)(1).

### B. Second Cause of Action—Equal Protection

The Equal Protection Clause requires that the government treat all similarly situated people alike. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Specifically, the Equal Protection Clause "bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if 'such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.' " *Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005) (quoting *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980)). To state a viable Equal Protection claim, a plaintiff generally must allege "purposeful discrimination ... directed at an identifiable or suspect class." *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995). In the alternative, under a "class of one" theory, plaintiff must allege that he has been intentionally treated differently from others

Case 3:25-cv-01174-AMN-TWD    Document 10    Filed 11/04/25    Page 76 of 83
Thomas v. Pingotti, Not Reported in Fed. Supp. (2017)
2017 WL 3913018

similarly situated, with no rational basis for the difference in treatment. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *DeMuria v. Hawkes*, 328 F.3d 704, 706 (2d Cir. 2003).

Here, plaintiff states that he is an "African American Muslim," and claims that defendants treat him differently from the Caucasian inmates in the SOTP "without a [reason] of doing so." Compl. at 13. More specifically, plaintiff alleges that defendants Piliero-Kinderman, Bode-Cutler, and Snyder (identified as Caucasian female employees assigned to the SOTP), spoke disparagingly to him in an attempt to "dehumanize" him and "strip [him] of his self-esteem;" plaintiff contends that these remarks were racially motivated. *Id.* Plaintiff further claims that he was improperly disciplined by defendant Scaringi (identified as a "Caucasian female American"), who ignored substantial evidence of plaintiff's innocence and found him guilty due to her discriminatory motive. *Id.* at 13, 15 (Scaringi went "against her better judgment, due to the fact that plaintiff is a African American male in a sex-offender program. And Defendant is a Caucasian woman."). With respect to a disciplinary hearing conducted by defendant Polizzi (identified as a Caucasian American male), plaintiff claims that he was improperly found guilty without regard to the evidence "because [he] is an African-American Muslim." *Id.* at 15. [10] As against defendant Acting Supt. Pingotti, plaintiff complains that he improperly reviewed and approved misbehavior reports written against plaintiff by C.O. Cutler, C.O. Clayburn, and C.O. Figuero (not a defendant) and designated Polizzi to conduct the hearings, actions that Acting Supt. Pingotti would not have taken in the case of a "Caucasian prisoner who had a false misbehavior report written against him." *Id.* at 18. Plaintiff further alleges that Acting Supt. Pingotti improperly affirmed the disciplinary findings by defendant Polizzi. *Id.*

[10]    The hearing was convened to consider an inmate misbehavior report written by C.O. Clayburn. Compl. at 16.

**\*7** Plaintiff's complaint does not include any facts plausibly suggesting that similarly situated prisoners were treated differently than he was. Rather, plaintiff merely makes the conclusory assertion that inmates of other races, religions, and gender were treated differently by defendants (or would be treated differently if they found themselves in similar circumstances). Conclusory allegations of disparate treatment or a plaintiff's personal belief of discriminatory intent are patently insufficient to plead a valid claim under the Equal Protection clause. *Nash v. McGinnis*, 585 F. Supp. 2d 455, 462 (W.D.N.Y. 2008); *see also Coleman v. Rice*, No. 8:14-CV-1469 (MAD/CFH), 2015 WL 401194, at \*7 (N.D.N.Y. Jan. 28, 2015); *Hughes v. Butt*, No. 9:06-CV-1462 (TJM/GHL), 2009 WL 3122952, at \*12 (N.D.N.Y. Sept. 28, 2009).

As a result, plaintiff's Equal Protection claims set forth in the Second Cause of Action are dismissed without prejudice for failure to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1).

### C. Third Cause of Action—Free Exercise

"Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003). This includes the "right to participate in congregate religious services ... Confinement in keeplock does not deprive prisoners of this right." *Salahuddin v. Coughlin*, 993 F.2d 306, 308 (2d Cir. 1993) (internal citations omitted); *see also Ford*, 352 F.3d at 597 ("[A] prisoner's free exercise right to participate in religious services is not extinguished by his or her confinement in special housing or keeplock."). [11] However, an inmate's freedom of religion is not absolute, and must be balanced against "the interests of prison officials charged with complex duties arising from administration of the penal system." *Ford*, 352 F.3d at 588 (citation omitted). The analysis of a free exercise claim is governed by the framework set forth in *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987) and *Turner v. Safley*, 482 U.S. 78, 84 (1987). [12]

[11]    As the Second Circuit noted in *Ford*, DOCCS Directive 4202 "sets out prison officials' obligations in accommodating prisoners' religious practices." *Ford*, 352 F.3d at 586. Part X of Directive 4202 provides that "[u]pon commencement of keeplock or confinement status, an inmate may submit a written request to attend regularly scheduled congregate religious services;" such requests are to be directed to (and decided by) the Deputy Superintendent for Security.

Case 3:25-cv-01174-AMN-TWD    Document 10    Filed 11/04/25    Page 77 of 83
Thomas v. Pingotti, Not Reported in Fed. Supp. (2017)
2017 WL 3913018

12    This framework is one of reasonableness and is "less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *O'Lone*, 482 U.S. at 349. "It has not been decided in this Circuit whether, to state a claim under the First Amendment's Free Exercise Clause, a 'prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs.' " *Holland v. Goord*, 758 F.3d 215, 220 (2d Cir. 2014) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 274-75 (2d Cir. 2006)). At this early stage of the action, this Court applies the traditional formulation that, to prevail on a First Amendment claim, an inmate must show that he has a sincerely held religious belief, that it was substantially burdened, and that defendants' conduct was not reasonably related to some legitimate penological interest. *See Holland*, 758 F.3d at 221; *Salahuddin*, 467 F.3d at 274-75.

As alleged in the complaint, defendants Piliero-Kinderman, Bode-Cutler, and Snyder deliberately undertook to deny plaintiff the ability to practice his religion "when they went out of their way to discretely get plaintiff remove[d] from sex-offender treatment program by having false misbehavior reports written on plaintiff." Compl. at 19. [13]  Plaintiff also contends that defendant Lt. Gardner made disparaging remarks about plaintiff's religion during the disciplinary hearing he conducted to address these reports. *Id.* At the conclusion of the hearing, Lt. Gardner found plaintiff guilty of misbehavior and sanctioned him with thirty (30) days of keeplock confinement. *Id.* During plaintiff's period of "restrictive confinement," Acting Deputy Supt. of Security ("Acting DSS") Bertone ignored plaintiff's written requests to attend Jum'mah services, and "to attend to break of Ramadan prayer and festival" with his "fellow Muslim[s]." *Id.* at 20-21. [14]  Plaintiff identifies these observances as "religious tenets" of his faith. *Id.* at 20.

13    As noted, plaintiff states that he is an "African American Muslim." Compl. at 13.

14    Plaintiff does not contend that he was prohibited or prevented from praying or otherwise practicing his religion in his cell during the period of keeplock confinement.

  **\*8**  Upon review, and with due regard for plaintiff's status as a pro se litigant, the Court finds that a response to plaintiff's claim that he was denied free exercise of his religion is required from Acting DSS Bertone. This is not a ruling on the merits and the Court expresses no opinion as to whether this claim can withstand a properly filed dispositive motion.

The Court reaches a different conclusion, however, with respect to the sufficiency of plaintiff's claims against defendants Piliero-Kinderman, Bode-Cutler, Snyder, and Gardner. As to these defendants, because plaintiff has not alleged facts which plausibly suggest that they were personally involved in the determinations made regarding plaintiff's ability to participate in congregate religious services during his period of keeplock confinement, his First Amendment free exercise claims against them set forth in the Third Cause of Action do not survive the Court's initial review and are dismissed without prejudice for failure to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1).


    **D. Fourth Cause of Action—Privacy and Failure to Address Grievances**

The Supreme Court has recognized that the right to privacy protects against disclosure of personal matters, such as one's medical conditions. *Whalen v. Roe*, 429 U.S. 589, 598-600 (1977); *Doe v. City of N.Y.*, 15 F.3d 264, 267 (2d Cir. 1994). "The privacy interest is at its zenith when the prisoner suffers from an 'unusual' condition, such as HIV or transsexualism, that is 'likely to provoke an intense desire to preserve one's medical confidentiality, as well as hostility and intolerance from others.' " *Shuler v. Brown*, No. 07-CV-0937 (TJM/GHL), 2009 WL 790973, at \* 5 (N.D.N.Y. Mar. 23, 2009) (quoting *Powell v. Schriver*, 175 F.3d 107, 111 (2d Cir. 1999)). However, courts have held that the right of confidentiality does not prohibit the disclosure of an individual's criminal history, including arrest records. *See Paul v. Davis*, 424 U.S. 693, 713 (1976) (finding no constitutional right of confidentiality affected by the publication of the fact that an individual was arrested of shoplifting); *Doe v. Cuomo*, 755 F.3d 105, 114 (2d Cir. 2014) (rejecting claim that reporting and notification requirements of New York's Sex Offender Reporting Act violate plaintiff's right to privacy of personal information); *Cline v. Rogers*, 87 F.3d 176, 179 (6th Cir. 1996) (holding that "there is no constitutional right to privacy in one's criminal record" because "arrest and conviction information are matters of public record").

Case 3:25-cv-01174-AMN-TWD    Document 10    Filed 11/04/25    Page 78 of 83
Thomas v. Pingotti, Not Reported in Fed. Supp. (2017)

2017 WL 3913018

Here, plaintiff alleges that defendant C.O. Cunningham improperly told other inmates in the SHU that plaintiff "is a rapist in the sex-offender program." Compl. at 21. According to plaintiff, C.O. Cunningham intended to "encourage" other inmates to antagonize plaintiff "to see if they could get him to hang himself." *Id.*

Because the constitutional right to privacy does not protect the type of information allegedly disclosed by C.O. Cunningham, this claim does not survive initial review. [15]

[15]     In light of plaintiff's pro se status, the Court also considered whether plaintiff has plausibly alleged that C.O. Cunningham intentionally exposed plaintiff to "a substantial risk to his safety" in violation of his Eighth Amendment rights when he made comments to other inmates about plaintiff's criminal history, and concludes that he has not. Plaintiff may pursue such a claim in a properly filed amended complaint.

**\*9**  The Fourth Cause of Action also includes claims against Deputy Supt. Taylor-Stewart and Supt. Lamanna which arise, if at all, from their alleged failure to properly investigate and address plaintiff's complaints and grievances. Compl. at 22. As alleged, Deputy Supt. Taylor-Stewart ignored plaintiff's constant complaints about defendants Piliero-Kinderman, Bode-Cutler, and Snyder. *Id.* Plaintiff also alleges that Supt. Lamanna ignored plaintiff's complaints and improperly denied his grievance. *Id.*

Despite the fact that New York prison inmates are required to exhaust administrative remedies prior to commencing an action complaining of prison conditions, and resort to that grievance process is regarded as protected activity under the First Amendment which insulates inmates against retaliation for engaging in such activity, *see Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996), there is no constitutional right of access to the established inmate grievance program. *Pine v. Seally*, No. 9:09-CV-1198 (DNH/ATB), 2011 WL 856426, at \*9 (N.D.N.Y. Feb. 4, 2011) ("the law is ... clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials") (citing *Bernstein v. New York*, 591 F. Supp. 2d 448, 460 (S.D.N.Y. 2008) (collecting cases)); *see also Shell v. Brzezniak*, 365 F. Supp. 2d 362, 369-70 (W.D.N.Y. 2005) ("[i]nmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim").

Based upon the foregoing, plaintiff's allegations that his complaints and grievances were not properly processed, investigated, and responded to does not give rise to cognizable claims for the violation of his Fourteenth Amendment due process rights. As a result, these claims against Deputy Supt. Taylor-Stewart and Supt. Lamanna set forth in the Fourth Cause of Action are dismissed without prejudice for failure to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 19215A(b)(1).

### E. Fifth Cause of Action—Unlawful SHU Confinement

Although it is clear that the Constitution "does not mandate comfortable prisons," it does not permit inhumane treatment of those in custody. *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001) (citing *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) and *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981)). "To demonstrate that the conditions of his confinement constitute cruel and unusual punishment a plaintiff must show that (1) he was incarcerated under conditions which posed a substantial risk of serious harm, and (2) prison officials acted with deliberate indifference to his health or safety. *See Farmer,* 511 U.S. at 834; *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir. 1994)." "Only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson v. Seiter*, 501 U.S. 294, 298–99 (1991).

In his Fifth Cause of Action, plaintiff claims that he was "unlawfully confined in the SHU" due to the actions of defendants Piliero-Kinderman, Bode-Cutler, Snyder, Cutler, Stefanik, Clayburn, Cunningham, Gardner, Taylor-Stewart, Pingotti, Scaringi, Polizzi, Denniston, North, and Koba. Compl. at 22. No other facts are alleged.

Generally speaking, the "normal" or "ordinary" restraints imposed on inmates confined in SHU are not unconstitutional. *See Sostre v. McGinnis*, 442 F.2d 178, 192 (2d Cir. 1971) (en banc) ("It is undisputed on this appeal that segregated confinement does

Case 3:25-cv-01174-AMN-TWD    Document 10    Filed 11/04/25    Page 79 of 83
Thomas v. Pingotti, Not Reported in Fed. Supp. (2017)
2017 WL 3913018

not itself violate the Constitution."). [16] Moreover, such confinement is not "abnormal" unless it is "totally without penological justification, grossly disproportionate, or involve[s] the unnecessary and wanton infliction of pain." *Smith v. Coughlin*, 748 F.2d 783, 787 (2d Cir. 1984) (internal quotation marks and citations omitted). In limited circumstances, the length of the disciplinary detention may itself constitute disproportionate punishment in light of the gravity of the offense. *See Sostre v. McGinnis*, 442 F.2d 178, 190–94 & n.28 (2d Cir. 1971) (length of disciplinary detention [12 months] did not constitute disproportionate punishment considering the gravity of the offense); *Peoples v. Fischer*, No. 11-2694, 2012 WL 1575302, at *9 (S.D.N.Y. May 3, 2012) (denying motion to dismiss claim that disciplinary sentence of thirty-six months SHU confinement for a non-violent rule infraction constituted cruel and unusual punishment), *motion for reconsideration granted in part and denied in part on other grounds*, 898 F. Supp.2d 618, 626 (S.D.N.Y. 2012).

[16]     "Under the 'normal conditions of SHU confinement in New York [state prison],' the prisoner is: placed in a solitary confinement cell, kept in his cell for 23 hours a day, permitted to exercise in the prison yard for one hour a day, limited to two showers a week, and denied various privileges available to general population prisoners, such as the opportunity to work and obtain out-of-cell schooling. Visitors [are] permitted, but the frequency and duration [is] less than in general population. The number of books allowed in the cell [is] also limited." *Palmer v. Richards*, 364 F.3d 60, 66 n.3 (2d Cir. 2004) (citation omitted).

**\*10**   Significantly, plaintiff does not allege that the conditions of his SHU confinement were unduly harsh or in any way "abnormal" or "unusual." Plaintiff has also not disclosed the duration of his confinement. Moreover, plaintiff has failed to allege facts in support of his claim that these fifteen defendants were personally involved in creating the conditions of his SHU confinement that he seeks to complain of.

As a result, the unlawful confinement claim set forth in the Fifth Cause of Action is dismissed without prejudice for failure to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1).

### F. Sixth Cause of Action—Due Process
In the Sixth Cause of Action, plaintiff sets forth claims against defendants North, Hines, Pearson, and Koba which, liberally construed, assert violations of plaintiff's due process rights. *See* Compl. at 22-23.

As against defendant C.O. North, plaintiff alleges that he tampered with hearing tapes that plaintiff requested, and improperly "coached" Scaringi to find plaintiff guilty at a Tier III hearing held in November 2015. Compl. at 22.

To successfully state a claim under Section 1983 for denial of due process arising out of a disciplinary hearing, a plaintiff must show that he or she both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *See Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004); *Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir. 1996). "Prison discipline implicates a liberty interest when it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004) (citing *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). While not the only factor to be considered, the duration of a disciplinary confinement remains significant under *Sandin.  Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000). [17] Thus, while under certain circumstances confinement of less than 101 days could be shown to meet the atypicality standard under *Sandin* (*see Colon*, 215 F.3d at 232 n.5), the Second Circuit generally takes the position that confinement in a SHU, without unusual conditions, for a period of up to 101 days will generally not constitute an atypical hardship, while confinement for a period of more than 305 days has been held to be atypical even if under "normal conditions." *Ortiz*, 380 F.3d at 654; *Colon*, 215 F.3d at 231.

[17]     For example, segregation for a period of thirty days was found by the Supreme Court in *Sandin* not to impose a significant hardship on an inmate. *Sandin*, 515 U.S. at 485-86. In explaining its reasoning, the Court found that the disciplinary confinement failed to present "a dramatic departure from the basic conditions" of an inmate's normal sentence. *Id.*

Thomas v. Pingotti, Not Reported in Fed. Supp. (2017)

2017 WL 3913018

Here, insofar as plaintiff alleges that C.O. North engaged in conduct which resulted in his being denied due process at his disciplinary hearing, this claim does not survive initial review. Even assuming that plaintiff enjoyed a protected liberty interest in the disciplinary hearing conducted by Scaringi (and the Court makes no such finding), there is no basis in the complaint upon which the Court could conclude that C.O. North was personally involved in that wrongdoing for purposes of personal liability under Section 1983.

**\*11** Plaintiff alleges that defendant Hines improperly denied plaintiff's request for documents under the New York Freedom of Information Law ("FOIL"). Compl. at 23. [18] While the exact contours of plaintiff's claim are far from clear, to the extent that he claims that the denial of his FOIL request violated his constitutional rights, that claim is not cognizable in this Section 1983 action. *See Ladeairous v. Attorney Gen. of N.Y.*, 592 Fed.Appx. 47, 48 (2d Cir.), cert. denied sub nom. *Ladeairous v. Schneiderman*, 136 S. Ct. 220 (2015), reh'g denied, 136 S. Ct. 579 (2015) (" '[n]either the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control.' ") (quoting *Houchins v. KQED, Inc.*, 438 U.S. 1, 15 (1978)).

[18]    As alleged, plaintiff's request was denied on the ground that it was not timely. Compl. at 23.

As alleged in the complaint, defendant C.O. Pearson confiscated legal materials and grievance records from plaintiff's cell. Compl. at 23. Following this incident, plaintiff "started to have problems obtaining legal research and materials." *Id.*

The Supreme Court has held that even "an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful post-deprivation remedy for the loss is available." *Hudson v. Palmer*, 468 U.S. 517, 533 (1984). The Second Circuit has recognized that New York provides, "an adequate post deprivation remedy in the form of, inter alia, a Court of Claims action." *Jackson v. Burke*, 256 F.3d 93, 96 (2d Cir. 2001) (citing *Love v. Coughlin*, 714 F.2d 207, 208-09 (2d Cir. 1983)). [19] As a result, plaintiff's claims against C.O. Pearson arising from the confiscation of his legal papers are not cognizable in this action.

[19]    The confiscation of an inmate's legal papers related to a legitimate, non-frivolous legal proceeding can give rise to a claim under the First Amendment for interference with access to the courts, provided that the inmate can establish that he or she has suffered prejudice as a result of the actions of corrections officials in the pursuit of his or her legal claims. *See Pacheco v. Pataki*, No. 9:07-CV-850 (FJS/GHL), 2010 WL 3635673, at \*3 (N.D.N.Y. Sept. 9, 2010) ("A prisoner has a constitutional right of access to the courts, which is infringed when prison officials actively interfere with a prisoner's preparation of legal documents.... [f]or the claim of denial of access to the courts to be successful, a plaintiff must allege an actual injury."). Here, because plaintiff does not claim and there are no facts alleged in the complaint which even suggest, that the problems he experienced with the law library resulted in "actual injury," the complaint does not state a cognizable access to the courts claim.

In his complaint, plaintiff alleges that defendant Koba, identified as the Grievance Supervisor, falsely reported that plaintiff never filed any grievances, and "prevented plaintiff from exhausting his grievances against fellow employees." Compl. at 23. In addition, plaintiff alleges that Koba provided false testimony at plaintiff's disciplinary hearing "to make plaintiff look like a gang member." *Id.*

Upon review, the Court finds that plaintiff's claims against defendant Koba do not survive initial review. As discussed above in Part III(D), an inmate does not enjoy a protected due process interest in accessing the inmate grievance system. As a result, plaintiff's claim that defendant Koba did not properly perform his duties as "Grievance Supervisor" at Shawangunk C.F. is not cognizable in this Section 1983 action. In addition, it is well-settled that "provision of false testimony against an inmate by corrections officers is insufficient on its own to establish a denial of due process." *Mitchell v. Senkowski*, 158 Fed.Appx. 346, 349 (2d Cir. 2005) (summary order) (citing *Boddie*, 105 F.3d at 862). Thus, the mere allegation that a defendant has given false testimony at a disciplinary hearing fails to support a section 1983 claim for damages against the witness providing such

Thomas v. Pingotti, Not Reported in Fed. Supp. (2017)

2017 WL 3913018

testimony. *Green v. Greene*, No. 9:07–CV–0351 (GTS/DEP), 2009 WL 5874308, at *23 (N.D.N.Y. Mar. 30, 2009); *see also Cole v. Fischer*, No. 07 Civ. 11096, 2009 WL 130186, at *3 (S.D.N.Y. Jan. 15, 2009).

**\*12**  Based upon the foregoing, plaintiff's claims against defendants North, Hines, Pearson, and Koba set forth in the Sixth Cause of Action are dismissed without prejudice for failure to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1).

### G. Seventh Cause of Action—Inadequate Medical Care

There are two elements to a claim that officials violated a plaintiff's Eighth Amendment right to receive adequate medical care: "the plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009) (citation and punctuation omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003). [20]

[20]    "An official acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1970)).

In his complaint, plaintiff claims that Dr. Parks acted with deliberate indifference to plaintiff's "health and safety when he deny plaintiff proper and helpful medications." Compl. at 23. Plaintiff does not set forth any facts regarding the nature and extent of his medical and/or mental conditions, his efforts to obtain evaluation and treatment, or the basis for his belief that the treatment provided was not "proper and helpful."

Upon review, the Court concludes that the facts alleged in the complaint do not plausibly suggest that Dr. Parks acted with deliberate indifference, was reckless in his treatment of plaintiff, or provided him with treatment that was "inadequate" in a constitutional sense. It is well-settled that an inmate who disagrees with the physician over the appropriate course of treatment has no claim under Section 1983 if the treatment provided is "adequate." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998). The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " *Jones v. Westchester County Dept. of Corrections*, 557 F. Supp. 2d 408, 413 (S.D.N.Y. 2008). "[D]isagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001).

As a result, plaintiff's medical indifference claim set forth in the Seventh Cause of Action does not survive initial review and is dismissed without prejudice for failure to state a claim. *See* 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1).

## V. CONCLUSION

**\*13  WHEREFORE**, it is hereby

**ORDERED** that upon review of the pleadings filed in *Thomas* I and *Thomas* II, the Court finds that there is considerable duplication and repetition of claims and defendants in these two actions, as to which common questions of law and fact exist; because the pleading in *Thomas* II is more complete and because plaintiff has asserted additional claims and named additional defendants in that action, *Thomas* I is hereby **DISMISSED without prejudice** in favor of *Thomas* II; and it is further

**ORDERED** that plaintiff's IFP application in *Thomas* I (Dkt. No. 11) is **DENIED as moot**; and it is further

Case 3:25-cv-01174-AMN-TWD    Document 10    Filed 11/04/25    Page 82 of 83
Thomas v. Pingotti, Not Reported in Fed. Supp. (2017)
2017 WL 3913018

**ORDERED** that plaintiff's IFP application in *Thomas* II (Dkt. No. 10) is **GRANTED**;[21] and it is further

21    Although his in forma pauperis application has been granted, plaintiff will still be required to pay fees that he may incur in this action, including copying and/or witness fees.

**ORDERED** that the Clerk provide the superintendent of the facility, designated by plaintiff as his current location, with a copy of plaintiff's inmate authorization (Dkt. No. 3), and notify the official that this action has been filed and that plaintiff is required to pay to the Northern District of New York the entire statutory filing fee of $350 in installments, over time, pursuant to 28 U.S.C. § 1915; and it is further

**ORDERED** that the Clerk provide a copy of plaintiff's inmate authorization (Dkt. No. 3) to the Financial Deputy of the Clerk's Office; and it is further

**ORDERED** that plaintiff's claim that he was denied free exercise of his religion by Acting DSS Bertone set forth in the Third Cause of Action survives initial review and requires a response from this defendant; and it is further

**ORDERED** that plaintiff's remaining claims are **DISMISSED without prejudice** in accordance with 28 U.S.C. § 1915(e)(2)(ii) and 28 U.S.C. § 1915A(b)(1);[22] and it is further

22    Should plaintiff seek to pursue any of the claims dismissed without prejudice, he must file an amended complaint. Any amended complaint, which shall supersede and replace the original complaint in its entirety, must be a complete pleading and must allege claims of misconduct or wrongdoing against each named defendant which plaintiff has a legal right to pursue, and over which this Court may properly exercise jurisdiction. Any amended complaint filed by plaintiff must also comply with the pleading requirements of Rules 8 and 10 of the Federal Rules of Civil Procedure.

**ORDERED** that the Clerk shall terminate Polizzi, Pingotti, Lamanna, Taylor-Stewart, Parks, Piliero-Kinderman, Denniston, Koba, Bode-Cutler, Snyder, Pearson, Gardner, Hines, Cunningham, Clayburn, Scaringi, Cutler, Stefanik, and North as defendants in this action; and it is further

**ORDERED** that upon receipt from plaintiff of the documents required for service of process, the Clerk shall issue a summons and forward it, along with a copy of the complaint, to the United States Marshal for service on defendant Bertone. The Clerk shall forward a copy of the summons and complaint to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

 **\*14**  **ORDERED** that a response to plaintiff's complaint be filed by defendant Bertone or his counsel as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action must bear the case number (No. 9:17-CV-0377), and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **<u>Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel, in writing, of any change in his address; his failure to do so will result in the dismissal of this action</u>**; and it is further

**ORDERED** that the Clerk of the Court serve a copy of this Decision and Order on plaintiff.


**IT IS SO ORDERED.**

**Thomas v. Pingotti, Not Reported in Fed. Supp. (2017)**

2017 WL 3913018

**All Citations**

Not Reported in Fed. Supp., 2017 WL 3913018

---

**End of Document**                                         © 2025 Thomson Reuters. No claim to original U.S. Government Works.